**James W. Hunt – SBN 122582**
james.hunt@fitzhunt.com
**Christopher S. Hickey – SBN 198938**
christopher.hickey@fitzhunt.com
**FITZPATRICK & HUNT,**
**PAGANO, AUBERT, LLP**
633 West Fifth Street, 60th Floor
Los Angeles, CA 90071
Tel.: (213) 873-2100 / Fax: (213) 873-2125

Attorneys for Defendants
**SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.;** and **UNITED TECHNOLOGIES CORPORATION**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| D.F., a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and T.L., a minor, by and through her Guardian Ad Litem, TASHINA AMADOR,<br><br>Plaintiffs,<br>vs.<br><br>SIKORSKY AIRCRAFT CORPORATION; et al.,<br><br>Defendants. | Case No. 13-cv-00331-GPC-KSC<br><br>Judge: Hon. Gonzalo P. Curiel<br>Magistrate: Hon. Karen S. Crawford<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SIKORSKY'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS**<br><br>*Filed Concurrently with Notice of Motion and Motion; Proposed Order*<br><br>Date: August 11, 2017<br>Time: 1:30 p.m.<br>Courtroom: 2D<br>Judge: Hon. Gonzalo P. Curiel |

///
///
///

# Table of Contents

**Page**

I. INTRODUCTION .......... 1

II. RELEVANT LAW .......... 3

A. Federal Rules of Civil Procedure: .......... 3

B. Federal Rules of Evidence: .......... 3

III. ARTHUR “LEE” COFFMAN: .......... 4

A. Mr. Coffman did not comply with the requirements of Rule 26: .......... 4

B. Mr. Coffman’s opinions are unreliable and must be excluded under FRE 702 and *Daubert:* .......... 7

1. Causation Theory: .......... 7

2. Compliance with military specification Mil-W-5088F. .......... 9

IV. JOHN BLOOMFIELD .......... 11

A. Mr. Bloomfield’s causation opinion is speculative and unreliable and must be excluded under FRE 702 and Daubert. .......... 11

B. Mr. Bloomfield’s related opinions regarding design changes to the Electric Wiring Interconnect System are also unreliable and must be excluded under FRE 702 and Daubert. .......... 15

VI. CONCLUSION .......... 20

# Table of Authorities

**Page**

**Cases**

*Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828 (9th Cir. 2011) .......... 8, 12
*Bunker v. Ford Motor Co.*, 640 Fed.Appx. 661 (9th Cir. 2016) .......... 8, 12
*Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579 (1993)* .......... passim
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) .......... 4
*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......... 4
*Jarritos, Inc. v. Reyes*, 345 Fed. Appx. 215 (9th Cir. 2009) .......... 6
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......... 4
*Macias v. Perez*, Case No. 10-cv-973, 2011 WL 2669475 .......... 5
*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) .......... 4
*Saler, et al. v. Honeywell International*, Inc., CV-07-00488, USDC, AZ) .......... 7
*Samuels v. Holland American Line-USA Inc.*, 656 F.3d 948 (9th Cir. 2011) .......... 10, 12
*Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052 (9th Cir. 2005) .......... 6
*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) .......... 5

**Rules**

Federal Rule of Civil Procedure 26(a)(2) .......... 2, 3, 4, 6
Federal Rule of Civil Procedure 26(a)(2)(D) .......... 2, 5
Federal Rule of Civil Procedure 37(c) .......... 2, 3, 5, 20
Federal Rule of Evidence 702 .......... passim
Rule 37(c) .......... 5

**Regulations**

10 USC § 113 Authority of the Secretary of Defense .......... 19
10 USC § 3013 (U.S. Army) .......... 19
10 USC § 5042 (U.S. Marine Corps) .......... 19

10 USC §5013 (U.S. Navy) ........ 19
10 USC §8013 (U.S. Air Force) ........ 19

**Other Authorities**

DOD Airworthiness Policy, DoDD 5030.6 1, Enclosure 3, Section I b( 1,2), May 30, 2013 ........ 19
Joint Unmanned Aircraft Systems Minimum Training Standards, issued by the Chairman of the Joint Chiefs of Staff. CJCSI 3255.0 I Ch I, dated October 31, 2011 ........ 19

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case involves the death of a United States Marine Corps ("USMC") Airframe Collateral Duty Quality Assurance Representative ("CDQAR")—a landing gear expert trained and qualified by USMC personnel to USMC standards—after he forcibly removed a properly functioning landing gear safety pin from a CH-53E helicopter owned, operated, inspected, and maintained by the USMC since 1990. The landing gear safety pin is the last of five interlocks in the landing gear system and serves as a mechanical barrier to retraction if the landing gear is inadvertently energized. The landing gear is physically incapable of retraction with the landing gear safety pin installed.

