**James W. Hunt – SBN 122582**
james.hunt@fitzhunt.com
**Christopher S. Hickey – SBN 198938**
christopher.hickey@fitzhunt.com
**Mark R. Irvine – SBN 137294**
mark.irvine@fitzhunt.com
FITZPATRICK & HUNT,
PAGANO, AUBERT, LLP
633 West Fifth Street, 60th Floor
Los Angeles, CA 90071
Tel.: (213) 873-2100 / Fax: (213) 873-2125

Attorneys for Defendants
Sikorsky Aircraft Corporation; Sikorsky Support Services, Inc.; and United
Technologies Corporation

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.F., a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and T.L., a minor, by and through her Guardian Ad Litem, TASHINA AMADOR, | Case No. 13-cv-00331-GPC-KSC **DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT (CORRECTED)** |
| Plaintiffs, | |
| vs. | |
| SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.; UNITED TECHNOLOGIES CORPORATION; G.E. AVIATION SYSTEMS, LLC; DUPONT AEROSPACE CO.; E.I. DUPONT DE NEMOURS AND COMPANY; PKL SERVICES INC.; and DOES 1 through 100, Inclusive, | Date:       August 11, 2017 Time:       1:30 p.m. Courtroom:  2D Judge:      Hon. Gonzalo P. Curiel |
| Defendants. | |

1  Defendants Sikorsky Aircraft Corporation; Sikorsky Support Services, Inc.;
2  and United Technologies Corporation, hereby submit their Separate Statement of
3  Undisputed Material Facts in support of their Motion for Summary Judgment or
4  Partial Summary Judgment.

5  ## SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
| --- | --- |
| 1. Plaintiff's decedent U.S. Marine Corps Sgt. Alexis Fontalvo died on March 17, 2011, at Miramar Marine Corps Air Station, as the result of a military helicopter accident involving a CH-53E Super Stallion heavy lift cargo helicopter that was being prepared for a training flight. | Hickey Decl., Ex. A |
| 2. Sgt. Fontalvo was acting as an aerial observer responsible for pulling the chocks and safety pins before departure, and had trouble removing a safety pin from the helicopter's left landing gear, which pin is designed to slide out easily. | Hickey Decl., Ex. A, Findings of Fact 3(e) (p.4); 31 (p.7); 39 (p.8). |
| 3. Sgt. Fontalvo moved from the left main landing gear to the left auxiliary fuel tank to remove that safety pin, and then returned to the landing gear and tried again to forcibly remove the stuck safety pin.  As soon as Sgt. Fontalvo forced the safety pin out, the landing gear retracted and the aircraft collapsed upon him, resulting in his death. | Hickey Decl., Ex. A, Findings of Fact 35-39 (p.8). |
| 4. Sgt. Fontalvo was an Airframe Collateral Duty Quality Assurance Representative (CDQAR), and | Hickey Decl., Ex. A, Findings of Fact 30 (p.7); Ex. B, |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| considered by the Navy to be a duty expert on the landing gear system. | Deposition of Wilcox at 23:19-24:21 |
| 5. Sgt. Fontalvo was trained never to remove a landing gear safety pin if any resistance is felt. | Hickey Decl., Ex. B, Deposition of Wilcox at 17:5-18:2; 35:23-36:5; 56:11-19 |
| 6. The subject CH-53E and the prior models, CH-53A, CH-53D and RH-53D, share a similar landing gear control system, consisting of five protective interlocks.  Two interlocks are operated by the pilot – the up and down control handle and a separate lock to prevent inadvertent actuation. Two other interlocks are "Weight on Wheels" (WOW) switches associated with each of the two main landing gear, which prevent the landing gear from being retracted while the aircraft is on the ground.  The fifth interlock consists of landing gear safety pins – one for each of the two main landing gear, and one for the nose landing gear. These are mechanical locks that prevent each of the gear from being retracted on the ground.  The two cockpit interlocks and the two WOW switches are connected by electrical wiring terminating at the hydraulic components which move the landing gear upon pilot command.  The three landing gear safety pins are independent of | Wakefield Decl., ¶ 5; Knox Decl., ¶¶ 8-12. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| the cockpit and WOW switches, and "downstream" of all components which operated the landing gear. | |
| 7. Military investigators determined that an electrical short somewhere along the 437 inches of wire that connects the landing gear control panel in the cockpit to a hydraulic utility module activated the three landing gear to command retraction while the helicopter was on the ground. | Hickey Decl., Ex. A, Opinion 5 (p.12-13) |
| 8. Military investigators found several portions this electrical wire had degraded lamination and exposed wire. | Hickey Decl., Ex. A, Opinion 6 (p.13); D, Material Factors #1 and #2 (p.1) |
| 9. This "interconnect" wire starts at the landing gear control panel in the cockpit as "Kapton" wire. Three hundred sixty-seven (367) inches of the Kapton wire routes toward the rear of the helicopter, and is spliced to 70 inches of "Spec 55" wire. | Hickey Decl., Ex. C (p.2-3) |
| 10. Military investigators found that the Kapton portion of the wire "showed significant degradation, and several indications of moisture and possible arcing," and that the non-Kapton wire "also had possible exposure sites…." | Hickey Decl., Ex. A, Opinion 6 (p.13) |
| 11. Military investigators found that Kapton wiring degradation had previously caused a | Hickey Decl., Ex. A, Findings of Fact 69 (p.11) |

