# EXHIBIT G

D.F. et al., v. Sikorsky Aircraft Corporation, et al.
U.S.D.C., Case No.: 13:cv-00331-GPC-KSC
(Exhibits to Declaration of Christopher S. Hickey
In Support of Motion for Summary Judgment)

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4    D.F., a minor, by and through his

5    Guardian Ad Litem, TASHINA AMADOR,

6    individually and as Successor in

7    interest to Alexis Fontalvo,

8    deceased, and T.L., a minor, by

9    and through her Guardian Ad Litem,

10   TASHINA AMADOR

11             Plaintiffs

12   vs.                        Case No. 13-cv-00331

13   SIKORSKY AIRCRAFT

14   CORPORATION, et al.

15             Defendants

16   _____/

17

18             The Videotaped deposition of WILLIAM MELLEN

19   was held on Tuesday, February 21, 2017, commencing at

20   12:00 P.M., at the offices of Naval Air Systems Command

21   Office of Counsel, 47085 Buse Road, Building 462,

22   Patuxent River, Maryland 20670, before Heather Bjork

23   Avalos, a Notary Public.

24   REPORTED BY:  Heather Bjork Avalos

25   Pages 1 - 105

                                              Page 1

1 I don't remember. It predated 2006. It was funded
2 when I was there. Phase 1 was fully funded.
3    Q    And then moving forward with the
4 installation, that was already also in place by the
5 time you arrived in 2006?
6    A    Yes.
7    Q    So by 2006, Phase 1 had begun?
8    A    Yes.
9    Q    Do you know what percentage of it was done
10 at that point?
11    A    On the -- I think on the MH side, if I
12 remember right -- I don't the exact percentages. I
13 think -- I know that the MH side was more complete than
14 the CH side. But there were only seventeen -- or
15 nineteen aircraft of the thirty MH's and, like,
16 ninety-six out of 157 CH's that were affected. I
17 believe the MH was one or two aircraft away from being
18 complete in Phase 1. And the CH probably had another
19 couple years left. But I don't remember how many were
20 complete at the time. I would have to go back and --
21    Q    Do you know when Phase 1 was completed?
22    A    I cannot remember the exact date or year.
23    Q    We've been going for an hour and a half.
24 Do you want to take a break?
25    A    Sure.

Page 62

1        MR. HICKEY:  Let's go off the record.
2        THE VIDEOGRAPHER:  Off the record at 1:32.
3        (There was a break in the proceedings.)
4        THE VIDEOGRAPHER:  This is the beginning of
5 DVD number two. We're back on the record at 1:37.
6    Q    So, Bill, before we broke, we were talking
7 about the Kapton replacement program. You indicated
8 there are three phases. We talked about the first
9 phase, that by the time you had arrived in 2006 the
10 bundles that were to be replaced in that phase were
11 already identified, there was funding to replacement
12 them, and, in fact, the replacement program had already
13 started. And it took a few years after you arrived
14 there to complete, but that Phase 1 was in motion by
15 the time you arrived, correct?
16    A    Yes.
17    Q    So now what was -- I know you can't, off
18 the top of your head, tell me which bundles were in
19 which phase. But what was the criteria for bundles to
20 get into Phase 1?
21    A    Again, they were what we determined to be
22 the most problematic harnesses that were called out in
23 a haz rep or HMR, hazard maintenance report, mishaps.
24 Anything that called that harness as a problem fell
25 into Phase 1. Anything that was attached to a critical

Page 63

1 mission system that if the Kapton caused problems could
2 cause a mission to be aborted, that was thrown in
3 there. And then everything else was divided among
4 Phase 2 and Phase 3.
5        But the reason it's hard to say when stuff
6 stopped and started is because they weren't serial
7 phases. They were concurrent phases. So a lot of
8 times Phase 1 and 2 were going on at the same time.
9 Certain aircraft had finished Phase 1 and there was --
10 you know, they may have been -- probably eighty percent
11 of the Phase 1 CH completed by the time I got there.
12 These ones who were now going through Phase 2, but
13 there are still Phase 1 aircraft to reach as well. So
14 it's hard to say.
15        I can tell you that I remember that the
16 first Kapton-free aircraft came out around 2011 when we
17 finally -- the first -- through all three phases. It
18 was around there.
19    Q    So the harnesses that would be in Phase 3
20 would be, from a mission standpoint, the least
21 critical?
22    A    Yes.
23    Q    Why was that a criteria? Why was the --
24 whether it was critical to the mission or not, why was
25 that a criteria for replacing these harnesses?

Page 64

1    A    Again, it comes down to funding and the
2 amount of time it would take to get the aircraft back
3 into operational status. So there are competing
4 priorities, obviously, for funding. Competing
5 priorities for the needs for that particular aircraft.
6        So if you only have a finite amount of
7 funding, you can't afford to bumper to bumper replace
8 all the wirings. It forced to prioritize to get the
9 most critical ones out first with the available money.
10    Q    I guess what I mean is, why not just base
11 it on which harnesses were the most problematic,
12 irregardless of whether it impacted the mission or not?
13    A    Well, those were all in the Phase 1
14 problematic -- regardless of what it did. If it was
15 causing problems repeatedly in the fleet, that was
16 replaced. Even if it were just a landing gear light
17 wires. If it was causing problem, it was added. If it
18 was a recorded problem, it was added. And then on top
19 of that -- in addition to that was anything that was
20 mission critical or safety related.
21        The most problematic included safety and
22 just nuisance ones I may not have been critical mission
23 at all. They were nuisance. They were repeat
24 offenders.
25    Q    And those would be in --

Page 65

17 (Pages 62 - 65)

1 he or she. It's their aircraft?
2     A   Yes.
3     Q   So do they also -- I'm trying to understand
4 the division between two the two, right. So PMA-261 is
5 responsible for sustainment of it. The type commander
6 determines what that aircraft is going to do, correct,
7 mission-wise?
8     A   Yes.
9     Q   So that office also gets an amount of money
10 as well, correct?
11     A   Correct.
12     Q   Between those two, do you know who gets the
13 most funding each year?
14     A   No. But the type of money that the Ty Com
15 gets is different from what we get. We get
16 aircraft-procurement-type money. The fleet gets flight
17 hour dollars, basically, to pay for consumables, fuel,
18 oil, spare parts, things like that. Ours is -- theirs
19 is probably bigger. I don't know. I'm not sure. It
20 depends on -- not necessarily. It depends on the
21 program.
22        We get funded for specific programs like --
23 obviously, depending on what's going on in the program
24 office, we get a -- for instance, the 53-K program is a
25 billion dollar program. I don't think the Ty Com ever
                                                    Page 74

1 gets billions of dollars to operate aircraft. It's
2 just different type of money. It's really not apples
3 to apples. So I couldn't say for sure.
4     Q   So that leads into my next question which
5 is, are the Ty Com and PMA-261 sort of trying to get at
6 the same fund of money, the same bucket of money?
7     A   No.
8        (Mellen Deposition Exhibit 3 was marked
9 for purposes of identification.)
10     Q   So you've just been handed, Bill, what's
11 been marked as Exhibit 3 to your deposition. It's
12 Bates named Mil 120264 through 120280. It's entitled
13 PMA-261, CH-53D, CH-53E helicopter program briefing for
14 Mrs. Trish Ryan, professional staff member, House
15 Appropriations Committee, national security, 12
16 February, 1997.
17        First question -- and I know you said that
18 you were reviewing historical documents related to the
19 Kapton issue.
20        Have you reviewed this particular document?
21     A   No. I wouldn't have had this one. No.
22     Q   Does this indicate to you that PMA-261 has
23 prepared a briefing for Mrs. Trish Ryan who is a staff
24 member of the House Appropriations Committee?
25     A   Yes.
                                                    Page 75

1     Q   Now, in your experience, why would PMA-261
2 be preparing a briefing for the House Appropriations
3 Committee?
4     A   Probably was -- it's not something that we
5 would regularly do at this level. It must have been a
6 staffer request for a little bit of background
7 information for the funding request we were making.
8 They want to understand what it is we want. Sometimes
9 if we are asking for money -- budget line items are
10 very nondescript. And it's not a lot of -- the budget
11 is not very user friendly to be able to describe,
12 necessarily, what it is you're asking money for. And
13 for a staffer to be able to defend the budget for you
14 or to secure the money that you're asking for, it helps
15 them to have a better understanding of the nature of
16 what you're asking for.
17        It probably was a request saying we want to
18 work together so I can make sure I can defend what
19 you're asking for more effectively. This is typically
20 why you do these. I don't know if that was the case,
21 if this person asked us to come brief it. But that is
22 typically what happens.
23     Q   In your experience, you will occasionally
24 get requests from Congressional committees for
25 information related to programs that you want money
                                                    Page 76

1 for?
2     A   Yes.
3     Q   And PMA-261 will prepare a briefing in
4 order to justify that expenditure?
5     A   Yes.
6     Q   So if you go to what's been Bates stamped
7 as Mil 120277.
8     A   Okay.
9     Q   On this page, it's titled CH-53E service
10 life extension program, SLEP.
11        Do you see that?
12     A   Yes.
13     Q   And then under Phase 2, the second sub
14 bullet point, it says replacement of Kapton wiring.
15        Do you see that?
16     A   Yes.
17     Q   So based on your own experience with this
18 procedure, would it be your understanding that one of
19 the things that they were briefing to this House
20 Appropriations Committee was why they need money for
21 the replacement Kapton program?
22     A   Yes.
23     Q   And this is in 1997, correct?
24     A   Yes.
25     Q   So I know you couldn't give me a specific
                                                    Page 77

1 date for when the replacement -- Kapton replacement
2 program began. But I believe you said it was after
3 2000 sometime?
4     A   I'm assuming. I just know for sure it was
5 in place and multiple aircraft had been repaired by
6 2006 when I arrived.
7     Q   Do you know or have you heard from anyone
8 that's been there longer that they were having problems
9 getting funding for the replacement program?
10    A   Yes.
11    Q   And what did you hear?
12    A   Well, even every year I was there, it was
13 always -- we never were able to receive funding that
14 was necessary to replace all the Kapton on all the
15 aircraft that needed it, which led us down this
16 multiple phase thing. So it was difficult to get full
17 funding of the entire scope of what we had to do, which
18 was, you know, almost a hundred aircraft that had to
19 have replacement wiring in the order of over a million
20 dollars per aircraft to replace it. We couldn't get
21 that kind of money.
22    Q   So based on your understanding of the
23 Kapton issue, if Nav Air had been given the funds to do
24 all three phases immediately, they would have done it?
25    A   We would have.

1     Q   But you weren't given those funds. So you
2 had to break it up into phases, starting with what Nav
3 Air determined were the most critical harnesses and
4 them moving down into Phase 2 and Phase 3 with the less
5 critical harnesses, as determined by Nav Air?
6     A   Yes.
7         (Mellen Deposition Exhibit 4 was marked
8 for purposes of identification.)
9     Q   So, Bill, you've been handed what's been
10 marked as Exhibit 4 to your deposition, Bates stamped
11 Mil 120702 through 735 titled H-53 an executive
12 helicopter's program.
13        Again, as part of your review of historical
14 documents, have you reviewed this document?
15    A   Not this particular.
16    Q   And this is entitled POM-00NALG, in
17 quotations, B, code review. And then the individual
18 named on here is Colonel Robert A. Forester, United
19 States Marine Corps, program manager, dated 23 October,
20 1997.
21        First question, what is POM-00?
22    A   That's the fiscal year, 00, budget cycle.
23    Q   And NALG, what does that stand for?
24    A   I don't remember. It's a leadership group,
25 but I don't remember.