The Navy's investigation concluded the utility hydraulic module ("UM"), which operates to extend and retract the landing gear, had been unintentionally energized to command retraction of the landing gear due to an errant transfer of current between two deteriorated, bare electrical wires. This caused the landing gear to continuously attempt retraction, which—by design—caused the landing gear safety pin to become pinched. The investigation was unable to identify the wire that energized the landing gear control wire and the ability to do so is now lost because the landing gear control wire ("subject wire") was removed from the helicopter during the investigation.

The subject wire is routed from the cockpit landing gear control panel to the "up valve" on the UM. It consists of 367 inches of Kapton-insulated wiring ("Kapton wiring") and 70 inches of Spec 55-insulated wire ("Spec-55 wiring"). Kapton is an aromatic polyimide film developed by DuPont with a known propensity to degrade and deteriorate when exposed to moisture. At the time of the helicopter's manufacture, the use of Kapton-insulated wiring was required by the Navy. Post-accident inspection revealed degradation and wear in the insulation surrounding both the Kapton wiring and Spec-55 wiring.

Plaintiffs have designated Mr. Coffman as a retained expert on wiring. Mr. Coffman submitted a three-page report pursuant to Federal Rule of Civil Procedure 26(a)(2) (Ex. A to Hickey Decl., "Coffman report"), in which he disclosed only the "main categories of my opinions" and stated "there are related opinions and sub-opinions which opposing counsel will be able to obtain during my deposition." (Coffman report at 4.) Because Mr. Coffman did not comply with Rule 26 requiring that an expert provide "a complete statement of all opinions" in their written report, Plaintiffs should be precluded from using or relying upon any opinions of Mr. Coffman at trial or, in the alternative, his testimony should be limited to just the information disclosed. *See* Fed. R. Civ. P. 26(a)(2)(D); Fed. R. Civ. P. 37(c).[1] Sikorsky further requests that this Court exclude Mr. Coffman's opinions and testimony at trial as unreliable under FRE 702 and *Daubert*. Mr. Coffman has no stated experience with the CH-53E or other military helicopter, nor does he claim to have any training or expertise regarding electrical/hydraulic wiring systems. In fact, he has testified in the past that he is solely and engine expert. Furthermore, Mr. Coffman has failed to engage in the type of reliable, scientific analysis required of admissible expert testimony, as he has not explained how he arrived at his conclusions.

Plaintiffs also designated John Bloomfield as an electrical systems expert. However, Mr. Bloomfield has no training or experience designing landing gear wiring systems for aircraft, nor does he have experience designing any type of electrical system for military aircraft. Not only does he lack the requisite qualifications to opine about the landing gear wiring system at issue in this case, but his opinions regarding the cause of the accident and proposed design changes to the electrical system lack any evidentiary foundation, are purely hypothetical and will do nothing to help the jury understand the facts at issue in this case. Consequently,

---

[1] Mr. Coffman did not file a supplemental report.

Sikorsky further moves to exclude Mr. Bloomfield's opinions and testimony at trial as unreliable under FRE 702 and *Daubert*.

## II. RELEVANT LAW

### A. Federal Rules of Civil Procedure:

Rule 26(a) of the Federal Rules of Civil Procedure provides as follows:

> (B) Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;

Rule 26(a)(2)(B)(i-ii). Parties that fail to make the required disclosures may be precluded from offering evidence or testimony not disclosed. Rule 37(c).

### B. Federal Rules of Evidence:

The admissibility of expert testimony at trial is also governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 imposes a gate-keeping duty on trial judges to ensure that expert testimony is "not only relevant, but reliable." 509 U.S. 579, 589 (1993). Expert testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," and it is relevant only if "that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

In *Daubert*, the Supreme Court identified several non-exclusive factors for assessing the reliability of scientific testimony: (1) whether the technique can be (or has been) tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94. These factors were "meant to be helpful, not definitive," and the trial court has discretion to decide how to test an expert's reliability based on "the particular circumstances of the particular case." *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). Expert testimony should be excluded if the district court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## III. ARTHUR "LEE" COFFMAN:

### A. Mr. Coffman did not comply with the requirements of Rule 26:

Rule 26 requires parties to disclose the identity of any expert witness and provide a written report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." (Fed. R. Civ. P. 26(a)(2)(B).) The parties are required to make this disclosure "at the times

and in the sequence that the court orders." (Rule 26(a)(2)(D).) Rule 37(c) "gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Rule 37(c) specifically states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." (Fed. R. Civ. P. 37(c)(1).) "The Advisory Committee Notes to this Rule describe it as a 'self-executing,' 'automatic' sanction to 'provide[] a strong inducement for disclosure of material….'" *Yeti*, 259 F.3d at 1106.