| **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| similar inadvertent landing gear retraction of a CH53-E helicopter in 2005. | |
| 12. Military investigators found that Sgt. Fontalvo, a CDQAR and duty expert with respect to the landing gear system, should have recognized the danger of a stuck safety pin because it indicated that the landing gear was under pressure to retract; and that "a significant training issue with respect to maintenance publications and the landing gear safety pins." | Hickey Decl., Ex. D, Human Factors #1 and #2 (p.1-2) |
| 13. Plaintiffs sued Sikorsky and DuPont for defects in the landing gear and wiring systems, alleging that the "wire path leading to the landing gear was subject to an unplanned and uncommanded energization" that caused the landing gear to retract. | Plaintiffs' Second Amended Complaint, Dkt. 71, ¶ 17 |
| 14. More particularly as to Sikorsky, Plaintiffs allege that the landing gear system was defectively designed due to the configuration which juxtaposed a wiring harness and wire path "downstream of any and all interlocks and failsafes capable of preventing gear retraction in the event of unplanned energization." | Plaintiffs' Second Amended Complaint, Dkt. 71, ¶ 13 |
| 15. As to DuPont, Plaintiffs allege that its Kapton wire in the wire path leading from the landing gear control to the landing gear assembly was defective | Plaintiffs' Second Amended Complaint, Dkt. 71, ¶ 14 |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| due to degradation which made it prone to unplanned energizing events. | |
| 16. The subject military CH-53E was designed in response to U.S. Navy specific operational needs for a Heavy Lift Helicopter with increased lift capacity, compatibility with amphibious shipping, and maximum commonality with the existing H-53 series helicopter.  The CH-53E derives from earlier models – CH-53A, CH-53D and RH-53D (U.S. Navy variant). | Wakefield Decl. ¶¶ 4,5, Ex. 2; Knox Decl., ¶ 7. |
| 17. Congress began appropriating funds for the CH-53E in 1970, and the Department of Defense authorized the Navy to proceed with development in November 1971. | Wakefield Decl., Ex. 2 |
| 18. The U.S. Navy's airworthiness authority, NAVAIR, which is staffed with more than 1,000 engineers, awarded design contracts to Sikorsky for development of the CH-53E, which began with design and production of prototype helicopters.  Sikorsky submitted hundreds of engineering reports and drawings to NAVAIR pursuant to contractual requirements, which the Navy reviewed for purposes of development of a Detailed Specifications for the CH-53E. | Wakefield Decl., ¶¶ 6, 7; Hickey Decl., Ex. E, Leigh Deposition at 98:19-100:4 |
| 19.  The landing gear control system of the CH-53A, CH-53D, RH-53D, and CH-53E | Wakefield Decl., ¶¶ 7, Ex. 3-6; Knox Decl., ¶¶ 7-12. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| developmental and pre-production prototypes was carried forward into the CH-53E production contracts, including the accident helicopter (BuNo 163077), utilizing the same essential electrical wiring interconnect system, and five interlocks, which system the Navy had operated and maintained on the earlier models. | |
| 20.  In its development of the CH-53E, NAVAIR officials and engineers held hundreds of meetings with Sikorsky engineers and program management personnel on all aspects of the design specification, including items that would be changed from the CH/RH-53D.  These meetings included safety meetings, conferences and Preliminary and Critical Design Reviews. NAVAIR or its designated USG personnel assigned to, and residing at, the Sikorsky facility (NAVPRO – Naval Procurement, now called DCMA), reviewed all the engineering drawings, test plans and test reports. They had technical interchange meetings during the design, and reviews of design following testing to ensure the helicopter was compliant with the government's specifications. | Wakefield Decl., ¶ 8. |
| 21.  NAVAIR proceeded to contract further with Sikorsky Aircraft for the continued design and | Wakefield Decl., ¶ 9. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| development of the CH-53E. Contract N00019-73-C-0228 was a Research & Development contract which included the Navy's CH-53E Detailed Specification, SD-552-3, and consisted of two parts:<br><br>• Phase I was a Research & Development Contract for Sikorsky Aircraft to produce the design (drawings), complete the development, and conduct trade off studies for CH-53E. (with FY-73 funding).<br><br>• Phase II was Research & Development Contract for Sikorsky Aircraft to fabrication of two prototype helicopters for Sikorsky and USN to conduct ground and flight testing. (YCH-53E 159121 & 159122). | |
| 22.    Beginning in 1974, the design phase prototypes underwent extensive flight testing with both Sikorsky and Navy test pilots and engineers, which consisted of multiple hundreds of flight test hours.  All aspects of the helicopters were tested, including sub-system evaluations.  NAVAIR issued Naval Air Test Center Deficiency Reports for any deficiency discovered during flight testing.  Meetings were held between NAVAIR and Sikorsky engineers and program personnel concerning the reports. | Wakefield Decl., ¶ 10. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| Resolution and design decisions were always made by NAVAIR. | |
| 23.     Following the design review and flight testing of the design prototypes, the Detailed Specification SD-552-3 was revised and updated.  The changes were documented in Sikorsky Engineering Report 13197. NAVAIR awarded another contract for fabrication of two additional "pre-production" prototypes based on the revised Detail Specification.  These prototypes were designated BUNO 159876 and 159877, and they also underwent additional hundreds of hours of flight testing by Navy test pilots, which results were evaluated by NAVAIR engineers. | Wakefield Decl., ¶ 11, Ex. 4 |
| 24.     As a result of Navy evaluation and testing of the pre-production prototypes, NAVAIR made additional changes to the Detailed Specification which would control the production helicopter.  The changes were documented in Sikorsky Engineering Report SER 13300, dated September 9, 1977.  One significant change made by NAVAIR was the requirement that Kapton wiring be incorporated into all electrical harnesses pursuant to MIL-W-81381.  The U.S. Navy approved the CH-53E | Wakefield Decl., ¶ 12, Ex. 7, at ¶3.1.46 (SIK013611) |