1     Q   And then the, in quotations, B?
2     A   It's not familiar terminology to me.
3     Q   And so B code review?
4     A   It would just be the -- there are different
5 codes within OPNAV. It must -- it's one of the codes
6 along the way up the staffing chain. I don't know what
7 level this is.
8     Q   Do you know who Colonel Robert A. Forester
9 is?
10    A   No. I can assume he was the PMA-261 at the
11 time, just from the title.
12    Q   And by "title," you mean program manager?
13    A   Yes.
14    Q   So you believe he was the PMA-261 --
15    A   Program manager.
16    Q   -- program manager, which -- not the class
17 desk?
18    A   Not the class desk.
19    Q   This is the person above that, the actual
20 program manager?
21    A   Yes.
22    Q   Typically, what would be the rank of
23 someone that would occupy the class-desk position?
24    A   It would be either an O5 or O4 officer. So
25 either lieutenant commander or commander in the Navy or

1 a major or lieutenant colonel in the Marine Corps.
2     Q   And if you turn to what's been Bates
3 stamped as -- and this staple may be in the way. But
4 Mil 120711 and -- it's the one right before Mil 120712.
5 I can't read the number though.
6     A   Okay.
7     Q   But the title of the page is OAG POM-00
8 priorities, right?
9     A   Uh-huh.
10    Q   And below that under number three, it says,
11 ASPA, slash, WSS.
12        Do you know what those two acronyms stand
13 for?
14    A   It's -- I know what it is. I'm not sure if
15 I know the acronym. I know what they are, but I can't
16 remember what the acronym stands for again.
17    Q   Okay. Turn to the page before Mil 120716.
18 So it must be Mil 120715, but I can't read the number.
19    A   What page was it?
20    Q   So the page before Mil 120726. The Bates
21 stamp on that page is blacked because of the stapling
22 job that we did.
23    A   Okay.
24    Q   And this is -- the top of the page says,
25 H-53 issue sheet service life extension program SLEP

Veritext Legal Solutions
866 299-5127

1 H-53E?
2    A    Uh-huh.
3    Q    And correct me if I'm wrong, but this
4 indicates there is a funding shortfall for the SLEP
5 program?
6    A    Yes.
7    Q    So -- and if we look back on what was
8 marked as Exhibit 3, that one page regarding the SLEP
9 program that we talked about on the briefing to Trish
10 Ryan, it indicated that replacement of Kapton wiring at
11 that time was being considered as part of the SLEP,
12 correct?
13    A    Yes.
14    Q    So what this page is indicating is that
15 there is a shortfall in funding in order to accomplish
16 that, correct?
17    A    There is a -- yes.  There is a -- correct.
18    Q    And it projects out funding from fiscal
19 year '99 through fiscal year '05?
20    A    Correct.
21    Q    And the total deficit -- or the delta they
22 indicate is 754.2 million, correct?
23    A    That is the total deficit.  Yes.  So this
24 shows the -- this is the fit up, which is the fiscal
25 year defense plan, which is the FY '99 through '05.

Page 82

1 And then there is the to complete after that, which is
2 whatever you can't get -- it includes all the other
3 aircraft that aren't included in those years, plus.  So
4 the total rolls up all that together.
5    Q    But this applies only to the H-53 Echo,
6 correct?
7    A    Yes.
8    Q    So at least in 1997 -- I'm sorry -- 1997,
9 the projection out to '05 was -- indicated there was
10 going to be a total deficit of the required funding of
11 754.2 million?
12    A    Yes.  That's just the delta for the entire
13 SLEP, if what's what you mean, where Kapton was a part
14 of it.
15         MR. HICKEY:  Okay.  I only have one more
16 exhibit, but I can't find it.  Let's take a five-minute
17 break.
18         THE VIDEOGRAPHER:  Off the record at 2:11.
19         (There was a break in the proceedings.)
20         THE VIDEOGRAPHER:  Back on the record at
21 2:16.
22         (Mellen Deposition Exhibit 5 was marked
23 for purposes of identification.)
24    Q    So, Bill, you've been handed what's been
25 marked as Exhibit 5 to your deposition.  It's Bates

Page 83

1 stamped Mil 230430 through -440.  It's entitled
2 executive summary technical concurrence and risk
3 acceptance signature sheet.  And later on systems
4 safety risk and assessment H-53E Kapton electrical
5 wiring SSRA.
6         Have you ever seen this document before?
7    A    Yes.
8    Q    And what is this document?
9    A    This is a risk acceptance document that
10 outlines a hazard and mitigation and a risk
11 determination for certain hazards that, at a certain
12 level, have to get signed off by a different level of
13 leadership.  So this was to formally have the risk
14 decision be made at the proper level and get it signed
15 off on by the risk acceptance, which in this case was
16 PEOA.  And for a risk at this level, it requires DCA --
17 or ADCA, the deputy commandant Marine Corps for
18 aviation, to sign off as well.  That person represents
19 the fleet.  PEOA represents Nav Air.  And they both
20 concur with the risk and accept it.
21    Q    And what's the risk that's being analyzed
22 in this document?
23    A    This Kapton electrical wiring risk.
24    Q    And what's the date of this assessment?
25    A    20 May, 2009.

Page 84

1    Q    And do you know who performed this system
2 safety risk assessment?
3    A    John Fletcher, the system safety engineer
4 from Lake Hurst.
5    Q    And do you know John Fletcher?
6    A    Yes.
7    Q    Now, if you look at page 1 of 8, which is
8 on Mil 230432, at the very bottom it says, original,
9 dash, November, 1995, rev one, 02; rev two, 06; rev
10 three, which is this date, 09.
11         So are these all the prior risk assessments
12 that have occurred with regard to Kapton electrical
13 wiring?
14    A    These are other visions to the SAR 42005.
15 So yes.
16    Q    Would John Fletcher -- do you know, would
17 he have completed all such safety -- system safety risk
18 assessments?
19    A    Someone in his position.  I'm not sure how
20 long he was around.  He was around for a long time.  I
21 don't know if he started the original or not.  But I'm
22 sure he certainly did -- was there in '06, probably did
23 the '02.  But I don't know exactly when he started to
24 work 53 program.  Likely yes.  I don't know.  He was
25 there for a long time.

Page 85

22 (Pages 82 - 85)

Page 94

1 acceptance for every risk that we had in the program,
2 across the PEO, not just our program. So that drove us
3 to take this SRA and turn it into -- put it on this
4 format and have everybody actually sign to accept risk.
5 Previously, that hadn't happened. So that drove this
6 document.
7 Q. Okay.
8 A. But the risk was known well before 2009.
9 Q. But the risk that's being accepted here --
10 what is the risk that's being accepted?
11 A. To -- acknowledgment that there is -- a
12 hazard had been identified. This is the probability
13 and consequence of that hazard. Do we concur that it's
14 okay to continue to operate aircraft with this known
15 hazard.
16 Q. And everyone that signed this is indicating
17 that -- or everyone that signs this, their response to
18 that question is yes?
19 A. Yes.
20 Q. So you've talked to or briefed Captain
21 Muldoon. And then it says -- so the first three are
22 all reviewed by. And then technical approval is Rear
23 Admiral Gaddis?
24 A. Correct.
25 Q. And he has a designation of Air 4.0?

Page 95

1 A. Yes.
2 Q. So he's the engineering lead at Nav Air?
3 A. Yes.
4 Q. Is he an engineer himself? Do you know?
5 A. I don't know. He's retired now.
6 Q. So he is providing -- he's reviewing this
7 and then signing off on a technical standpoint that
8 everything is correct technically in this assessment?
9 A. Uh-huh.
10 Q. And then the US Navy, slash, US Marines
11 Corps user concurrence, what is that position?
12 A. That is the counterpart -- it's the class
13 desk at air land -- air forces that -- again, this
14 would be the person who represents the type commander
15 who owns the aircraft, the 53 -- the aircraft type
16 commander -- the fleet type commander.
17 Q. So the type commander is signing off on
18 this assessment?
19 A. Concurring.
20 Q. Right. And he's indicating that he concurs
21 below his name, correct?
22 A. Yes.
23 Q. And below that, Brigadier General J.M.
24 Davis?
25 A. Yes.

Page 96

1 Q. Assistant deputy commandant for aviation?
2 A. Yes.
3 Q. Who is that individual, if you know?
4 A. It's ADCA, which is the commandant in
5 Marines Corp is representative for aviation. So he
6 basically owns all the Marine Corps aircraft.
7 Q. Okay.
8 A. He has final authority on how Marine Corps
9 aircraft are used operationally.
10 Q. And then, finally, we get down to Rear
11 Admiral Eastburg who put this whole thing in motion.
12 And he's signing off. Next to his name it says risk
13 acceptance.
14     So, ultimately, it's up to Rear Admiral
15 Eastburg to determine whether this risk is going to be
16 accepted or not?
17 A. I think this is labeled not well. I think
18 what it's meant -- the risk acceptance is joint
19 acceptance between ADCA, General Davis, and Admiral
20 Eastburg. If one of them -- either one of them could
21 have said no, and then this would have been a
22 nonstarter. So Admiral Eastburg can't say -- if ADCA
23 says no, Admiral Eastburg can't say -- he can say I
24 accept it, but no aircraft are going to fly with it if
25 both don't accept it.

Page 97

1 Q. But both have accepted it. So Brigadier
2 General Davis and Rear Admiral Eastburg are stating
3 that they understand the risks associated with
4 continuing to operate the CH-53 Echo. And one of those
5 risks is the -- is that you may have an inadvertent
6 landing gear retraction while the aircraft is on the
7 ground, correct?
8 A. Yes.
9 Q. They understand that that's a risk. And
10 they are saying that this aircraft is going to continue
11 to operate even with that known risk, correct?
12 A. Yes.
13     MR. HICKEY: Thank you. That's all the
14 questions I have.
15     EXAMINATION BY MRS. SAVITT:
16     (Mellen Deposition Exhibit 6 was marked
17 for purposes of identification.)
18 Q. Good afternoon. My name is Lisa Savitt. I
19 represent DuPont. I just have a few questions.
20     I have something here I'm going to ask be
21 marked as an exhibit. I don't have copies. I don't
22 have the whole document. But I only have a few
23 questions. But it's Mil 242476 through 480. I will
24 represent that I know that there's about 110 pages in
25 that document. I didn't obviously print them all.

25 (Pages 94 - 97)

Page 102

```
 1  which phase?
 2      A    It definitely reminds of me of the number
 3  of harnesses in each phase and the status of each.  But
 4  I couldn't -- again, I couldn't tell you what was
 5  included in -- what the twenty were in Phase 2.
 6  Essentially, what I -- this pretty much spells out what
 7  I said previously.
 8      Q    And the fourth paragraph says, based on our
 9  current funding.  Then it goes on, full Kapton
10  replacement will be complete for the ninety-seven
11  effected CH's in fiscal year '17.
12           Do you have any knowledge of whether or not
13  it's on target to be finished in fiscal year '17?
14      A    I don't.  I would not know that.  A lot of
15  it depends on the induction schedule of aircraft into
16  the depot.
17      Q    And there is a reference at the top to an
18  attachment, CH phase 2 PowerPoint.
19           Was that a listing of the aircraft that
20  still were in Phase 2?  Or do you recall what it was?
21      A    I don't completely remember.  I think it
22  was probably -- I had several briefs that would lay out
23  which harnesses were in those phases and the timeline
24  to complete probably which slide, something to that
25  effect.
```

Page 103

```
 1      Q    And does this document at all refresh your
 2  recollection to some of the other questions Mr. Hickey
 3  asked you about funding, in particular the fact that
 4  it -- the Kapton replacement has never been a fully
 5  funded program.  That squares with what you testified
 6  earlier.
 7           Is that correct?
 8      A    Yes.
 9           MRS. SAVITT:  I have no further questions.
10           MR. SHEPARDSON:  I have no questions.
11           THE VIDEOGRAPHER:  This concludes today's
12  video recorded deposition.  We are now off the record
13  at 2:45.
14           (Deposition concluded at 2:45 P.M.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 104

```
 1
 2
 3              CERTIFICATE OF DEPONENT
 4
 5       I hereby certify that I have read and
 6  examined the foregoing transcript, and the same is a
 7  true and accurate record of the testimony given by me.
 8
 9       Any additions or corrections that I feel are
10  necessary will be made on the Errata Sheet.
11
12
13
14      _____
15            William Mellen
16
17      _____
18            Date
19
20  (If needed, make additional copies of the Errata Sheet
21  on the next page or use a blank piece of paper.)
22
23
24
25
```

Page 105