Although Plaintiffs timely produced a written Rule 26 report from Mr. Coffman setting forth certain of his "main categories" of opinions, Mr. Coffman expressly withheld some opinions from his report, stating "there are related opinions and sub-opinions which opposing counsel will be able to obtain during my deposition." (Ex. A at 4.) The decision to omit certain opinions from his report is in direct violation of the Rule 26 requirement that an expert provide "a complete statement of **all opinions**" in their written report, and appears to be a purposeful attempt make it more difficult for defense counsel to adequately prepare for the deposition and cross-examination of this witness. As a result of Mr. Coffman's failure to disclose certain opinions in his Rule 26 report, Plaintiffs should be precluded from using or relying upon any opinions of Mr. Coffman at trial that are not expressly stated in his Rule 26 Report under Rule 37(c). *See Macias v. Perez*, Case No. 10-cv-973, 2011 WL 2669475, *4 (S.D. Cal. July 7, 2011) (any attempt by an expert to deviate from the opinions stated in his written disclosure would provide "strong grounds" for excluding those opinions under Rule 37(c).)

Rule 37(c) contemplates only two exceptions to the exclusionary sanction for non-compliance with Rule 26(a): (1) the failure to disclose was substantially

justified, or (2) it was harmless. Neither exception applies here. Mr. Coffman offers no justification for failing to disclose all of his opinions in his Rule 26 Report, and indeed, it is hardly justifiable to withhold opinions that have been formed by the expert at the time of the disclosure, and that the expert intends to testify to at trial. Furthermore, Mr. Coffman's omission is not harmless. The Court set forth the expert disclosure deadline in its Third Amended Scheduling Order, which also set the dates for close of expert discovery and pre-trial motions. (Doc. 130.) "When the order establishing an expert disclosure deadline also sets a deadline for pretrial motions, we have held that 'disruption of the schedule of the court and other parties is not harmless,' even if, as here, 'the ultimate trial date is still some months away.'" *Jarritos, Inc. v. Reyes*, 345 Fed. Appx. 215, 217 (9th Cir. 2009) (citing *Wong v. Regents of the Univ. of Cal*., 410 F.3d 1052, 20162 (9th Cir. 2005).) In addition, the Court's Scheduling Order states:

> **Except as provided in the paragraph below [regarding supplemental disclosures], any party that fails to make these disclosures shall not, absent substantial justification, be permitted to use evidence or testimony not disclosed at any hearing or at the time of trial. In addition, the Court may impose sanctions as permitted by Fed. R. Civ. P. 37(c).**

(Doc. 132, emphasis in original.)

Failure to comply with the clear instructions of the Court and Rule 26 cannot be considered justified or harmless under these circumstances, and as a result, Plaintiffs should be precluded from presenting any testimony from Mr. Coffman or, in the alternative, should be precluded from offering any opinions of Mr. Coffman that were not expressly disclosed in his Rule 26 Report.

///

///

///

///

### B. Mr. Coffman's opinions are unreliable and must be excluded under FRE 702 and *Daubert:*

#### 1. Causation Theory:

Mr. Coffman opines in his Rule 26 report that "the non-compliant installation and damage to the subject Spec-55 wires, due to chaffing, caused an intermittent fatal short, arcing and uncommanded activation of the main landing gear retraction system that directly resulted in this main landing gear retraction malfunction and fatal accident." (Ex. A at 3-4.) However, Mr. Coffman lacks the requisite expertise and qualifications to offer this technical opinion, and his lack of detail or explanation as to how he arrived at this opinion renders it unreliable. As a result, it will serve to confuse rather than assist the trier of fact, and should be excluded under FRE 702 and *Daubert*.

First, it is evident from Mr. Coffman's *curriculum vitae* that he is unqualified to testify regarding the complex wiring system of a CH-53E helicopter: he has no training, education or background in wiring or electrical engineering; aircraft electrical wiring systems; analyzing wire insulation damage and wear patterns; or identifying areas of electrical shorts and/or arcing events. Mr. Coffman also provides no evidence of training or experience with Kapton or Spec-55 wiring, CH-53E helicopters, or any military aircraft. Rather, he is an A&P mechanic specializing in engine maintenance, specifically turbine engines as he has explained in prior depositions:

> Q: And what do you do for a living?
> A: I am an aviation consultant. I specialize in turbine engine failure analysis.
> Q: Just turbine engine or also - -
> A: I do all aircraft. I primarily stay in the corporate aircraft world, but I work on all types of engines, but I do a lot of turbines.