| **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| for service use, with a specific requirement to use Kapton wiring, on April 15, 1980. | |
| 25. Approximately 90 installation drawings showing "clamping, routing and mounting" of wiring were required to be submitted for NAVAIR review and approval. The Navy also reviewed and approved certain changes in routing and location of wiring paths. | Wakefield Decl., ¶ 7, 8 and 12 (SER 13300 at 3.1.46 (SIK013611); Hickey Decl., Ex. E, Leigh Deposition at 98:19-100:4 |
| 26. Design development reports reflect that the hydraulic system's weight would be reduced by manifolding and relocating components to shorten line routing. | Wakefield Decl., ¶ 8-9, 12 (SER 13300 at 3.1.74 (SIK013664); |
| 27. The engineering reports confirm that they contain those changes "agreed to by NAVAIR" for incorporation into the production helicopter. The development and qualification process could not proceed unless and until NAVAIR engineers approved all aspects of the design. | Wakefield Decl., ¶ 7-12 (SER 13300 at 1.0 (SIK013513); SER 13197 at SIK 012485); Knox Decl., ¶ 9 |
| 28.    Beginning in approximately 1978, the Navy entered into a series of production contracts with Sikorsky based on the finalized production specification issued by NAVAIR. The Navy procured a total of 229 CH/MH-53E aircraft under these production contracts, which were ordered in twenty-one production lots. Changes to the Detail Specification were | Wakefield Decl., ¶ 13, Ex. 8. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| identified during the proposal phase for each respective contract.  Lots 1-8 were governed by separate, one-year contracts.  Lots 9-12, consisting of 26 CH-53E and 29 MH-53E helicopters, were governed by a single multi-year contract. | |
| 29.     The subject helicopter, BUNO 163077, was ordered in Lot 12, under Contract Number N0010-85-C-0066, pursuant to Detailed Specification SD-552-3-9 which incorporated military specifications including MIL-W-5088F ("Wiring, Aerospace Vehicles") which, in turn, incorporated 66 additional military specification and standards concerning the design and construction of electrical systems. | Wakefield Decl., ¶ 14, Ex. 9-11. |
| 30.     Kapton wiring was new to the CH-53E, and required by the specification. | Wakefield Decl.,  ¶ 12 |
| 31.     Pursuant to the requirement that the CH-53E maintain maximum commonality with the H-53D, the landing gear control system, including interlocks, were the same as the CH-53D and RH-53D. | Wakefield Decl., ¶ 5; Knox Decl., ¶ 8, 10-12 |
| 32.     Configuration of the hydraulic utility module was also different from the CH-53D, in that it combined the hydraulic functions into a | Knox Decl., ¶ 9; Wakefield Decl.,  ¶ 8-9, 12 (SER 13300 at 3.1.74 (SIK013664) |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| single unit (Knox Decl., ¶ 9) This change was reviewed and approved by NAVAIR. | |
| 33.    Per the contract, Sikorsky is prohibited from making any changes to the aircraft system without government approval. | Wakefield Decl., ¶ 15. Ex. 9, at section H-7, p.7-32 (SIK06938) |