```
 1  State of Maryland
 2  Prince George's County, to wit:
 3       I, HEATHER AVALOS, a Notary Public of the
 4  State of Maryland, County of Prince George's, do hereby
 5  certify that the within-named witness personally
 6  appeared before me at the time and place herein set
 7  out, and after having been duly sworn by me, according
 8  to law, was examined by counsel.
 9       I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12       I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in the
14  outcome of this action.
15       As witness my hand this 9th day of March,
16  2017.
17
18
19
20
21            <%signature%>
22            HEATHER AVALOS,
23            Notary Public
24  My Commission Expires:
25  December 29, 2019
```

27 (Pages 102 - 105)

# EXHIBIT H

D.F. et al., v. Sikorsky Aircraft Corporation, et al.
U.S.D.C., Case No.: 13:cv-00331-GPC-KSC
(Exhibits to Declaration of Christopher S. Hickey
In Support of Motion for Summary Judgment)

# In The Matter Of:

*D.F., a minor*
*v.*
*SIKORSKY AIRCRAFT CORPORATION*

---

## *AMADOR, TASHINA – Vol. 1*
### *November 4, 2015*

---



**DTI** **Court Reporting Solutions**

20750 Ventura Boulevard, Suite 205
Woodlands Hills, CA 91364
Phone: 818.593.2300 - Fax: 818.593.2301

TASHINA AMADOR - 11/4/2015

Page 42

1   through DF-000547.
2       Exhibit 2 is a number of documents that
3   appear to be related to the dissolution of -- of the
4   marriage between Tashina Peshlakai --
5       THE WITNESS:  Peshlakai.
6       MR. HICKEY:  Peshlakai, sorry.
7       -- and Delvin Troy Long.
8       Tashina, these documents were produced by
9   your counsel in this case, and I just want to ask
10  you a few questions about it.
11      Q.  If you turn to page -- at the very bottom
12  it's -- there are what we call Bates numbers at the
13  very bottom of the page.  It starts with DF and then
14  there's 000 and then a number after that.
15      Do you see those at the bottom?
16      A.  Yes.
17      Q.  Okay.  If you can go to 532.  Okay.  Do you
18  recognize the document that you're looking at?
19      A.  Yes, I do.
20      Q.  Okay.  And it's -- the title of it is
21  "Income and Expense Declaration."
22      A.  Yes.
23      Q.  Now, was this a document that you filled
24  out?
25      A.  Yes, it is.

Page 43

1       Q.  Okay.  And is that your signature at the
2   bottom?
3       A.  Yes.
4       Q.  Okay.  And in Section 3 it says "Tax
5   Information"; do you see that?
6       A.  Yes.
7       Q.  And it says:  "I last filed taxes in the
8   year 2008," and then under B, "My tax filing status
9   is," and you checked "head of household"; is that
10  correct?
11      A.  Correct.
12      Q.  Okay.  Why did you check "head of
13  household"?
14      A.  Because I was head of household.
15      Q.  Did you have a dependent at that time?
16      A.  Yes, I do.
17      Q.  And who's the dependent?
18      A.  Tanika Long.
19      Q.  Okay.  And when was Tanika Long born?
20      A.  She was born November 10th, 2000.
21      Q.  Can you spell her name for the record?
22      A.  T-a-n-i-k-a, L-o-n-g.
23      Q.  Okay.  And who is the father of Tanika
24  Long?
25      A.  Her biological father is Delvin Long.

Page 44

1       Q.  Okay.  So at the time Tanika was born, you
2   weren't married at that time?
3       A.  No.
4       Q.  Okay.  And then subsequent to that, you and
5   Mr. Long got married in August 2006?
6       A.  Yes.
7       Q.  Did you ever live together with Mr. Long?
8       A.  Yes.
9       Q.  Okay.  And what was -- when did you live
10  with Mr. Long?
11      A.  The beginning of 2001 to around -- I'm
12  sorry, 2000, beginning of 2000, to around November
13  2001.
14      Q.  Did you ever live with him again after that
15  time frame?
16      A.  Yes.  He moved to San Diego a week after
17  our marriage for one week.
18      Q.  So he lived in San Diego for one
19  week in August 2006?
20      A.  Yes.
21      Q.  Okay.  And you lived together during
22  that -- for that week?
23      A.  Yes.
24      Q.  Okay.  And what happened to Mr. Long after
25  that?

Page 45

1       A.  He left.
2       Q.  Okay.  After he left in 2006, did he have
3   any contact with -- with Tanika?
4       A.  Off and on, yes.
5       Q.  Did he see her in person?
6       A.  No.
7       Q.  How did he communicate with her?
8       A.  Letters.
9       Q.  So when you say "letters," would those be
10  letters sent by U.S. mail?
11      A.  Yes.
12      Q.  Okay.  Did he call her at all?
13      A.  He did.  It was usually on her birthday for
14  once a year.
15      Q.  When's the last time he had contact with
16  Tanika?  When's the last time Mr. Long had contact
17  with Tanika?
18      A.  2010.
19      Q.  What was the nature of that meeting?
20      A.  He called her.
21      Q.  Was that on her birthday?
22      A.  It was a little after her birthday, yes.
23      Q.  After August 2006 did Mr. Long provide any
24  financial support for the upbringing of Tanika?
25      A.  No.

12  (Pages 42 to 45)

TASHINA AMADOR - 11/4/2015

Page 46

1    Q.  Okay.  What about before 2006?

2    A.  No.

3    Q.  Okay.  So when you -- when you marked on

4    the document that we're talking about, DF-000532,

5    that you were the head of the household, that's

6    because you were the -- providing the sole financial

7    support for Tanika?

8    A.  Yes.

9    Q.  Okay.  Now, if you take a look at all the

10   documents between DF-00527, which is the first page

11   of Exhibit 2 --

12       MR. SHEPARDSON:  Listen to his question

13   before you start --

14       THE WITNESS:  Okay.

15   BY MR. HICKEY:

16   Q.  -- and through the end, which is DF-000547,

17   are these all the documents that -- or did you

18   prepare all the documents between that Bates

19   range?

20   A.  Yes, I did.

21   Q.  And not all the documents are

22   signed, but most of them are, and they're signed on

23   June 26, 2009; is that the time when you filled out

24   these documents?  Is that the date you filled out

25   these documents?

Page 47

1    A.  Yes.

2    Q.  Okay.  Now, if you go to page DF-000530 --

3        Do you see that?  Are you there?

4    A.  Yes, I do.

5    Q.  -- under paragraph 13 it says "Average

6    Monthly Expenses," and you have checked that these

7    are estimated expenses.  Did you -- you filled out

8    this portion?

9    A.  Yes, I did.

10   Q.  So your total monthly expenses in June of

11   2009 you estimate were $2,442; is that correct?

12   A.  Correct.

13   Q.  And if you go to paragraph 17, which is on

14   page DF-000531 -- 17 -- it says that you provide

15   children's healthcare expenses and it says that,

16   under paragraph -- under subsection A, that you've

17   checked that you do.  Is that for -- was that for

18   Tanika?

19   A.  Yes.

20   Q.  Okay.  And in paragraph 18 it has

21   additional expenses for the children and under C it

22   has travel expenses for visitation and under there

23   is a number $400.  Is that travel expenses for

24   Tanika to visit somebody?

25   A.  Yes.

Page 48

1    Q.  Who was she visiting?

2    A.  Her grandparents in New Mexico.

3    Q.  Okay.  And all the numbers that are listed

4    in paragraph 18, you filled in those numbers?

5    A.  Yes.

6    Q.  Okay.  If you turn to page DF-000533, under

7    paragraph 9 you've marked that there's been a change

8    in income, and it indicates "deployed for six

9    months."  That's at Al Asad, Iraq?

10   A.  Yes.

11   Q.  And is that one of the deployments that we

12   talked about?

13   A.  Yes.

14   Q.  Which one was it?

15   A.  My first deployment.

16   Q.  Okay.  The one from April 2007 to November

17   2007?

18   A.  Yes.

19   Q.  Okay.  And who else have you been married

20   to?

21   A.  To Angel Amador.

22   Q.  And when did you and Angel get married?

23   A.  June 20th, 2014.

24   Q.  And do you and Angel have any biological

25   children between yourselves?

Page 49

1    A.  No.

2    Q.  And does Angel have any children?

3    A.  Yes, he does.

4    Q.  Okay.  What are their names?

5    A.  Brittany Amador.

6    Q.  And what's Brittany's age?

7    A.  She'll be five in November.

8    Q.  Okay.

9    A.  Kaeley Amador.  She is three.

10   Q.  Okay.

11   A.  Krystal Amador.  She's 16.

12   Q.  And are all three of these children from a

13   prior marriage that Angel had?

14   A.  There's Maria Amador.

15   Q.  That's Angel's ex-wife?

16   A.  No, that's his daughter.

17   Q.  Oh, I'm sorry.  I thought there were -- so

18   there's more than three?

19   A.  Yes, there's four.

20   Q.  Okay.  And how old is Maria?

21   A.  Twenty-two.

22   Q.  And, again, as we talked about before, if

23   you don't remember something, that's fine.  Okay?

24   So I noticed you looked over towards Angel, but he

25   is not being deposed today.  So if you don't

13 (Pages 46 to 49)

TASHINA AMADOR - 11/4/2015

Page 78

1  Afghanistan, I went to Iraq.
2      Q.  Okay.  When Tanika lived with both you and
3  Alex, did Alex pay for any of Tanika's expenses?
4      A.  Yes, he did.
5      Q.  What did he pay for?
6      A.  He paid for half her braces, the first --
7  the first set.  He paid for her sports, the fees.
8  The youth center, he would pay for -- he paid half
9  for that.
10     Q.  And what is the youth center?
11     A.  It's -- it's on base.  It's like a daycare
12 for -- for youth, for -- I believe it's from seven
13 on up, seven to 18-year-olds, before and after care,
14 before school and after school care.
15     Q.  So you said he paid for sports fees.  Do
16 you recall about how much money that was?
17     A.  Well, yes, it was a -- just to enroll her
18 was $55.
19     Q.  Was that on a monthly basis?
20     A.  No, it was a one-time enrollment fee, but
21 it was for every sport.  It's $55 for every sport
22 she would enter into.
23     Q.  Okay.  And you said he paid for half, half
24 of her braces.  Do you know how much her braces
25 cost?

Page 79

1      A.  Yes.  Her braces were around 3,000.
2      Q.  And he paid -- Alex paid half of that or
3  $1500?
4      A.  Yes, he did.
5      Q.  And he paid half for her enrollment in the
6  youth center on -- at Miramar?
7      A.  Yes, he did.
8      Q.  How much was that?
9      A.  Hers was around, like, $75 a month.
10     Q.  And he would pay half of that $75?
11     A.  Yes.
12     Q.  Each month?
13     A.  Well, one month he would pay and then the
14 next month I would pay, so we would divide it that
15 way.
16     Q.  Anything else that Alex would have paid
17 for?  Strike that.
18          Is there any other expenses for Tanika that
19 Alex paid for?
20     A.  Clothing.  He helped with clothing.  He
21 helped with food.
22     Q.  And can you estimate what percentage of
23 Tanika's clothing expenses were paid by Alex?
24     A.  I would say the clothing was 50/50.
25     Q.  What percentage of food purchases?

Page 80

1      A.  He did more than that.  He -- I'm going to
2  say I probably paid 40 percent of it.
3      Q.  So Alex paid roughly 60 percent, you paid
4  40 percent?
5      A.  Yes.
6      Q.  Okay.  Are there any other expenses related
7  to Tanika that Alex paid for?
8      A.  Yes.  When she would go to Texas to visit
9  his parents, he'd be the one purchasing the tickets.
10     Q.  You mean the airplane tickets?
11     A.  Airplane tickets.
12     Q.  So Alex would purchase the airplane tickets
13 to Houston?
14     A.  Yes.
15     Q.  How often did Tanika go to Houston?
16     A.  It was for every deployment, and we would
17 go back for -- we would try to go back for Christmas
18 and her birthday.
19     Q.  Your first deployment in 2007 --
20     A.  No, he didn't pay for that one.
21     Q.  Where was Tanika during that first
22 deployment?
23     A.  She stayed with my parents.
24     Q.  In New Mexico?
25     A.  Yes.

Page 81

1      Q.  Okay.  And the second deployment in 2008 to
2  2009, Tanika went to Houston; correct?
3      A.  Correct.
4      Q.  Okay.  And Alex paid for the plane ticket
5  to and from Houston?
6      A.  Yes, he did.
7      Q.  Okay.  And the last deployment that you had
8  in 2012 Tanika also went to Houston?
9      A.  Yes.
10     Q.  Okay.  And she was living with Alex's
11 parents?
12     A.  Parents, correct.
13     Q.  Okay.  Anything else that Alex paid for
14 regarding Tanika's expenses?
15     A.  No.
16     Q.  Okay.  That's it.
17          You know, with regard to the total cost of
18 raising Tanika, how much would you say Alex
19 contributed to that on a percentage?
20     A.  I'm going to say about -- about 60 percent.
21     Q.  And was that true during the entire time
22 that you and Tanika were living with Alex?
23     A.  Yes.
24     Q.  Okay.  So from February 2008 to March 2011
25 you estimate Alex paid for approximately 60 percent

21 (Pages 78 to 81)

TASHINA AMADOR - 11/4/2015

Page 82

1    of Tanika's expenses?

2        A.  Yes.

3        Q.  What about when Alex was deployed, was he

4    still able to pay for her expenses?

5        A.  Yes.

6        Q.  How did he do that?

7        A.  When we were both deployed at the same

8    time, he was sending money to his mom while she was

9    in the care of his parents, and he was sending her

10   money every payday, which is bi-weekly.

11           MR. HICKEY:  What exhibit are we up to?

12           THE REPORTER:  Three.

13           MR. HICKEY:  Mark that as Exhibit 3.

14           (The document referred to was marked by the

15   reporter as Exhibit 3 for identification and is

16   attached hereto.)

17   BY MR. HICKEY:

18       Q.  Mrs. Amador, you've been handed what's been

19   marked Exhibit 3.  Do you recognize this document?

20       A.  Yes, I do.

21       Q.  Okay.  And Exhibit 3 is dated 8 April,

22   2011.  It's two pages.  The bottom of the first page

23   just says "enclosure" and a parenthetical No. 13,

24   and the second page is a Bates number DF-00130.  Can

25   you describe or can you explain what Exhibit 3 is?

Page 83

1        A.  Exhibit 3 is when I was being questioned by

2    an investigator, the judge advocate, and this is

3    pretty much everything -- my statement to him

4    regarding the questions.

5        Q.  Did you type up this statement?

6        A.  I did not.

7        Q.  Do you know who did?

8        A.  I believe he did.

9        Q.  Can you read through this document and let

10   me know if there's anything that's incorrect?

11           MR. SHEPARDSON:  Take your time.

12           THE WITNESS:  No.

13   BY MR. HICKEY:

14       Q.  So everything that's written in Exhibit 3

15   is accurate?

16       A.  Yes, except for no date was set for the

17   wedding.

18       Q.  Okay.  Do you remember who the JAG was that

19   you talked to?

20       A.  No, I do not remember his name.

21       Q.  Was it a Marine Corps JAG?

22       A.  Yes.

23       Q.  Okay.  Do you know if the JAG worked at

24   Miramar?

25       A.  Yes.

Page 84

1        Q.  Do you see in the paragraph that's

2    second -- the second paragraph from the bottom on

3    the first page?

4        A.  Yes.

5        Q.  It says:

6           "While he was home and the squadron was

7           deployed, Sergeant Fontalvo would check in each

8           morning with Staff Sergeant Hamenberger."

9           Do you know who that is?

10       A.  Yes, I do.

11       Q.  And who is Staff Sergeant Hamenberger?

12       A.  It was one of the staff sergents that

13   stayed behind his unit, and he was still here

14   while the unit was deployed, so it was his

15   supervisor at the time.

16       Q.  Okay.  And the next sentence says:

17           "The FRO was also around for HMH 363."

18       A.  361.

19       Q.  I'm sorry, thank you, 361.

20           Who's the FRO?

21       A.  That's the FRO.  It's a civilian that sends

22   emails to the spouses left behind regarding updates

23   about the deployment, such as the return, how

24   they're doing, events that are going to be taking

25   place.  That's who FRO is.

Page 85

1        Q.  And FRO stands for what?

2        A.  I don't know.

3        Q.  Does it stand for family readiness officer?

4        A.  Yes, it does.

5        Q.  And was Alex communicating with the -- with

6    the FRO?

7        A.  Yes, he was.

8        Q.  Do you know what that was about?

9        A.  No.

10       Q.  Was he friends with the FRO?

11       A.  I don't think he was friends, no.

12       Q.  Do you know who -- who the family readiness

13   officer was?

14       A.  Yes.  Her name is Natalie.

15       Q.  Do you recall the last name?

16       A.  No.

17       Q.  Also on the -- on the first page, in the

18   last paragraph -- in fact, the last sentence -- it

19   says:

20           "Generally, he wished to come back to HMH

21           466."

22           Do you know why Alex wanted to go back to

23   that squadron?

24       A.  That's where a lot of his friends were and

25   he was only supposed to be at 361 temporarily and --

TASHINA AMADOR - 11/4/2015

Page 126

1    So you claim Tanika as a dependent and part
2  of that you get an increase in BAH; correct?
3     A.  Yes.
4     Q.  Alex Fontalvo claimed Dominic as his
5  dependent and as a result he got an increase in BAH;
6  correct?
7     A.  Yes.
8     Q.  Okay.  All right.  Who claimed Tanika as a
9  dependent on -- strike that.
10        During the time you were with Alex
11 Fontalvo, did you file joint tax returns?
12    A.  No.
13    Q.  So you each filed separate tax returns?
14    A.  Correct.
15    Q.  Okay.  Who claimed Tanika as a dependent on
16 their tax forms?
17    A.  I did.
18    Q.  Okay.  Who claimed Dominic as a dependent
19 on their tax form?
20    A.  Dominic.
21    Q.  Dominic.
22    A.  Alex did.
23    Q.  Dominic.  Let me write that down.
24    Okay.  So Alex claimed him as a
25 dependent --

Page 127

1     A.  Yes.
2     Q.  -- for purposes of filling out a tax
3  return?  Okay.
4        One more question.  Exhibit 7 is titled
5  "Children's" -- sorry, if you can get that back.
6        Okay.  Exhibit 7 Is titled "Children's
7  Dependency Determination Affidavit"; correct?
8     A.  Correct.
9     Q.  And Exhibit 8 is "Dependency Statement,
10 Child Born Out of Wedlock Under Age 21"; correct?
11    A.  Correct.
12    Q.  Now, did Alex fill out that dependency
13 application in order to claim Dominic as his
14 dependent?
15    A.  Yes, I believe he did.
16    Q.  And do you know what military form, what DD
17 form that would be that he would have filled out in
18 order to -- in order to apply to have Dominic as his
19 dependent?
20    A.  Wouldn't it be these two forms?
21    Q.  Okay.  So it's your belief these are the
22 only two forms that have to be filled out?
23    A.  Yes, along with his birth certificate.
24    Q.  Did he ever fill -- did Alex Fontalvo ever
25 fill out a Children's Dependency Determination

Page 128

1  Affidavit for Tanika?
2     A.  Yes, he has.
3     Q.  He has.
4        Do you have that document?
5     A.  I do, but it's just like this, not
6  completely done.
7     Q.  So it was not signed?
8     A.  No.
9     Q.  Okay.  Okay.  But you have -- how easy
10 would it be for you to get that document?
11    A.  It's in Pensacola packed away in storage,
12 so I'm going to say it will take me about three
13 hours to locate it.
14    Q.  Stored in your home or stored offsite?
15    A.  Stored in my home.
16    Q.  And did Alex also fill out a dependency
17 statement with regard to Tanika?
18    A.  I believe he did, yes.
19    Q.  You would have that document at home as
20 well?
21    A.  I've seen it.  I just have to look for it.
22    Q.  Okay.  Do you know what DEERS is?
23    A.  Yes, I do.
24    Q.  Okay.  What is DEERS?
25    A.  I don't know what it stands for, but it's

Page 129

1  a -- it's a system for the military where we add our
2  dependents, our spouses into the system in order for
3  us to receive Tricare Prime benefits.
4     Q.  Okay.  And I believe DEER stands for
5  Defense Enrollment Eligibility Reporting System, so
6  -- but I wouldn't have known that either unless I
7  wrote it down.
8        But who registered Dominic in DEERS?
9     A.  I believe at the time I gave birth I did
10 and then he switched him over to Alex.
11    Q.  Okay.  And with regard to Tanika, who
12 registered Tanika in DEERS?
13    A.  I did.
14    Q.  Okay.  So it was under your name that
15 Tanika was receiving Tricare; correct?
16    A.  Correct.
17    Q.  And at least at first Dominic was receiving
18 Tricare under your name but later you believe he was
19 receiving Tricare under Alex Fontalvo's name?
20    A.  No, he was.
21    Q.  He was for sure?
22    A.  Yes.
23    Q.  Okay.  All right.  So Tashina, you've been
24 handed what's been marked as Exhibit 9, identified
25 by the Bates number DF-00394.  It's entitled "Marine

TASHINA AMADOR - 11/4/2015

Page 134