(Ex. B to Hickey Decl., Coffman deposition, *Saler, et al. v. Honeywell International*, Inc., CV-07-00488, USDC, AZ at p. 5.) The engine is not an issue in this case and not the subject of his purported opinions, here. Mr. Coffman is

unqualified to testify regarding the complex electrical system of a CH-53E helicopter and his opinions and testimony in this regard should be excluded. Fed. R. Evid. 702. *See, e.g.*, *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) (expert's opinion regarding the content of industry waste was outside his scientific expertise despite his degree in chemical engineering and experience in medical toxicology and biology where "nothing in the record indicates that [expert] had any special training or knowledge regarding metal working industries"); *Bunker v. Ford Motor Co.*, 640 Fed.Appx. 661, 662 (9th Cir. 2016) (district court properly excluded expert's opinion regarding flaw in design of the brake shift interlock system on a Ford Ranger truck, where expert "had virtually no familiarity with brake shift interlock systems" on that vehicle).

Second, Mr. Coffman's causation opinion is based on unfounded assumptions and is not supported by any scientifically valid reasoning or methodology. Relying solely on his observation that the Spec-55 wire had areas of exposed bare wire and his "experience and career," he opines that "a fatal short occurred in the Spec-55 wire of the main landing gear hydraulic system" that resulted in the landing gear retraction. (Ex. A at 3.) However, he does not identify the wire that he believes energized the landing gear control wire, nor does he cite any manual, publication, schematic, diagram or test result that demonstrates or supports his causation theory.

Mr. Coffman's causation theory also appears to depend on the electrical arcing creating "an intermittent unpredictable electrical signal" but other than stating in one sentence his belief that such a condition existed, he offers absolutely no explanation for this statement. It is a mere statement without basis, reason, facts or data in support.

The significant "analytical gap" between the minimal information he provides and the speculative opinions he proffers does not stand up to the scrutiny of the *Daubert* factors. As a result, Mr. Coffman's causation opinion, his theories as to the cause of certain wire damage, and the occurrence of an intermittent

electrical signal, is wholly unreliable and should be excluded under Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 592–93.

**2. Compliance with military specification Mil-W-5088F.**

Mr. Coffman further opines in his Rule 26 report that "the installation of the main landing gear hydraulic wiring was non-compliant with Military Specification MIL-W-5088F section 3.11.7." (Ex. A at 3.) However, like his opinion regarding causation, this opinion is well outside the bounds of Mr. Coffman's expertise, and lacks any evidentiary or analytical support.

Mr. Coffman has failed to establish that he has the requisite knowledge of military specifications regarding wire installation. He has no apparent training or experience interpreting, complying with or enforcing military specification, nor does he state in his report or *curriculum vitae* that he has ever installed electrical wiring on a CH-53E or similar helicopter according to military specifications. Even his purported "52 years of training and experience as an A&P mechanic in troubleshooting and repairing wiring issues in corporate and private aviation," which is not substantiated by his *curriculum vitae*, is far afield from installing an entire electrical wiring system in a military helicopter in accordance with the particular specifications cited in his Rule 26 report.

Fully demonstrating his lack of expertise in this area, Mr. Coffman appears to try to support this opinions with a grossly misguided belief that

> "During the later stages of the manufacturing process, helicopters including the subject helicopter, are put through a shake test and then inspected to ensure the proper security of the wiring in the helicopter."

(*See* Ex. A at 3.) While there are vibratory tests sometimes referred to as "shake tests" performed on test articles during the development of an aircraft or a technical evaluation program, in the context of the manufacture of military helicopters, the term "shake test" is just vernacular meaning a quality assurance inspection to ensure the helicopter complies with all government specifications. At no point in the

manufacture of the subject helicopter was it physically shaken. (Ex. C to Hickey Decl., Deposition of John D. Wakefield at 222:2-21; *see also* Wakefield Decl. in support of Motion for Summary Judgment ("Wakefield Decl.") at ¶ 7.) Mr. Coffman's misunderstanding of the term "shake test" in the context of military helicopter manufacture demonstrates that he is far afield of his area of knowledge.

Because Mr. Coffman lacks the necessary expertise to opine about compliance with such specifications, his opinion in this regard should be excluded as unreliable under FRE 702. *See Samuels v. Holland American Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011) (expert with 30 years of experience in travel industry, but not on cruise lines specifically, was not qualified to offer opinion regarding the propriety of actions taken by defendant cruise line.)