| 34.    The Navy closely monitors the production of helicopters manufactured by Sikorsky. The NAVAIR's participation is extensive and NAVAIR approvals are documented every step of the way on the production line.  This process includes, but is not limited to, reviewing and approving every drawing before it is used for production, reviewing and approving all test plan and the results of those tests, reviewing and approving every flight test by Sikorsky personnel, conducting quality inspections during manufacture, reviewing the build file, and ensuring the helicopter is compliant with the government's specifications. Full-time on-site U.S. government personnel (NAVPRO, now DCMA) assigned to the Sikorsky facility conduct a final quality acceptance inspection and Navy and Marine Corps pilots fly each aircraft, to make sure the aircraft is built the way NAVAIR requires. | Wakefield Decl., ¶ 16 |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 35.     The production build of the subject helicopter BUNO 163077 was monitored and approved by Navy engineers, inspectors, manufacturing personnel and pilots stationed on site at Sikorsky in Stratford, Connecticut, who confirmed that the aircraft conformed to the contract and to Detailed Specification SD-552-3-9. | Wakefield Decl., ¶ 17. |
| 36.     Following the NAVAIR's final inspection and flight testing certifying compliance with all specifications, the government accepted the subject aircraft on September 30, 1990. Sikorsky never received any notice from the government regarding any deficiency or failure to meet the government's specifications. | Wakefield Decl., ¶ 18, Ex. 12. |
| 37.     The DD-250 is the government's acceptance of the specific aircraft. | Wakefield Decl., ¶ 18 |
| 38.     Sikorsky did not, and was not contractually required to provide any manuals to the Navy for the CH-53E.  The Detail Specification states that these publications "will be furnished by the Government as specified in the publications requirements of the contract." | Wakefield Decl., ¶ 20, Ex. 10, at ¶ 3.23.3 |
| 39.     Although the Navy specification for the Ch-53E required the use of Kapton wiring, the Navy recognized well before the subject CH-53E was | Wakefield Decl., ¶ 22, Ex. 13-16 |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| manufactured, that there that there were "many problems inherent in our Navy aircraft wiring systems" and that the "maintainability and durability aspects in many of our current aircraft wiring systems have been compromised by the use of [Kapton wire] which is the predominant type wire installed in Naval aircraft." After conducting several studies, the Navy concluded in 1985 that Kapton "exhibits properties that are not acceptable for continued installation in Naval aircraft." | |
| 40.    Sikorsky made formal requests to the Navy that it be permitted to submit an engineering change proposal to replace Kapton wiring.   The Navy declined Sikorsky's requests, and stated in one internal memorandum dated July 22, 1987 regarding the "status of Kapton wire in H-53 aircraft" that "C/MH-53E contains Kapton but is under a multiyear procurement (FY 1986-89).  We do not have a firm quote from Sikorsky Aircraft, but to modify the multiyear specification at this time would be both prohibitively expensive and untimely." Sikorsky recommend for the third time at a meeting in November 1998, that all wiring be replaced in the CH/MH-53E. The Navy again rejected this recommendation. | Wakefield Decl., ¶ 22, Ex. 13-16. |

| | UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 41. | In 1989, the Navy decided to remove Kapton wire from the CH-53E specification and replace it with Spec 55 wire.  However, the Navy determined the change would start with LOT 13.  Since the subject helicopter, BUNO 163077, was manufactured as part of LOT 12, Sikorsky was required by the government to manufacture the subject helicopter using Kapton wiring. | Wakefield Decl., ¶ 23, Ex. 17. |
| 42. | Although the Navy switched to the use of Spec-55 wire for production aircraft beginning with Lot 13, the Navy decided not to replace Kapton wiring in helicopters already produced or that were being produced as part of LOT 12, including the subject helicopter BUNO 163077. In a memorandum dated July 7, 1987, the Navy stated that although other aircraft may be retrofitted with new wiring, removal from the CH-53E "would be disapproved." It was not until 2004 that the Navy began retrofitting old CH-53E helicopters under a Kapton Replacement Program, which is currently scheduled to be completed by the end of 2017. | Wakefield Decl., ¶ 24, Ex. 18. |
| 43. | In a memorandum dated February 6, 1989, the Navy authorized Navy and Marine Corps to use Spec-55 wiring as a substitute for Kapton, but | Wakefield Decl., ¶ 25, Ex. 19, 20. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| only for "repair, modification, engineering changes and replacements…"  The rest of the subject wire (367 inches) was required to be Kapton per the government's SD-552-3-9 specification, section 3.16.5.  Thus, the Kapton portion of the subject wire (367 inches) is almost certainly the original, 20-year-old wire, while the Spec-55 portion (70 inches) could also be the original wire or per the Navy's February 6, 1989, could also be a more recent replacement per a USMC maintenance task that occurred sometime between delivery in 1990 and the accident in March 2011. | |
| 44.    The build records for the subject aircraft reflect that a portion of the subject landing gear control wiring was composed of Spec 55 wire rather than Kapton.  The Navy expressly approved this variance in wiring per an engineering change order.  The reason for this change is not stated but during this timeframe there was a shortage of Kapton wiring and that is the reason for the change. | Wakefield Decl., ¶ 25, Ex. 20 |
| 45.    The Navy conducted safety assessment risk analyses of Kapton wiring in 2002 and 2009, before the accident.  The Navy's 2009 study recognized that "catastrophic severity damage due | Hickey Decl., Ex. F, G (96:10-97:12) |