```
1        (The document referred to was marked by the
2   reporter as Exhibit 11 for identification and is
3   attached hereto.)
4   BY MR. HICKEY:
5        Q.  It's identified by Bates range DF-695
6   through DF-00717.  Do you know what this document
7   is, Tashina?
8        A.  Yes.
9        Q.  What is it?  Sorry, go ahead.  What is it?
10       A.  It's tax returns, H&R Block.
11       Q.  And this tax return is for who?
12       A.  Myself.
13       Q.  And for which tax year?
14       A.  Ten.
15       Q.  Okay.
16       A.  Yes, 2010.
17       Q.  And the front of the page says "H&R Block
18  Advantage."  What is H&R Block Advantage?
19       A.  It's a company.
20       Q.  Okay.  Did you work with an H&R Block
21  employee when filling out your tax returns?
22       A.  No.
23       Q.  Okay.  Did you use a computer program that
24  H&R Block, you know, sells in order to help you fill
25  out your tax returns?
```

Page 135

```
1        A.  Yes.
2        Q.  Okay.  Do you recall the program that
3   you -- that you used, the H&R software that you used
4   to fill out your tax returns?
5        A.  No, it was from H&R Block.
6        Q.  Okay.  Did you purchase that software from
7   H&R Block?
8        A.  No.  It's free for military members.
9        Q.  Did you fill out this -- your tax returns
10  on base?
11       A.  No.
12       Q.  Okay.  So were you able to download this
13  H&R Block software onto your home computer?
14       A.  No, I didn't -- didn't do any downloading.
15  I just went online.
16       Q.  Okay.  Did you go through a military
17  website?
18       A.  Yes.
19       Q.  What was the website that you went through?
20       A.  Military One Source.
21       Q.  Did you receive any assistance in filling
22  out your tax return for 2010?
23       A.  Yes, I did.
24       Q.  And who gave you assistance?
25       A.  Alex helped me.
```

Page 136

```
1        Q.  Okay.  Other than Alex, did anyone else
2   help you?
3        A.  I'm not sure if it was this year or this
4   tax return or the one before where I took it to H&R
5   Block to have them go over it to see if I missed
6   anything and then I submitted it.
7        Q.  But as you sit here today, you don't recall
8   when you spoke to H&R Block?
9        A.  No.
10       Q.  Do you believe it was before 2010?
11       A.  I don't remember.  I don't know which year
12  it was.
13       Q.  Okay.  Did you use this H&R Block software
14  this year as well to do your taxes?
15       A.  For?
16       Q.  Your tax return.  So this year, when you
17  did your tax -- filled out your tax returns, did
18  you also go through Military One Source and utilize
19  the H&R Block software that's at Military One
20  Source?
21       A.  Yes, I did.
22       Q.  Okay.  So the H&R Block software that's
23  available on Military One Source, isn't it a
24  software where it prompts you to fill in certain
25  information; correct?
```

Page 137

```
1        A.  Correct.
2        Q.  And it asks you certain questions?
3        A.  Yes.
4        Q.  Okay.  And you answer those questions and
5   then it tells you what -- what deductions you're
6   allowed to take, so forth; isn't that how the
7   Military One Source tax software works?
8        A.  That's how the H&R Block software works.
9        Q.  Correct.  Sorry.  Correct.  Isn't that how
10  the H&R Block software at Military One Source works?
11       A.  Yes.
12       Q.  Okay.  If you flip to page 699, DF-00699 --
13       Tell me when you're there.
14       A.  I'm there.
15       Q.  So in the name and address section at the
16  very top of the page it has your name; correct?
17       A.  Correct.
18       Q.  And then it has the address 11146 Mine
19  Shaft Drive, Apartment 371, Lakeside, California
20  92040.  That's where you were living at the time
21  that you filled out this tax return?
22       A.  Correct.
23       Q.  And you were living there with Alex;
24  correct?
25       A.  Correct.
```

35 (Pages 134 to 137)

TASHINA AMADOR - 11/4/2015

Page 138

```
 1        Q.   And by "Alex" I mean Alex Fontalvo; right?
 2        A.   Yes.
 3        Q.   And on this document you claim yourself;
 4   correct?
 5        A.   Yes.
 6        Q.   As an exemption and you also claim one
 7   dependent as an exemption; correct?
 8        A.   Correct.
 9        Q.   And that one dependent is Tanika Long;
10   right?
11        A.   Yes.
12        Q.   And right above that where it has "filing
13   status" and it has several boxes that you can put an
14   X in, one is "single," the other's "married," and
15   then down to 4 where it says "head of household with
16   qualifying person," and you checked off that box;
17   correct?
18        A.   Okay.
19        Q.   Indicating that you were the head of the
20   household and that Tanika Long is your dependent;
21   correct?
22        A.   Correct.
23        Q.   Okay.  So by claiming you were the head of
24   the household you were doing that because you were
25   providing more than 50 percent of Tanika Long's
```

Page 139