Furthermore, Mr. Coffman lacks foundation for his opinion that the main landing gear hydraulic wiring was not installed in compliance with MIL-W-5088F. The subject aircraft was delivered in 1990, meaning that the subject wiring was installed many years and many flight hours ago. Mr. Coffman does not, and cannot, claim to have inspected the subject helicopter at the time of its manufacture in 1990, nor does he cite to any build records, photographs or other documentary evidence demonstrating the quality of the wiring installation at the time of manufacture.

Mr. Coffman also does not explain how he has eliminated 21 years of Marine Corps maintenance as a possible cause of this alleged non-compliance. A maintenance record for the subject helicopter dated just two months prior to the Fontalvo incident describes the wire bundle that included the subject landing gear control wire as a "twisted mess." (Ex. D to Hickey Decl., filed under seal.) Thus, Mr. Coffman has no basis for opining as to the state of the wiring when originally installed 21 years prior to the accident.

Lastly, section 3.11.7 of MIL-W-5088F, the military specification cited by Coffman in his Rule 26 report, sets forth several requirements. (Ex. 11 to Wakefield Decl., MIL-W-5088F at p. 23, section 3.11.7, filed under seal.) Mr.

Coffman does not indicate which portion of section 3.11.7 he believes Sikorsky did not comply with or even which area of electrical wiring in the subject helicopter he believes is non-complaint. Mr. Coffman is again making a statement without basis, reason, facts or data in support.

In sum, Mr. Coffman lacks the necessary expertise to opine on compliance with military specifications for wire installation, and his opinion that such wiring was not properly installed is purely speculative and lacks foundation. As a result, it is unreliable, will not assist the trier of fact, and should be excluded under FRE 702. *See Daubert*, 509 U.S. at 592–93.

## IV. JOHN BLOOMFIELD

### A. Mr. Bloomfield's causation opinion is speculative and unreliable and must be excluded under FRE 702 and *Daubert.*

Mr. Bloomfield opines that the cause of the subject accident was: "the energizer wire for the down solenoid that goes to the hydromechanical unit intermittently energized the up solenoid wire going to the hydromechanical unit … through a compromise in the installation," causing an uncommanded retraction of the landing gear. (Ex. E to Hickey Decl., Bloomfield Dep., at 113:19-114:3.) His opinion is based on the assumption that energy was inadvertently transferred from an energized "down wire" (which commands the landing gear to lower) to the "up wire" (which, if energized, commands the landing gear to retract), due to matching spots of bare wire on the down and up wires coming into contact. (*Id.* at 114:25-116:9.) However, as evidenced by Mr. Bloomfield's Rule 26 report and deposition testimony, he has no evidentiary foundation for this purely theoretical assumption, and his opinion in this regard is unreliable, will only serve to confuse the jury, and should be excluded under FRE 702 and *Daubert*.

First, as someone with no experience either designing or installing wiring systems for aircraft landing gear—military or otherwise—he is not qualified to speculate on the cause of the uncommanded landing gear retraction, as he proposes

to do. (*See generally*, Ex. F to Hickey Decl., "Bloomfield report", at Appendix A.); *see e.g.*, *Samuels*, 656 F.3d at 953; *Avila*, 633 F.3d at 839 ("nothing in the record indicates that [expert] had any special training or knowledge regarding metal working industries"); *Bunker*, 640 Fed.Appx. at 662 (expert "had virtually no familiarity with brake shift interlock systems" on subject model vehicle).

Second, Mr. Bloomfield has no evidence that the up and down wires were actually touching, or even capable of touching, at the time of the accident. Mr. Bloomfield did not have the opportunity to inspect them as installed, but rather inspected them separately after the wire bundle containing both wires, among others, had been unbundled and uncoiled by the Navy accident investigators. (Ex. E at 123:7-12, 134:22-135:4.) He admits that it is not possible to match the wires up exactly to determine which wires in the bundle were touching and in what spots:

> "the physical location of the wires as we see them depicted here [in Navy investigation photographs] … are more than likely not the way they were in the accident … So we can't be confused that the proximities that we're looking at in these pictures is the way – the actual way the wire was at the accident time." (*Id*. at 133:2-14.)

Third, Mr. Bloomfield cannot identify a degraded spot on the down wire that matches up with a degraded spot on the up wire (Ex. E at 133:15-134:5)—as is necessary to support his theory that voltage was passed between the two—and admits that no one has identified such a spot:

> Q: So you would agree, then, as the evidence stands in this case, no one has identified a bare spot that goes to P494 pin A [up wire] that matches up with … a corresponding bare spot on the wire that goes to P495 pin A [down wire]; correct?
> A: That's reasonable.

(*Id*. at 138:16-22.)