| | **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 2 | to Kapton wiring failure" caused an inadvertent | |
| 3 | landing gear retraction in 2005. (MIL230432) | |
| 4 | Seven Navy officials reviewed and signed the | |
| 5 | 2009 assessment, including the Rear Admiral who | |
| 6 | signed under "Risk Accepted," which specifically | |
| 7 | included "an inadvertent landing gear retraction | |
| 8 | while the aircraft is on the ground." | |
| 9 | 46.   The Navy's replacement of Kapton wiring | Hickey Decl., Ex. G at 64:23- |
| 10 | was delayed by funding shortages.  The Navy | 65:9;   75:10-77:5;   78:7-21; |
| 11 | initially planned in 1995 to replace all Kapton | 82:3-83:14; 102:8-16 |
| 12 | wiring in connection with a Service Life | |
| 13 | Extension Program for the CH-53E, with Kapton | |
| 14 | listed as "priority #2" under the program.  By | |
| 15 | June 1, 2000, the program was essentially | |
| 16 | cancelled due to insufficient Congressional | |
| 17 | funding then re-started in 2002-03, and then | |
| 18 | dropped without comment in 2004, after which | |
| 19 | the Navy then instituted a phased wiring | |
| 20 | replacement program which prioritized | |
| 21 | replacement of more than one hundred Kapton | |
| 22 | wire harnesses into three phases.  Inadequate | |
| 23 | funding also delayed this program, which was | |
| 24 | initially planned to be completed in 2011 and is | |
| 25 | currently scheduled to be completed by the end of | |
| 26 | 2017. | |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 47.     The wiring in question in this accident was part of Phase III, which was "still in development" at the time of Sgt. Fontalvo's accident. | Order Granting Defendant PKL Services Inc.'s Motion for Summary Judgment, ECF No. 144, at pp. 3:22-25, 4:1-2. |
| 48.   NAVAIR engineers also attempted to address wire degradation issues by modifying the CH-53E electrical wiring interconnect system by (1) installing an arc-fault circuit breakers ("AFCB"), and (2) experimenting with two-types of diagnostic clamps to determine the level of wire damage. | Supp. Hickey Decl., Ex. P, Deposition of Montes de Oca at 61:19-63:14; 40:15-44:11 |
| 49.   The AFCBs were installed on some CH-53E but ultimately all were removed because the false-detection rate was too high. The diagnostic clamps were also removed due to poor performance, inability to survive the USMC helicopter operating environment, and because they increased the weight of the aircraft. | Supp. Hickey Decl., Ex. P, Deposition of Montes de Oca at 40:15-44:11; 74:11-75:25 |
| 50.   While these measures were due primarily to Kapton degradation issues, NAVAIR also testified that they were experiencing problem with all wiring due to improper Navy and USMC maintenance actions. NAVAIR responded to this problem by developing wiring awareness and inspection technique training. | Supp. Hickey Decl., Ex. P, Deposition of Montes de Oca at 59:9-13; 44:12-25; 50:7-51:14; 55:9-23; 57:7-10; 57:25-60:18 |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 51.  The Marine Corps chartered a CH-53E Super Stallion Independent Readiness Review ("SSIRR") in 2015 to identify the root cause of aircraft, aircrew and maintenance readiness.  The report concluded the USMC CH-53E fleet has been in a state of decline since 2001 due to "the effects of very heavy and hard usage in eleven years of war overseas and an ineffectual reset effort upon their return home."  The SSIRR resulted in a NAVAIR decision to completely replace all wiring (Kapton and Spec-55) in its CH-53E fleet. | Hickey Decl., Ex. M |
| 52.  The Navy conducted a risk assessment of helicopters from Production Lots 1-12 that contained Kapton, observing that "[t]he properties of Kapton wiring insulation are such that it lends itself to causing, rather than preventing electrical problems." | Hickey Decl., Ex. F at SIK230432 |
| 53.  A Navy survey revealed 54 incidents relating to Kapton, and causing at least 17 separate subsystems to malfunction. | Hickey Decl., Ex. F at SIK230430, 434 |
| 54.  A follow-up safety risk assessment in 2009 referenced "catastrophic severity damage due to Kapton wiring failure" that caused an inadvertent landing gear retraction in 2005.  Seven Navy officials reviewed and signed the assessment, | Hickey Decl., Ex. F at SIK230434 |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| including the Rear Admiral who signed under "Risk Accepted," which specifically included "an inadvertent landing gear retraction while the aircraft is on the ground." By 2009, the Navy noted that the number of known Kapton-related incidents had risen from 38 to 54. | |
| 55.    A NAVAIR Program Manager testified in this case about the Kapton wiring replacement efforts:<br>"Well, even every year I was there, it was always -- we never were able to receive funding that was was necessary to replace all the Kapton on all the aircraft that needed it, which led us down this multiple phase thing.  So it was difficult to get full funding of the entire scope of what we had to do, which was, you know, almost a hundred aircraft that had to have replacement wiring in the order of over a million dollars per aircraft to replace it.  We couldn't get that kind of money." | Hickey Decl., Ex. G, Mellen Deposition at 78:7-21 |
| 56.    Plaintiff's decedent, Alexis Fontalvo, died on March 17, 2011. | undisputed |
| 57.    Alexis Fontalvo was not married on March 17, 2011. | undisputed |
| 58.    Plaintiff T.L. was born on February 3, 2000, to his biological mother, Plaintiff Tashina Amador and biological father, Delvin Long. | Hickey Decl., Ex. H, Amador Deposition at 43:19-20 |