```
 1   support during the year 2010; correct?
 2        MR. SHEPARDSON:  Objection to the form,
 3   assumes facts not in evidence.
 4   BY MR. HICKEY:
 5        Q.   Were you providing more than 50 percent of
 6   Tanika Long's support during the year 2010?
 7        A.   No.
 8        Q.   How much of Tanika Long's support were you
 9   providing -- did you provide during the year 2010?
10        MR. SHEPARDSON:  Objection.  Asked and
11   answered.
12        You can estimate, if you have an answer to
13   the question.
14        MR. HICKEY:  Do you want me to ask the
15   question again?
16        (Whereupon the record was read as follows:
17        "Q.   How much of Tanika Long's support were
18        you providing -- did you provide during the
19        year 2010?")
20        MR. SHEPARDSON:  Were you provided?  Is
21   that what it said?
22        MR. HICKEY:  I'll just rephrase it.  Strike
23   that last question.
24        MR. SHEPARDSON:  Please, please.
25   ///
```

Page 140

```
 1   BY MR. HICKEY:
 2        Q.   As a percentage, how much of Tanika Long's
 3   support were you providing -- did you provide during
 4   the year 2010?
 5        MR. SHEPARDSON:  Objection.  Asked and
 6   answered.
 7        THE WITNESS:  I'm sorry, this is to make me
 8   look like a bad mother?  Like I do anything for my
 9   kids?
10        MR. SHEPARDSON:  No, it's not.  It is not.
11        MR. SHEPARDSON:  He asked you before and
12   you answered it before, but he's asking again:  Can
13   you estimate, percentage-wise?
14        THE WITNESS:  It makes me look like I don't
15   do anything, like I'm a bad mother.
16        MR. HICKEY:  Do you want to take a break?
17        MR. SHEPARDSON:  Let's take a break off the
18   record.
19        THE VIDEOGRAPHER:  Off the record.  The
20   time is 2:51.
21        (Brief recess.)
22        THE VIDEOGRAPHER:  Back on the record at
23   2:59.
24   BY MR. HICKEY:
25        Q.   Okay.  Mrs. Amador, so we're back on the
```

Page 141