Fourth, Mr. Bloomfield's entire theory of causation depends on the premise that the down wire was energized at the time of the accident, for which there is no evidence. He first testified that "[t]he down wire 495A is energized in normal

operation" (Ex. E at 141:3-7), and when asked why he believes it was energized, answered "because that's the only place that the 494 up wire could have gotten 28 volts; and I believe that it did." (*Id*. at 141:15-21.) He further testified "from a pure elimination process … the only way the up-line wire can be energized with 28 volts is through the down wire…. If there was a bundle of ten other 28-volt sources here all together we'd have to go chase down each one of those. But in this case, we don't. That's all there is." (*Id*. at 151:2-20.) However, he then undermines his own "pure elimination process" by testifying that he cannot tell what other wires were bundled with the up wire because "[the Navy investigators] have unbundled all these wires. They've snipped all the zip ties. They spread them all out." (*Id*. at 152:6-12.) Essentially, Mr. Bloomfield's only explanation for why the down wire was energized is that his theory that the down wire transferred energy to the up wire depends upon it. This is the definition of circular logic, which is lacking in evidentiary foundation and is purely speculative.

Mr. Bloomfield's testimony that he can identify the source of energy to the up wire through a "pure elimination process" is further undermined by the testimony of Defendant Dupont's expert, Dr. Joseph Reynolds. Like Mr. Bloomfield, Dr. Reynolds opines that energy to the up landing gear wire caused the uncommanded retraction of the landing gear. (Ex. G to Hickey Decl., "Reynolds Report" at p. 17.) However, unlike Mr. Bloomfield, he ultimately opines that "the source of the inadvertent powering was undetermined." (*Id*.) Dr. Reynold's deposition testimony confirms that he has not been able to pinpoint a source of energy to the "up" wire:

> Q: When you wrote your report, what did you believe were the potential sources of the 28 volts that went into 494-A [the up wire]?
>
> A: …We have a set of three to four pictures of the wires that were examined by … [the Navy], but we don't see all the wires in the area that could – could have played a role… and, therefore, it remains more or less unknown as to what other wires could have contributed.

…

Q: And were you able to identify the wires in that area, in the area of the 494 [up] wire?

A: Not entirely. Not entirely.

…

Q: In looking at this schematic that we've marked as Exhibit 26, can you identify all the wires that are in the area of the [up] wire that goes to 494 pin A?

A: Well, I would say probably not. There are nine wires, I guess you might say, shown here going into that area, if you count the ones connected to the Cannon plugs.

(Ex. H to Hickey Decl., Reynolds Dep. at 195:11-23, 197:23-198:9.) This is in direct contradiction to the testimony of Mr. Bloomfield that the down wire was "all there is" in the vicinity of the up wire that could possibly have been a source of energy. (*See* Ex. E at 151:2-20.)

Fifth, Mr. Bloomfield contradicts his own testimony by later agreeing that, in normal operation, a component called the cam limit switch will shut off energy to the down wire, meaning that, when the aircraft is on the ground, there is normally no energy directed to the down wire. (*See* Ex. E at 147:3-7.) Based on this, he had no choice but to acknowledge that his entire causation theory is dependent on the cam limit switch not functioning properly (due to improper adjustment, as he theorizes), and not turning off the 28 volts to the down wire as it was supposed to do. (*Id*. at 147:14-17.) Despite the fact that a malfunction of the cam limit switch is a necessary condition of his entire causation theory, Mr. Bloomfield failed to mention the cam limit switch at all in his Rule 26 report, admits that he did not consider the impact of the cam limit switch until he had reviewed the report of defense expert Jim Knox, and cannot point to any evidence that it was malfunctioning or improperly adjusted at the time of the accident. (*See Id*. at 149:5-8.) Instead he mere speculates, "we could have a limit switch – a cam limit switch that wasn't perfectly adjusted," for no other reason than the simple fact that his entire theory of the case depends upon it. (*See Id*. at 147:22-24.)

Lastly, Mr. Bloomfield admits that he has not tested his causation theory to determine whether it in fact is feasible:

> Q: Is that the complete basis for your opinion that there were 28 volts in the P495 wire is that there had to be?
> A: Yes, there had to be.
> Q: So did you do any testing to confirm that?
> A: Well, there's no test that I can do.
> …
> Q: Did you test this theory that you have utilizing any hydraulic utility module?
> A: No I haven't tested a hydraulic utility module.
> …
> Q: Have you done any testing in this case to confirm any theory that you have in this case?
> A: No. I don't have any equipment.

(Ex. E at 150:12-17, 159:18-21, 160:7-9.)