| **UNDISPUTED FACT** | **SUPPORTING EVIDENCE** |
|---|---|
| 59.    Delvin Long never provided any financial support to Plaintiffs Tashina Amador or T.L. | Hickey Decl., Ex. H, Amador Deposition at 45:23-46:8 |
| 60.    From February 3, 2000 to December 2007, Tashina Amador provided 100% of T.L.'s support. | Hickey Decl., Ex. H, Amador Deposition at 45:23-46:8 |
| 61.    Tashina Amador's filing status on her 2010 federal tax return was "Head of Household" with T.L. as her qualified dependent. | Hickey Decl., Ex. H, Amador Deposition at 134:5-16; 138:19-139:7 |
| 62.    Alexis Fontalvo was never married to Tashina Amador, T.L.'s mother and guardian ad litem. | Undisputed |
| 63.    T.L. was not dependent upon Alexis Fontalvo for 50% or more of her support in the 180 days prior to the death of Alexis Fontalvo. | Hickey Decl., Ex. H, Amador Deposition at 45:23-46:8; Ex. K, Fractor Deposition at 65:23-66:9 |
| 64.    Plaintiffs' economists testified at deposition that the sole basis for his opinion that the decedent was providing 50% of T.L.'s support was Ms. Amador's testimony and not any analysis of the financial records produced. | Hickey Decl., Ex. K, Fractor Deposition at 63:12-25 |
| 65.    Plaintiffs' economist testified at deposition that his opinion regarding the support of T.L. by decedent was at the "time of his death" only. | Hickey Decl., Ex. K, Fractor Deposition at 69:9-70:3 |
| 66.    The filing status "Head of Household" requires that the filer have paid more than half the cost of the support for the qualifying dependent. | Hickey Decl., Ex. J |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 67.    Tashina Amador's Marine Corps gross income was approximately the same in 2010 as the decedent, Alex Fontalvo. | Hickey Decl., Ex. H, Amador Deposition; Ex. K, Fractor Deposition |
| 68.    In October 2010, Alex Fontalvo stated in a notarized military form that the total personal monthly expenses for D.F. in October 2010 were $1,300, that he contributed $1,500 to D.F.'s monthly support and that no other person contributes to the support of D.F. | Hickey Decl., Ex. I |
| 69.  Tashina Amador's (the guardian of T.L. and her biological mother) testified that the decedent provided "about 60 percent" of T.L's support. | Hickey Decl., Ex. H, Amador Deposition at 81:17-82:2 |
| 70.  Sikorsky Support Services, Inc. had no involvement in design or manufacturer of the subject helicopter. | Wakefield Decl., ¶ 2 |
| 71. NAVAIR opened a H-53 Safety Action Record ("SAR 42-005") in 1986. | Supp. Hickey Decl., Ex. O |

| | |
|---|---|
| 72.  NAVAIR discussed, worked, made decisions and took action regarding the wire deterioration problem through several of its working groups including the H-53 System Safety Working Group, the Integrated Logistics Support Management Team, and Fleet Support Team. | Hickey Decl., Ex. N |

Dated: June 13, 2017

FITZPATRICK & HUNT
PAGANO. AUBERT. LLP
James W. Hunt
Christopher S. Hickey


By: /s  Christopher S. Hickey
Christopher S. Hickey
Attorneys for Defendants Sikorsky Aircraft
Corporation, Sikorsky Support Services,
Inc., and United Technologies Corporation