```
 1   record.  We're going to have the last question read
 2   back, and then if you can answer that question.
 3        (Whereupon the record was read as follows:
 4        "Q.   As a percentage, how much of Tanika
 5        Long's support were you providing -- did you
 6        provide during the year 2010?")
 7        THE WITNESS:  I provided about 40 percent.
 8   BY MR. HICKEY:
 9        Q.   If you can flip to page DF-000701 of
10   Exhibit 11.  In part 1 it lists MCAS Miramar youth
11   teen center; what is that?
12        A.   It's the teen center I mentioned earlier.
13        Q.   And the cost for the year was $3,493?
14        A.   Yes.
15        Q.   Okay.  And that was for Tanika Long;
16   correct?
17        A.   Correct.
18        Q.   And that amount was only for Tanika Long?
19        A.   Yes.
20        Q.   Okay.  And in part 2 it says "credit for
21   child and dependent care expenses," and underneath
22   there it lists Tanika Long's name?
23        A.   Yes.
24        Q.   And qualified expense $3,493?
25        A.   Yes.
```

36 (Pages 138 to 141)

TASHINA AMADOR - 11/4/2015

Page 198

1   his arm, I was charged with battery.
2   BY MR. HICKEY:
3       Q.   And where did this incident occurred?
4       A.   Pensacola, Florida.
5       Q.   Was it inside your home?
6       A.   It was in our garage.
7       Q.   Okay.   Was anyone else present at the time?
8       A.   No.
9       Q.   Okay.   So was Tanika in the house at the
10  time?
11      A.   They were sleeping.
12      Q.   Okay.   And so Dominic was in the house as
13  well?
14      A.   Yes.   They were sleeping.
15      Q.   Or Dominic.
16           So how did the authorities get involved in
17  this incident?
18      A.   Angel called them so that they could calm
19  me down and so he could prove me wrong that I
20  couldn't just kick him out of the house.
21      Q.   I'm sorry, I didn't understand that.
22      A.   Like I couldn't just ask him to leave, and
23  he wanted the cops to calm me down and tell me that
24  I can't have him leave.   But with the State of
25  Florida, they said one of us has to get arrested.

Page 199

1       Q.   Okay.   So the police arrived and they
2   arrested you and then you had your court hearing on
3   the 3rd?
4       A.   Yes.
5       Q.   Okay.   Which is yesterday.   And you have to
6   go through a program?
7       A.   Yes.
8       Q.   Okay.   So as you said, you've had anger
9   issues.   Is this the first incident or has there
10  been other incidents in the past?
11           MR. SHEPARDSON:   Object to the form.
12           MR. HICKEY:   I'll rephrase it.
13      Q.   You just mentioned that you have anger
14  issues.   What did you mean by that?
15      A.   Meaning I go through a lot of depression.
16      Q.   Okay.   Is that something that's happened
17  just post accident, the accident that we've been
18  talking about?
19      A.   Yes.
20      Q.   So did it ever -- did you ever have anger
21  issues before the accident?
22      A.   No.   I mean, I would get angry, but not
23  this bad.
24      Q.   Okay.   So have you ever injured anybody
25  else in -- in one of these incidents?

Page 200

1       A.   No.   This was the only incident.
2       Q.   Okay.   That's all the questions I have.
3
4                   EXAMINATION
5
6   BY MR. JOHNSON:
7       Q.   Ms. Amador, how are you doing?   How are you
8   doing, Ms. Amador?
9       A.   I'm fine.   Still here.
10      Q.   As well as could be expected?
11      A.   Yes.
12           MR. JOHNSON:   Let's mark this as Exhibit
13  29.
14           (The document referred to was marked by the
15  reporter as Exhibit 29 for identification and is
16  attached hereto.)
17  BY MR. JOHNSON:
18      Q.   What we marked as Exhibit 29 has been Bates
19  labeled DF-00371-379.   Can you take a couple minutes
20  to look through this?
21      A.   Yes, I can.
22      Q.   And let me know when you've finished
23  reviewing it.
24      A.   Okay.
25      Q.   You've had a chance to review this?

Page 201

1       A.   Yes, I did.   I glanced through it.
2       Q.   And do you recognize this document?
3       A.   No, I do not.
4       Q.   Have you ever seen it before?
5       A.   No.
6       Q.   Okay.   I think that's all that I have.
7   Thank you.
8
9                   EXAMINATION
10
11  BY MR. BARKOWSKI:
12      Q.   Hi, Ms. Amador.   Justin Barkowski for E.I.
13  Dupont de Nemours and Company.   Just have a few
14  questions.   I apologize if this is repetitive, but I
15  just want to make sure that I had the right answers
16  and make sure it was asked.
17           You said that you were previously married
18  to Mr. Delvin Long; is that right?
19      A.   Correct.
20      Q.   Is it correct that you stated that the only
21  times you lived with him were beginning of 2000
22  through -- through November 2001 and for one week in
23  August 2006?   Those are the only two times?
24      A.   Yes.
25      Q.   And Mr. Long has never provided any

51 (Pages 198 to 201)

TASHINA AMADOR - 11/4/2015

Page 202

1   financial support for Tanika Long?
2       A.  No.
3       Q.  Have there been any attempts to have a
4   court of law issue an order requiring him to provide
5   any financial support for Tanika Long?
6       A.  Well, our divorce decree says he's
7   responsible for 50 percent, which he never did.
8       Q.  Has there been any attempts to force him to
9   pay that?
10      A.  No.  He's been in prison.
11      Q.  Can I ask what the nature of the
12  incarceration?
13      A.  I have no idea.  I don't contact him.
14      Q.  Do you know if he's still incarcerated?
15      A.  I believe he is.
16      Q.  Did Alex have a regular physician or doctor
17  that he saw when you were with him?
18      A.  No, not a regular, no.
19      Q.  Is that something he would get through the
20  Marine Corps?  If he wanted to see a doctor, is
21  there a doctor that would be provided through the
22  Marine Corps or does he have his own private
23  physician?
24      A.  No, it's through the Marine Corps.  Through
25  the Marine Corps.

Page 203

1       Q.  Putting aside any support from Alex for --
2   from your own income, military pay or benefits, did
3   Tanika Long receive any other financial support from
4   any other source during the time that you were with
5   Alex?
6       A.  No.
7       Q.  I mean, I was meaning parents, other people
8   that we may not know who were sending money,
9   anything like that.
10      A.  No.
11      Q.  I just want to be clear.
12          And the same question for Dominic.  Putting
13  aside any support from Alex or yourself, was Dominic
14  receiving any sort of financial support from any
15  other source during the time that you were with
16  Alex?
17      A.  Dominic, no.
18      Q.  Sorry.
19      A.  No.
20          MR. BARKOWSKI:  I have no further
21  questions.
22          MR. SHEPARDSON:  And I will reserve all
23  questions for the time of trial.
24          MR. HICKEY:  Bruce, are you still there?
25          MR. CLEELAND:  I'm still here and I have no

Page 204

1   questions.
2           MR. SHEPARDSON:  Thanks, Bruce.
3           THE VIDEOGRAPHER:  This will then mark the
4   end of Volume I in the recorded deposition of
5   Tashina Amador.  This original recording is retained
6   at DTI at 20750 Ventura Boulevard, Woodland Hills,
7   California.  Going off the record.  The time is
8   5:04.
9           THE REPORTER:  Are you ordering a certified
10  copy of the transcript, counsel?
11          MR. SHEPARDSON:  Yes.
12          MR. BARKOWSKI:  Yes.
13          MR. JOHNSON:  Can I let you know?
14  ///
15  ///
16  ///
17
18
19
20
21
22
23
24
25

Page 205

1               Declaration
2
3
4
5           I hereby declare I am the deponent in the
6   within matter; that I have read the foregoing
7   deposition and know the contents thereof, and I
8   declare that the same is true of my knowledge,
9   except as to the matters which are therein stated
10  upon my information or belief, and as to those
11  matters, I believe it to be true.
12          I declare under the penalties of perjury
13  under the law of the United States that the
14  foregoing is true and correct.
15          Executed on the     day of          ,
16  2015, at          ,          .
17
18
19
20                      W i t n e s s
21
22
23
24
25

52 (Pages 202 to 205)

# EXHIBIT I

D.F. et al., v. Sikorsky Aircraft Corporation, et al.
U.S.D.C., Case No.: 13:cv-00331-GPC-KSC
(Exhibits to Declaration of Christopher S. Hickey
In Support of Motion for Summary Judgment)

| DEPENDENCY STATEMENT -<br>CHILD BORN OUT OF WEDLOCK<br>UNDER AGE 21 | CONTROL NUMBER | OMB No. 0730-0014<br>OMB approval expires<br>Nov 30, 2010 |
|---|---|---|

The public reporting burden for this collection of information is estimated to average 1.25 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Washington Headquarters Services, Executive Services Directorate, Information Management Division, 1155 Defense Pentagon, Washington, DC 20301-1155 (0730-0014). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.
**PLEASE DO NOT RETURN YOUR FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO YOUR LOCAL SERVING PERSONNEL/PAYROLL OFFICE.**

### PRIVACY ACT STATEMENT

**AUTHORITY:** P.L. 93-64; 37 U.S.C., Chapter 7, Section 403; E.O. 9397 (SSN); and DoDFMR 7000.14-R, Vol. 7a, Chapter 26.

**PRINCIPAL PURPOSE(S):** The information will be used to determine the relationship and dependency of the claimed dependents and determine the member's entitlement to authorized benefits.

**ROUTINE USE(S):** In addition to those disclosures generally permitted under 5 U.S.C. 552a(b) of the Privacy Act, these records or information contained therein may specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3) as follows: The DoD "Blanket Routine Uses" published at the beginning of the DoD compilation of systems of records notices apply.

**DISCLOSURE:** Voluntary; however, failure to provide this information will result in a suspension of the dependent entitlement until the military member provides the required certification.

### INSTRUCTIONS

MALE MEMBER WITH CHILD BORN OUT OF WEDLOCK WHOSE PATERNITY HAS NOT BEEN JUDICIALLY DETERMINED AND WHO DOES NOT RESIDE IN MEMBER'S HOUSEHOLD. Member must complete Items 1 and 2, and sign and date the form. Child's custodian or representative must complete Items 3 through 13, sign and date the form, and have it notarized. CHILD MUST BE MORE THAN 50% DEPENDENT ON MEMBER. If member is deceased, representative of the child must complete this form in its entirety and have the form notarized. Items 5 through 11 must reflect the 12 months prior to the member's death. Report income in GROSS amounts, and attach verification documentation.

**NOTE:** Answer all questions. If any question does not apply, write "NOT APPLICABLE" or "N/A" in that block. Use the Remarks section when required. Incomplete answers will delay final action on the application.

### 1. ENTITLEMENTS REQUESTED (X and complete as applicable)

| a. TYPE | b. FIRST APPLICATION? | c. LAST APPLICATION WAS |
|---|---|---|
| ☐ USIP CARD<br>☐ OTHER (Specify) | ☒ YES  (If No, give date of last application)<br>☐ NO.  (YYYYMMDD) | ☐ APPROVED<br>☐ DISAPPROVED |

### 2. MEMBER INFORMATION

| a. NAME (Last, First, Middle Initial) | b. SSN | c. RANK |
|---|---|---|
| FONTALVO, ALEXIS | 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 | SGT |

**d. STATUS (X and complete as applicable)**

| ☒ ACTIVE DUTY | ☐ NATIONAL GUARD | ☐ ARMY | ☐ NAVY | ☐ DECEASED (Date of death) (YYYYMMDD) |
|---|---|---|---|---|
| ☐ RETIRED | ☐ RESERVE | ☒ MARINE CORPS | ☐ AIR FORCE | ☐ OTHER (Specify) |

**e. COMPLETE RESIDENCE ADDRESS (Street, Apartment Number, City, State, ZIP Code)**
11146 MINE SHAFT DR #371
LAKESIDE CA 92040

**f. COMPLETE MILITARY ADDRESS (Include assignment: squadron and base)**
HMH 361  HANGER 5
MCAS. MIRAMAR  SAN DIEGO CA 92145

| g. TELEPHONE NUMBERS (Include DSN or Area Code) | h. E-MAIL ADDRESS | i. MARITAL STATUS (X one) |
|---|---|---|
| (1) WORK 858 577 9695  (2) HOME 832 661 0936 | Alexis.FONTALVO@ usmc.mil | ☐ SINGLE  ☐ SEPARATED  ☐ WIDOWED<br>☐ MARRIED  ☒ DIVORCED |

### 3. MEMBER'S CHILD

| a. NAME (Last, First, Middle Initial) | b. SSN | c. DATE OF BIRTH (YYYYMMDD) |
|---|---|---|
| FONTALVO, DOMINIC M. | ▓▓▓▓▓ | 20100222 |

| d. COMPLETE ADDRESS (Street, Apartment Number, City, State, ZIP Code) | e. HAS CHILD EVER BEEN MARRIED? (If Yes, attach a copy of annulment decree, final divorce decree, or death certificate of child's spouse.) |
|---|---|
| 11146 MINE SHAFT DR  #371<br>LAKESIDE CA 92040 | ☐ YES<br>☒ NO |

### 4. CHILD'S OTHER BIOLOGICAL PARENT

| a. PARENT'S NAME (Last, First, Middle Initial) | b. COMPLETE ADDRESS (Street, Apartment Number, City, State, ZIP Code) |
|---|---|
| PESHLAKAI, TASHINA S. | 11146 MINE SHAFT DR #371<br>LAKESIDE CA 92040 |

**c. IS OTHER BIOLOGICAL PARENT IN ANY BRANCH OF SERVICE, INCLUDING RESERVE OR NATIONAL GUARD (X one)** ☒ YES  ☐ NO (A, 92145)
*(If Yes, show rank, name, SSN, and military address.)*
SGT TASHINA PESHLAKAI, 585454611, MWHS-3 BOX 452038 San Diego

| DD FORM 137-4, JAN 2008 | PREVIOUS EDITION IS OBSOLETE. | Page 1 of 4 Pages |
|---|---|---|
| | | Adobe Professional 7.0 |

EXHIBIT
8
AMADOR
PENGAD 800-631-6989

DF-00231

**4. CHILD'S OTHER BIOLOGICAL PARENT** *(Continued)*

**d. DOES OTHER PARENT CLAIM CHILD FOR BASIC ALLOWANCE FOR HOUSING (BAH), TRAVEL ALLOWANCE, OR USIP CARD** *(X one)*   YES ☐   NO ☒
*(If Yes, explain.)*

**e. WAS CHILD'S MOTHER MARRIED FOR ANY PART OF THE 10-MONTH PERIOD PRECEDING THE CHILD'S BIRTH?** *(X one)*   YES ☐   NO ☒
*(If Yes, give date of marriage) (YYYYMMDD)*

If the mother was married but is now separated, divorced, or widowed, furnish a copy of separation agreement, interlocutory decree, final divorce decree, or death certificate of spouse.

**f. HAS PATERNITY OF CHILD BEEN JUDICIALLY DIRECTED?**
*(If Yes, ID card can be issued.)*
YES ☐   NO ☒

**g. HAS MEMBER BEEN JUDICIALLY DIRECTED TO SUPPORT THE CHILD?**
*(If Yes, furnish a copy of all documents.)*
YES ☐   NO ☒

## 5. CHILD'S RESIDENCE

**a. TYPE OF RESIDENCE** *(X and complete as applicable)*

☐ HOME OR APARTMENT OF OTHER PARENT
☒ HOME OR APARTMENT OF MEMBER
☐ HOME OR APARTMENT OF CHILD
☐ HOME OR APARTMENT OF FORMER SPOUSE OF MEMBER
☐ STUDENT DORMITORY OR OTHER ON-CAMPUS FACILITY

☐ HOME OR APARTMENT OF FRIEND OR RELATIVE *(State relationship)*

☐ HOSPITAL OR INSTITUTION
☐ OTHER *(Explain)*

**b. OWNER OF RESIDENCE**

| (1) NAME *(Last, First, Middle Initial)* | (2) ADDRESS *(Street, Apartment Number, City, State, ZIP Code)* |
|---|---|
| Lincoln Military Housing | 11146 mineshaft DR #371, Lakeside CA 92040 |

**c. IS RESIDENCE SUBSIDIZED HOUSING?**
☒ YES
☐ NO

**d. DATE CHILD STARTED LIVING AT CURRENT ADDRESS** *(YYYYMMDD)*
20100706

**e. DATE CHILD STARTED LIVING WITH PERSON WHO CURRENTLY HAS PHYSICAL CUSTODY** *(YYYYMMDD)*

## 6. PERSONS LIVING IN HOUSEHOLD WITH CHILD

List all persons who live in the household, including claimed child. If employed, show hours per week worked. Continue in Remarks if more space is needed.

| a. NAME *(Last, First, Middle Initial)* | b. RELATIONSHIP TO CHILD | c. AGE | d. MARRIED (X) YES | d. MARRIED (X) NO | e. EMPLOYED HOURS PER WEEK | e. EMPLOYED NO (X) |
|---|---|---|---|---|---|---|
| PESHLAKAI, TASHINA S. | MOTHER | 28 | | X | 45+ | |
| FONTALVO, ALEXIS | FATHER | 25 | | X | 45+ | |
| LONG, TANIKA | SISTER | 10 | | X | | X |
| FONTALVO, DOMINIC | | 8m | | X | | X |

## 7. HOUSEHOLD EXPENSES

List the household expenses for all persons living in the home. If expense was one-time only, such as purchase of a new chair, do not show this as a monthly expense; list it as an expense for the past 12 months. If child resides in the member's household or in a dwelling owned by the member, use Fair Rental Value (FRV) for dwelling. If child does not reside in member's household or in a dwelling owned by member, list actual mortgage, rent, or FRV if dwelling is mortgage-free. If FRV is used, give a brief explanation of how Fair Rental Value was obtained using the Remarks section.

FAIR RENTAL VALUE (FRV): FRV is a single monthly sum for the entire dwelling where the child lives. This sum is an amount the owner can reasonably expect to receive from a stranger to rent the dwelling. FRV will not include food, utilities, furniture, and home repairs, which are listed separately.

| ITEM | (1) PRESENT MONTHLY EXPENSE | (2) TOTAL EXPENSE FOR PAST 12 MONTHS | ITEM | (1) PRESENT MONTHLY EXPENSE | (2) TOTAL EXPENSE FOR PAST 12 MONTHS |
|---|---|---|---|---|---|
| **a. (X one)** ☒ RENT ☐ FRV ☐ MORTGAGE *(Specify amount of tax and insurance if applicable)* TAX INSURANCE | 1500.00 | 19,982.00 (See RMKS) | **d. FURNITURE AND APPLIANCES** | — | — |
| | | | **e. REPAIRS ON HOME** | — | — |
| **b. FOOD** | 323.87 | 3,886.74 | **f. OTHER** *(Specify)* | | |
| **c. UTILITIES** *(Heat, power, water, and telephone)* | 200.00 | 2,400.00 | | | |

DD FORM 137-4, JAN 2008

DF-00232

**8. CHILD'S PERSONAL EXPENSES**
List all of the child's personal expenses regardless of who is paying for them.