Given the lack of physical evidence to support Mr. Bloomfield's causation theory, the lack of testing to determine the feasibility of his theory and Mr. Bloomfield's inexperience with landing gear wiring and electrical functionality, his theory of causation is purely speculative. The "analytical gap" between the sparse physical evidence he relies upon (the mere existence of spots of bare wire) and the causation opinion he proffers does not stand up to the scrutiny of the *Daubert* factors. As a result, Mr. Bloomfield's causation opinion is wholly unreliable and should be excluded under Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 592–93.

### B. Mr. Bloomfield's related opinions regarding design changes to the Electric Wiring Interconnect System are also unreliable and must be excluded under FRE 702 and *Daubert.*

Based on his unfounded opinion that voltage to the down wire inadvertently energized the up wire and caused the landing gear to retract, Mr. Bloomfield proposes three alternative designs to the Electric Wiring Interconnect System (EWIS) that he claims could have prevented the accident. (Ex. F at ¶¶ 22-24.)

However, these proposed design changes are purely theoretical in nature. Mr. Bloomfield has not drawn the proposed changes into existing schematics to demonstrate that they could feasibly be integrated into the EWIS of the CH-53E aircraft, he has not tested the "new" designs to confirm that they would indeed have impacted the accident sequence, and he has not fully considered the how such changes would be implemented as a practical matter. Mr. Bloomfield's opinions in this regard are not the product of reliable principles and methods, are not based on sufficient facts and will not assist the jury to understand the evidence or determine a fact in issue. As such, they are unreliable and should be excluded under Federal Rule of Evidence 702 and *Daubert*, 509 U.S. at 592–93.

Mr. Bloomfield's first proposed alternative design is to install parallel redundant wires for each function, and require both wires to agree before a particular system is activated. (Ex. F at ¶ 22.) This would significantly increase the amount of existing wires bundled throughout the aircraft, and would require installation of at least one additional component, a "comparator", to determine whether energy is coming from one wire versus both redundant wires. (Ex. E at 173:8-18.) Mr. Bloomfield did not mention the use of comparators in his Rule 26 report, and when asked at his deposition whether any other additional components would be necessary to implement this proposed design change, he responded "Not that I can think of right now. I wasn't designing a system … I was simply offering an alternative philosophy that a lot of aircraft manufacturers use." (*Id*. at 176:2-8.) He did not provide a drawing or schematic to demonstrate the proposed design, and he refused to do so during his deposition. (*Id*. at 168:16-169:5.) Mr. Bloomfield admitted that he did not research whether any other aircraft manufacturers use a redundant wiring system to actuate landing gear. (*Id*. at 166:25-167:12, 167:24-168:2.) He further admitted that he does not know how having multiple additional wires as suggested would affect the maintenance of the CH-53 helicopter. (*Id*. at 182:10-13.) Because Mr. Bloomfield has not done any work to demonstrate the

feasibility of his "philosophical" theory of landing gear actuation, nor tested its effectiveness, it is entirely speculative and unreliable.

Mr. Bloomfield's second proposed design change is to physically separate the up and down wires by tying them into two different wire bundles in the aircraft, and redesigning the hydraulic utility module such that the "up" and "down" wire connectors, into which the wires are installed, are located on opposite sides of the module. (Ex. F at ¶ 23; Ex. E at 188:16-189:8.) However, he admitted at his deposition that he does not even know where those connectors are currently situated on the utility module:

> Q: Now, where are the connectors currently?
> A: Well, they have to be on the – I'm not sure. I can't – I can't determine that from this picture.
> Q: Well, from your work that you've done in this case, do you know what side the connectors were on on the hydraulic utility module?
> A: I believe they're on the same side because of … the length of wire that the technicians clipped and opened up – the fact that it was bundled so close together, they – the connectors more than likely are very adjacent to each other.
> …
> Q: So you're assuming that the connectors are currently on the same side of the mechanism … correct?
> A: Correct
> Q: Okay. So you believe from other pictures that they're on the same side of the mechanism, correct?
> A: I think so. And if they are, they shouldn't be … is what I'm saying.

(Ex. E at 189:9-190:18.) Without foundational knowledge of how the hydraulic utility module is current designed and why, Mr. Bloomfield's opinion that it should be redesigned is nothing more than untested and unfounded theory.