| ITEM | (1) PRESENT MONTHLY EXPENSE | (2) TOTAL EXPENSE FOR PAST 12 MONTHS | ITEM | (1) PRESENT MONTHLY EXPENSE | (2) TOTAL EXPENSE FOR PAST 12 MONTHS |
|---|---|---|---|---|---|
| a. CLOTHING | 160,00 | 480,00 | g. PRIVATE AUTO PAYMENTS *(If auto is registered in child's name)* | — | — |
| b. LAUNDRY AND DRY CLEANING | 20,00 | 160,00 | h. MONTHLY TRANSPORTATION PAYMENTS *(Specify type)* | 200.00 (GAS) | 1600.00 |
| c. MEDICAL *(Do not include expenses paid by insurance, welfare, or Medicare)* | — | — | i. SCHOOL EXPENSES *(Itemize)* AUG – PRESENT → APR – JUL → | 720.00 1,100.00 | 1440.00 3,300.00 |
| d. VALUE OF USIP CARD *(Verification of amount is required)* | — | — | | | |
| e. PERSONAL INSURANCE *(Specify)* | — | — | j. OTHER EXPENSES *(Itemize)* FORMULA | 300.00 | 2400.00 |
| f. PERSONAL TAXES *(Specify)* | — | — | | | |

**9. CHILD'S INCOME**
All gross income received by or in behalf of the child, whether taxable or nontaxable, and whether received monthly, quarterly, or yearly, must be listed. This includes any income you receive as custodian or administrator for the child. If any income received during the past 12 months was a lump-sum (one-time) payment, be sure to state this. Verification documents are required.

| SOURCE | (1) PRESENT MONTHLY INCOME | (2) TOTAL INCOME FOR PAST 12 MONTHS | SOURCE | (1) PRESENT MONTHLY INCOME | (2) TOTAL INCOME FOR PAST 12 MONTHS |
|---|---|---|---|---|---|
| a. WAGES, SALARIES, TIPS, OR OTHER CASH GRATUITIES | — | — | g. SOCIAL SECURITY PAYMENTS, DISABILITY OR REGULAR *(Specify)* | — | — |
| b. INTEREST ON INVESTMENTS, BONDS, SAVINGS, TRUST FUNDS, ETC. | — | — | h. SUPPLEMENTAL SECURITY INCOME (SSI) | — | — |
| c. INSURANCE OR PUBLIC GOVERNMENT PENSION PAYMENTS, UNEMPLOYMENT OR DISABILITY COMPENSATION *(Specify type)* | — | — | i. VETERANS ADMINISTRATION PAYMENTS *(Specify type)* | — | — |
| d. CONTRIBUTIONS FROM PERSONS OTHER THAN MEMBER | | | j. STATE OR LOCAL WELFARE AID, INCLUDING AID TO DEPENDENT CHILDREN *(Include agency and address in Remarks section)* | — | — |
| e. SCHOLARSHIPS OR EDUCATIONAL GRANTS | — | — | k. OTHER *(Specify)* | — | — |
| f. TAX REFUNDS *(Specify)* | — | — | | | |

**10. CHILD'S EMPLOYMENT**

| a. HAS CHILD BEEN EMPLOYED DURING THE PAST 12 MONTHS? | YES | ☒ NO *(If Yes, furnish the following:)* |
|---|---|---|

b. NAME OF EMPLOYER

| c. DATE EMPLOYMENT STARTED *(YYYYMMDD)* — | d. DATE EMPLOYMENT ENDED *(YYYYMMDD)* — | e. MONTHLY SALARY *(Gross)* — | f. TYPE OF WORK PERFORMED — |
|---|---|---|---|

g. REASON EMPLOYMENT ENDED
—

**11. MEMBER'S CONTRIBUTION**

a. SHOW THE TOTAL AMOUNT THE MEMBER HAS CONTRIBUTED TO THE CHILD'S SUPPPORT FOR EACH OF THE PAST 12 MONTHS.

| (1) MONTH AND YEAR | (2) AMOUNT | (1) MONTH AND YEAR | (2) AMOUNT | (1) MONTH AND YEAR | (2) AMOUNT |
|---|---|---|---|---|---|
| OCT 2010 | 1500.00 | JUN 2010 | 1000.00 | FEB 2010 | 600.00 |
| SEP 2010 | 1500.00 | MAY 2010 | 1000.00 | | |
| AUG 2010 | 1500.00 | APR 2010 | 1000.00 | | |
| JUL 2010 | 1000.00 | MAR 2010 | 800.00 | | |

| b. MEMBER PROVIDES SUPPORT BY *(X one)* | ALLOTMENT | ☒ PERSONAL CHECK | ☒ MONEY ORDER |
|---|---|---|---|
| | OTHER *(Explain)* | | |

DD FORM 137-4, JAN 2008                                             Page 3 of 4 Pages

**12. REMARKS** *(Use a separate sheet of paper if necessary)*

7a

| | | |
|---|---|---|
| Jul - Present | (1500) | 6,000.⁰⁰ |
| Jan - Jul | (1316) | 9,212.⁰⁰ |
| Oct - Dec | (590) | 4,770.⁰⁰ |
| | | 19,982.⁰⁰ |

**READ THE PENALTY PROVISIONS, SIGN AND DATE THE FORM, AND HAVE IT NOTARIZED.**

NOTE: Whoever, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device, a material fact, or makes any false, fictitious, or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious; or fraudulent statement or entry, shall be fined as provided in Title 18, or imprisoned not more than 5 years, or both (U.S. Code, title 18, section 1001). The information provided in this form may be referred to the appropriate Military Service investigative agency.

I make the foregoing claim with full knowledge of the penalties involved for willfully making a false claim. (U.S. Code, title 18, section 287, formerly section 80, provides a penalty as follows: Imprisonment for not more than five years and subject to a fine in the amount provided in this title.)

**13. SIGNATURES**

**a. CUSTODIAN**

I/we ___Alexis Fontalvo___ (print name(s)) will immediately notify the service concerned of any change in child's financial circumstances, marital status, physical custody, or change in dependency upon the service member as shown in this form.

| (1) SIGNATURE OF PERSON (OTHER THAN MEMBER) WHO HAS PHYSICAL CUSTODY OF THE CHILD | (2) RELATIONSHIP TO CHILD | (3) DATE SIGNED (YYYYMMDD) |
|---|---|---|
| *[signature]* | Father | 2010 10 27 |

**b. NOTARY PUBLIC**

Subscribed and duly sworn (or affirmed) to before me according to law by the above named affiant(s).

This __27__ day of __October__, __2010__, at city (or town) of __Miramar__, county of __San Diego__

and state (or territory) of __California__

*[signature]* (Notary)

Certified As A Notary Public
Under the Provisions of Title 10,
USC Sections 936 and 1044a

*(Official Seal)*

__Legal Assistance Attorney__ (Official Title)

**c. MEMBER**

| (1) SIGNATURE | (2) DATE SIGNED (YYYYMMDD) |
|---|---|
| | |

**DD FORM 137-4, JAN 2008**

DF-00234

# EXHIBIT J

D.F. et al., v. Sikorsky Aircraft Corporation, et al.
U.S.D.C., Case No.: 13:cv-00331-GPC-KSC
(Exhibits to Declaration of Christopher S. Hickey
In Support of Motion for Summary Judgment)



Department of the Treasury

**Internal Revenue Service**

**Publication 501**
Cat. No. 15000U

# Exemptions, Standard Deduction, and Filing Information

For use in preparing

## 2010 Returns



**Get forms and other information faster and easier by:**

**Internet** IRS.gov

Jan 05, 2011

## Contents

What's New . . . . . . . . . . . . . . . . . . . . . 1

Reminders . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . 2

Who Must File . . . . . . . . . . . . . . . . . . . 2

Who Should File . . . . . . . . . . . . . . . . . 3

Filing Status . . . . . . . . . . . . . . . . . . . . 4

Exemptions . . . . . . . . . . . . . . . . . . . . . 9

Exemptions for Dependents . . . . . . . . . 10

Social Security Numbers for
   Dependents . . . . . . . . . . . . . . . . . . 21

Standard Deduction . . . . . . . . . . . . . . . 21
   2010 Standard Deduction
      Worksheet . . . . . . . . . . . . . . . . 23

How To Get Tax Help . . . . . . . . . . . . . . 24

Index . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## What's New

**Who must file.** In some cases, the amount of income you can receive before you must file a tax return has increased. Table 1 shows the filing requirements for most taxpayers.

**Limits on personal exemptions and overall itemized deductions ended.** For 2010, you will no longer lose part of your deduction for personal exemptions and itemized deductions, regardless of the amount of your adjusted gross income.

**Standard deduction increased.** The standard deduction for some taxpayers who do not itemize their deductions on Schedule A of Form 1040 is higher in 2010 than it was in 2009. The amount depends on your filing status. In addition to the annual increase for some taxpayers due to inflation adjustments, your 2010 standard deduction is increased by:

- Any state or local sales or excise taxes you paid in 2010 on the purchase of a new motor vehicle after February 16, 2009, and

- Any net disaster loss you had in 2010 because of a disaster that occurred before 2010 and was declared a federal disaster after 2007.

You can use the 2010 Standard Deduction Worksheet near the end of this publication to figure your standard deduction. But to increase your standard deduction by taxes paid on the purchase of a new motor vehicle or a net disaster loss, you must use Schedule L (Form 1040A or 1040) and attach it to your return.

## Reminders

**Taxpayer identification number for aliens.** If you are a nonresident or resident alien and you do not have and are not eligible to get a

a. You cannot claim the credit for the elderly or the disabled, and

b. You will have to include in income more (up to 85%) of any social security or equivalent railroad retirement benefits you received.

9. The following credits are reduced at income levels that are half of those for a joint return:

a. The child tax credit, and

b. The retirement savings contributions credit.

10. Your capital loss deduction limit is $1,500 (instead of $3,000 if you filed a joint return).

11. If your spouse itemizes deductions, you cannot claim the standard deduction. If you can claim the standard deduction, your basic standard deduction is half the amount allowed on a joint return.

12. Your first-time homebuyer credit is limited to $4,000 (instead of $8,000 if you filed a joint return). If the special rule for long-time residents of the same main home applies, the credit is limited to $3,250 (instead of $6,500 if you filed a joint return).

**Adjusted gross income (AGI) limits.** If your AGI on a separate return is lower than it would have been on a joint return, you may be able to deduct a larger amount for certain deductions that are limited by AGI, such as medical expenses.

**Individual retirement arrangements (IRAs).** You may not be able to deduct all or part of your contributions to a traditional IRA if you or your spouse was covered by an employee retirement plan at work during the year. Your deduction is reduced or eliminated if your income is more than a certain amount. This amount is much lower for married individuals who file separately and lived together at any time during the year. For more information, see *How Much Can You Deduct?* in chapter 1 of Publication 590, Individual Retirement Arrangements (IRAs).

**Rental activity losses.** If you actively participated in a passive rental real estate activity that produced a loss, you generally can deduct the loss from your nonpassive income up to $25,000. This is called a special allowance. However, married persons filing separate returns who lived together at any time during the year cannot claim this special allowance. Married persons filing separate returns who lived apart at all times during the year are each allowed a $12,500 maximum special allowance for losses from passive real estate activities. See *Rental Activities* in Publication 925, Passive Activity and At-Risk Rules.

**Community property states.** If you live in Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington, or Wisconsin and file separately, your income may be considered separate income or community income for income tax purposes. See Publication 555, Community Property.

## Joint Return After Separate Returns

You can change your filing status by filing an amended return using Form 1040X.

If you or your spouse (or both of you) file a separate return, you generally can change to a joint return any time within 3 years from the due date of the separate return or returns. This does not include any extensions. A separate return includes a return filed by you or your spouse claiming married filing separately, single, or head of household filing status.

## Separate Returns After Joint Return

Once you file a joint return, you cannot choose to file separate returns for that year after the due date of the return.

**Exception.** A personal representative for a decedent can change from a joint return elected by the surviving spouse to a separate return for the decedent. The personal representative has 1 year from the due date (including extensions) of the return to make the change. See Publication 559 for more information on filing income tax returns for a decedent.

## Head of Household

You may be able to file as head of household if you meet all the following requirements.

1. You are unmarried or "considered unmarried" on the last day of the year.

2. You paid more than half the cost of keeping up a home for the year.

3. A "qualifying person" lived with you in the home for more than half the year (except for temporary absences, such as school). However, if the "qualifying person" is your dependent parent, he or she does not have to live with you. See *Special rule for parent*, later, under *Qualifying Person*.

 **TIP** If you qualify for head of household status, your tax rate usually will be lower than the rates for single or married filing separately. You will also receive a higher standard deduction than if you file as single or married filing separately.

**How to file.** If you file as head of household, you can use either Form 1040A or Form 1040. Indicate your choice of this filing status by checking the box on line 4 of either form. Use the Head of a household column of the Tax Table or Section D of the Tax Computation Worksheet to figure your tax.

## Considered Unmarried

To qualify for head of household status, you must be either unmarried or considered unmarried on the last day of the year. You are considered unmarried on the last day of the tax year if you meet all the following tests.

1. You file a separate return (defined earlier under *Joint Return After Separate Returns*).

2. You paid more than half the cost of keeping up your home for the tax year.

3. Your spouse did not live in your home during the last 6 months of the tax year. Your spouse is considered to live in your home even if he or she is temporarily absent due to special circumstances. See *Temporary absences*, later.

4. Your home was the main home of your child, stepchild, or foster child for more than half the year. (See *Home of qualifying person*, later, for rules applying to a child's birth, death, or temporary absence during the year.)

5. You must be able to claim an exemption for the child. However, you meet this test if you cannot claim the exemption only because the noncustodial parent can claim the child using the rules described later in *Children of divorced or separated parents or parents who live apart* under *Qualifying Child* or in *Support Test for Children of Divorced or Separated Parents or Parents Who Live Apart* under *Qualifying Relative*. The general rules for claiming an exemption for a dependent are explained later under *Exemptions for Dependents*.

 **CAUTION** *If you were considered married for part of the year and lived in a community property state (listed earlier under Married Filing Separately), special rules may apply in determining your income and expenses. See Publication 555 for more information.*

**Nonresident alien spouse.** You are considered unmarried for head of household purposes if your spouse was a nonresident alien at any time during the year and you do not choose to treat your nonresident spouse as a resident alien. However, your spouse is not a qualifying person for head of household purposes. You must have another qualifying person and meet the other tests to be eligible to file as a head of household.

**Earned income credit.** Even if you are considered unmarried for head of household purposes because you are married to a nonresident alien, you are still considered married for purposes of the earned income credit (unless you meet the five tests listed earlier under *Considered Unmarried*). You are not entitled to the credit unless you file a joint return with your spouse and meet other qualifications.

See Publication 596 for more information.

**Choice to treat spouse as resident.** You are considered married if you choose to treat your spouse as a resident alien. See chapter 1 of Publication 519.

## Keeping Up a Home

To qualify for head of household status, you must pay more than half of the cost of keeping up a home for the year. You can determine whether you paid more than half of the cost of keeping up a home by using the following worksheet.

# EXHIBIT K

D.F. et al., v. Sikorsky Aircraft Corporation, et al.
U.S.D.C., Case No.: 13:cv-00331-GPC-KSC
(Exhibits to Declaration of Christopher S. Hickey
In Support of Motion for Summary Judgment)

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3    _____
                                      )
 4    DOMINIC FONTALVO, a minor, by)
      and through his Guardian Ad  )
 5    Litem, TASHINA AMADOR,       )
      individually and as a        )
 6    successor in interest to     )No. 3:13-cv-00331-GPC-KSC
      Alexis Fontalvo, deceased,   )
 7    and TANIKA LONG, a minor, by )
      and through her Guardian Ad  )
 8    Litem, TASHINA AMADOR,       )
                                   )
 9            Plaintiffs,          )
                                   )
10       vs.                       )
                                   )
11    SIKORSKY AIRCRAFT            )
      CORPORATION; SIKORSKY SUPPORT)
12    SERVICES, INC.; UNITED       )
      TECHNOLOGIES CORPORATION; et )
13    al.,                         )
                                   )
14            Defendants.          )
      _____)
15
16
17          DEPOSITION OF DAVID TODD FRACTOR, Ph.D.
18               Woodland Hills, California
19                Thursday, May 18, 2017
20                     Volume I
21
22    Reported by:
      JILL GLANTZ
23    CSR No. 11341
24    Job No. 2618106
25    PAGES 1 - 75
```