Mr. Bloomfield's third proposed design change to the EWIS is to alter the existing Radio (or Radar) Altimeter, which determines distance of the aircraft from the ground, to only permit electrical current to retract the landing gear when it determines that the aircraft is a certain number of feet off the ground. (Ex. F at ¶

24.) However, again, Mr. Bloomfield has provided no specifics regarding the actual design change that he proposes, and testified only in vague terms about the design—which he again referred to as a "philosophy." (Ex. E at 198:19-206:3.) He explained the theory of how a Radio Altimeter might break an electrical circuit based on distance from the ground, but when asked what additional components would be required to implement this, he responded that "a piece of wire, a comparator and relay" are the basic building blocks, but "there may be another little piece here, another little piece there … this is an alternative philosophy that will work because they're already using it. Maybe I need a transistor here. I don't know yet." (*Id*. at 203:17-204:20.) This testimony clearly shows that Mr. Bloomfield does not have firm grasp on his own proposed design change. Furthermore, he again did not provide a diagram or schematic of a proposed altered Radio Altimeter in his report, and he refused to sketch out the design theory at his deposition. (*Id*. at 208:22-209:15.) Moreover, there is no indication that Mr. Bloomfield tested his re-design of the Radio Altimeter in any manner. Without determining whether his proposed design is feasible or effective, Mr. Bloomfield's opinion that it should have been implemented is unreliable.

Although not related to the EWIS, Mr. Bloomfield also purports to have "invented" a new tool for airmen to use to remove landing gear safety pins without standing underneath the aircraft, which he claims could have prevented the death of the Marine Staff Sergeant who was crushed by the aircraft after forcibly removing a landing gear safety pin. (Ex. F at ¶ 25.) However, once again, Mr. Bloomfield has not produced a diagram or a prototype to demonstrate that his invention is actually feasible. Without a prototype, there is no way to test whether and how it would function to remove a landing gear safety pin from a CH-53E aircraft as he envisions. Furthermore, while Mr. Bloomfield touts his "experience" with safety pins as a basis for his design, he is entirely unfamiliar with the CH-53E landing gear safety pin mechanism. He testified that he has never pulled a safety pin from a CH-

53E landing gear, and has only witnessed such a pin being pulled one time, during an inspection for this litigation. (Ex. E at 219:24-220:7, 221:10-14.). Additionally, his "experience" with safety pins is limited to "I've got a lot of them on my boat." (*Id.* at 220:10-11.) It is therefore evident that the proposed "tool" for removing a landing gear safety pin from a CH-53E aircraft is nothing more than a figment of Mr. Bloomfield's imagination, which lacks any indicia of feasibility or reliability.

In sum, Mr. Bloomfield's design change opinions are nothing more than vague notions that should not be presented to the jury. Mr. Bloomfield has done no work to show that these changes could feasibly be implemented; he has not provided any drawings, schematics, prototypes, test results or economic assessments to support his proposals, nor has he fully considered all of the components and design elements that would be necessary to actually make these changes.[2] More importantly, because these designs are based on his flawed and speculative theory of causation, Mr. Bloomfield cannot show that any of the changes would have actually impacted the accident sequence. Because Mr. Bloomfield's opinions are not the product of reliable principles and methods and lack evidentiary foundation, they should be excluded as unreliable under Rule 702 and *Daubert*.

---

[2] Further demonstrating his lack of knowledge in this area, Mr. Bloomfield testified that the Federal Aviation Administration (which regulates civilian aircraft) would be the certifying agency for his design changes. (Ex. E at 206:22-207:22). That is wrong. The airworthiness authority for military aircraft of the individual military departments of the Department of Defense (DOD). The DOD alone possesses the statutory authority to certify, regulate, support, equip, maintain, and train all aircraft in the DOD inventory. *See* 10 USC § 113 Authority of the Secretary of Defense; 10 USC §8013 (U.S. Air Force); 10 USC § 3013 (U.S. Army); 10 USC §5013 (U.S. Navy); 10 USC § 5042 (U.S. Marine Corps). *See also* DOD Airworthiness Policy, DoDD 5030.6 1, Enclosure 3, Section I b( 1,2), May 30, 2013; and Joint Unmanned Aircraft Systems Minimum Training Standards, issued by the Chairman of the Joint Chiefs of Staff. CJCSI 3255.0 I Ch I, dated October 31, 2011.

## V. CONCLUSION

For the foregoing reasons, Sikorsky respectfully requests that this Court exclude the opinions and testimony of Plaintiffs' experts Arthur "Lee" Coffman and John Bloomfield as unreliable under FRE 702 and *Daubert*. Alternatively, Sikorsky requests that this Court limit Mr. Coffman's testimony at trial to those opinions that are expressly stated in his Rule 26 report under FRCP 37(c).

Dated: June 12, 2017

**FITZPATRICK & HUNT,**
**PAGANO, AUBERT, LLP**

By: /s Christopher S. Hickey
James W. Hunt
Christopher S. Hickey
Attorneys for Defendants,
**SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.;** and **UNITED TECHNOLOGIES CORPORATION**