                                              Page 1

1  Q  I'm sorry.  Remind me again where the double
2  dipping was.  I know you told me before.
3  A  Oh, with the health benefits after the military
4  retirement.  I didn't know if my number was too high or
5  not or whether I should include both, because he does
6  retain eligibility to medical care even after leaving the
7  service.
8  Q  You said you used long-term investment grade
9  corporate bonds for the discount rate?
10  A  I believe that's correct.
11  Q  What is your definition of a "long-term
12  investment grade bond"?
13  A  Twenty.
14  Q  I'm sorry.  Twenty years?
15  A  Yes.  And recognize, we're only going out 15
16  because the loss terminates in 2032.  But given that
17  trial was unknown -- I mean, part of the reason why I
18  stated very explicitly in the report that I want to
19  update it to reflect the time of trial, if trial was
20  around the corner, then I would look at a maturity that
21  is more closely linked to the length of the loss.  So I
22  would be using a shorter-term bond than that.  But I
23  purposely use a longer-term bond in a situation like
24  this to put in a little bit of a cushion if interest
25  rates should change between now and the time of trial.

Page 62

1  Q  I think that's all I have, subject to further
2  questions.
3
4            EXAMINATION
5  BY MR. HICKEY:
6  Q  I have a few questions.  If you turn to Page 2 of
7  your report.
8  A  Yes.
9  Q  And look at Paragraph 6, which we talked about a
10  little bit.
11  A  Yes.
12  Q  So in the middle of that paragraph, there's a
13  sentence that says "based upon Ms. Peshlakal's."  You
14  mean "Ms. Peshlakai"; correct?
15  A  Yeah.  It probably did a word correction on me.
16  So I apologize to her.
17  Q  And when you say "her extensive sworn testimony,"
18  what does that phrase mean?
19  A  Meaning a number of times in her depo, and I
20  referenced the pages as an example, she said "he paid
21  more than 50; he paid 60 percent of this, et cetera."
22  So I'm just relying on her testimony.
23  Q  So the term "extensive sworn testimony" is
24  referring to her deposition?
25  A  Yes.

Page 63

1  Q  And only her deposition?
2  A  I'm not aware of any other sworn testimony that
3  she has provided.
4  Q  As a economist, do you understand the term
5  "necessaries of life"?
6  A  I have never heard that term.
7  Q  Okay.  In this sentence, you use the term
8  "support" twice.  What did you mean by "support"?
9  A  Paid for the expenditures of the individual.
10  Q  Okay.  And that would include all of her
11  requirements, such as housing, food, clothing,
12  everything?
13  A  It would be -- right.  Right.
14  Q  Okay.
15  A  When I think of supporting my children, I think
16  of anything that I spend on their behalf.  It's
17  something to keep them alive or something like that.
18  Q  So that would be in addition to things that just
19  keep them sheltered and keep them alive.  It would be
20  for gifts, for example.  Would that be included in
21  support as well?
22  A  It would.
23  Q  All right.  So your statement here is "I have
24  concluded that the decedent provided more than
25  50 percent of Tanika's support," which is Tanika Long;

Page 64

1  correct?
2  A  Right.
3  Q  And did you do any analysis to determine whether
4  Tanika Long was dependent on that support that he was
5  allegedly providing?
6  A  I don't know what you mean by "dependent" here.
7  Q  Okay.  Well, someone can provide support, and it
8  is not necessarily necessary for the child's support;
9  correct?  I mean, they can provide money to a child, but
10  it's not absolutely necessary for their support;
11  correct?  Like, a grandparent can give their grandchild
12  money or give the parent money to help the child; right?
13  That doesn't mean it's necessary for that child's
14  support.  Do you understand that?
15  A  I think I'm getting bogged down.
16       MR. SHEPARDSON:  Object to the form.
17       THE WITNESS:  I think I'm getting bogged down in
18  legalese.  So by "support" here, I'm not talking about a
19  legal definition.  I'm talking about whatever a parent
20  or parent equivalent here, let's assume, spends for
21  their children.
22  BY MR. HICKEY:
23  Q  If Tashina Amador, or at this time Peshlakai, was
24  not in a relationship with Fontalvo or any other
25  individual, did she have the resources to provide for

Page 65

17 (Pages 62 - 65)

1 Tanika Long's support?
2    MR. SHEPARDSON:  Object to the form, vague and
3 ambiguous.
4    THE WITNESS:  I mean, I haven't looked at her
5 earnings and housing allowance in relation to what she
6 spent on the child, but I believe so.  And I mean, since
7 it was represented to me that she -- that the father of
8 the child was out of the picture for a very long time,
9 if not forever, that the child survived in some fashion.
10 BY MR. HICKEY:
11   Q  So wouldn't you agree, then, that the funds,
12 whatever they were, that were being provided by
13 Mr. Fontalvo were not necessary for Tanika Long's
14 support?
15    MR. SHEPARDSON:  Object to the form.
16    THE WITNESS:  I have a lot of trouble answering
17 your question, and part of the reason is when you have
18 got them now in a household together, then you have got
19 money that could be spent on other household members,
20 and then you have the son who is born.  So I don't know
21 at that point -- I mean, what do you want to do?  A
22 hypothetical that okay, now she has a son, but the
23 decedent doesn't spend any money, would it be necessary
24 for him to provide money to be able to provide for
25 Tanika's support?  I don't know.  I'm hopelessly
                                                  Page 66

1 confused at this point, because to me it sounds like
2 we're getting into a legal argument rather than is
3 somebody spending money on behalf of an individual or
4 not.
5 BY MR. HICKEY:
6   Q  Well, when we were going over the tax document,
7 which was, I believe, Exhibit 13, and you were asked
8 to -- one of the pages where she's listing a
9 dependent, and she lists her dependent as "Tanika Long."
10 So in that context, do you have an understanding of what
11 the word "dependent" means in that context?
12   A  I know you can claim them as a write-off on your
13 tax.  As I stated earlier, I'm a Ph.D.; I'm not a CPA.
14 I don't know if that means they spend 50 percent plus
15 one of the individual support or what.  I just -- I
16 don't know.
17   Q  Okay.  So as you sit here today, you have no
18 understanding of the difference between the terms -- if
19 someone says someone is supporting someone or someone is
20 dependent on that person's support, that doesn't mean
21 anything to you?  The difference between those terms or
22 those phrases don't mean anything to you?
23   A  Well, sure, there's a difference, because if you
24 don't support that person, that person is not able to
25 support themselves.
                                                  Page 67

1   Q  Okay.
2   A  Nothing beyond that.
3   Q  Well, is there a difference between someone being
4 supported by a parent and being dependent on that
5 parent's support?
6   A  Unless they have a trust fund or have the ability
7 to do work on their own, I would assume that to me
8 they're basically like one in the same.
9   Q  Okay.  Well, if by "trust fund" you mean if there
10 was some other source of income; right?  A child gets
11 some other source of income?
12   A  Right.  So they didn't need their parent for
13 daily expenditures.
14   Q  Okay.  In this case, when you state here "I
15 concluded that decedent provided more than 50 percent of
16 Tanika's support," I understand that you concluded that
17 Mr. Fontalvo was providing -- based on her testimony
18 providing more than 50 percent of Tanika's support.  But
19 in this case or in your analysis that you did in this
20 case, have you determined whether his support, whether
21 Tanika Long was dependent upon his support?
22    MR. SHEPARDSON:  Object that it calls for a legal
23 conclusion.
24    THE WITNESS:  I think I answered this question
25 before, because you have to look at it within the
                                                  Page 68

1 context of the other child in the family.  All I'm
2 saying is if this sworn testimony is, in fact, correct,
3 he was paying more than 50 percent of whatever
4 expenditures she incurred over the course of a year,
5 allocating the way we need to allocate, presumably rent
6 and stuff like that.  I'm not making any other
7 assumption beyond that.
8 BY MR. HICKEY:
9   Q  Okay.  What time frame are you referring to in
10 this sentence, "I have concluded that the decedent
11 provided more than 50 percent of Tanika's support"?
12 What's the time frame?
13   A  Time frame is at the time he passed away.
14   Q  Okay.  Back to when?
15   A  I don't know.  Obviously, the last document we
16 have here is October of 2010.  He passes away in March
17 of 2011.  So I don't know.  And as I sit here right now, I
18 don't know whether the depo testimony sheds any light on
19 whether there was some sort of change over the last
20 several months before his passing in terms of who paid
21 for what.  It's -- I mean, it is what it is.  I can -- I
22 rely on the testimony, and if ultimately I am instructed
23 not to rely on the testimony, then so be it.  But it's
24 obviously not coming from me.  I am relying on this as
25 being the way things were when Mr. Fontalvo passed away.
                                                  Page 69

18 (Pages 66 - 69)

1    Q   Okay. So just to be clear, the time frame here
2    is at the time of his death?
3    A   Yes.
4    Q   Okay. All right. Thanks. That's all the
5    questions I have.
6        MR. MONTANARI: I don't think I have anything
7    further, but I do want to mark -- what do we have?
8        THE WITNESS: We marked that already.
9        MR. MONTANARI: This file is --
10       THE WITNESS: You marked that.
11       MR. MONTANARI: The CD is the documents you
12   received?
13       THE WITNESS: Everything that is on the
14   directory, that's also in this folder. It's two pages.
15   And this is Dr. Udinsky's -- not all of his report, but
16   a portion of it and the study he relied upon.
17       MR. MONTANARI: This one is the study he relied
18   upon?
19       THE WITNESS: Yes. I know at least some of that
20   was produced at his depo, but I don't know whether the
21   entire report was produced.
22       MR. MONTANARI: What is this? This just looks
23   like correspondence.
24       THE WITNESS: You actually marked the directory
25   as part of Exhibit 3, the directory documents.
                                              Page 70

1        MR. MONTANARI: I would like to mark these
2    collectively. These appear to be transmittal documents.
3    What's the next one in order?
4        THE REPORTER: Sixteen.
5        (Exhibit 16 was marked for identification by
6        the court reporter and is attached hereto.)
7        MR. MONTANARI: If you can copy this and give the
8    original one back.
9        MR. SHEPARDSON: That wasn't already included?
10       MR. MONTANARI: I don't think so, Marshall. And
11   17 is the expenditures, because I just want to make sure
12   I'm looking at the same thing he is.
13       (Exhibit 17 was marked for identification by
14       the court reporter and is attached hereto.)
15       MR. MONTANARI: And I guess we need to mark that
16   as 18.
17       MR. SHEPARDSON: What is this?
18       THE WITNESS: Those are the documents that are in
19   the directory that is actually part of Exhibit 3. And
20   this is what your office sent to me.
21       MR. SHEPARDSON: And so you want an extra copy?
22   You need this back; right?
23       THE WITNESS: I do not need that back. That can
24   be an exhibit to the depo itself, because we have all
25   those documents.
                                              Page 71

1        MR. MONTANARI I'm going to mark this as 18,
2    please.
3        (Exhibit 18 was marked for identification by
4        the court reporter and is attached hereto.)
5        MR. HICKEY: What was 17?
6        MR. MONTANARI: Seventeen was this, "Expenditures
7    on Children By Families, 2015."
8        And 16 is the packet of the transmittal e-mails.
9        MR. SHEPARDSON: And you want a copy of that?
10       MR. MONTANARI: To give to the court reporter.
11   He wants these back, I assume.
12       MR. SHEPARDSON: You do?
13       MR. MONTANARI: You want these back?
14       THE WITNESS: I don't care about that. I
15   absolutely want that back.
16       MR. MONTANARI: Okay.
17       THE WITNESS: I would have to kill another tree.
18   Let someone else kill it.
19       MR. MONTANARI: Normal stip? Oh, she doesn't
20   know the stip.
21       MR. SHEPARDSON: Right.
22       MR. MONTANARI: I propose the stipulation that
23   the original be sent to plaintiff's counsel Marshall
24   Shepardson; that he may then provide that to
25   Mr. Fractor; Mr. Fractor has 30 days to review, make any
                                              Page 72

1    changes he deems appropriate and sign or elect not to
2    sign it under penalty of perjury; the original will then
3    be returned to Mr. Shepardson who will relieve the court
4    reporter of any statutory duty to maintain the original;
5    Mr. Shepardson will advise all counsel of any changes
6    that are made and whether it has been signed; and he
7    will agree to make the original available on any
8    reasonable request; if not so available, an unsigned
9    copy may be used with the same force and effect as
10   though a signed original.
11       MR. SHEPARDSON: Yeah. I will stipulate to that.
12       MR. HICKEY: Stipulate.
13       THE REPORTER: Counsel, do you need a copy?
14       MR. HICKEY: Yes, I do.
15
16       (TIME NOTED: 1:04 p.m.)
17
18
19
20
21
22
23
24
25
                                              Page 73

19 (Pages 70 - 73)