James W. Hunt – SBN 122582
james.hunt@fitzhunt.com
Christopher S. Hickey – SBN 198938
christopher.hickey@fitzhunt.com
Mark R. Irvine – SBN 137294
mark.irvine@fitzhunt.com
**FITZPATRICK & HUNT,
PAGANO, AUBERT, LLP**
633 West Fifth Street, 60th Floor
Los Angeles, CA 90071
Tel.: (213) 873-2100 / Fax: (213) 873-2125

Attorneys for Defendants
Sikorsky Aircraft Corporation; Sikorsky Support Services, Inc.;
and United Technologies Corporation

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.F., a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and T.L., a minor, by and through her Guardian Ad Litem, TASHINA AMADOR,<br><br>                   Plaintiffs,<br>vs.<br><br>SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.; UNITED TECHNOLOGIES CORPORATION; G.E. AVIATION SYSTEMS, LLC; DUPONT AEROSPACE CO.; E.I. DUPONT DE NEMOURS AND COMPANY; PKL SERVICES INC.; and DOES 1 through 100, Inclusive,<br><br>                  Defendants. | Case No. 13-cv-00331-GPC-KSC<br><br>**DECLARATION OF JOHN D. WAKEFIELD IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS** |

1    I, John D. Wakefield, declare as follows:

2    1.    I began working for the Sikorsky Aircraft Corporation in 1983 in the
3    business development office with responsibilities relating to the United States
4    Marine Corps heavy lift helicopter requirements, including the CH-53E.  From 1988
5    to 2000, I was the Program Manager for the CH/MH-53E Helicopter Program for
6    Sikorsky.   In 2000, I became Vice President for all Sikorsky U.S. Navy and
7    International Maritime Helicopter Programs.  I am also a former U.S. Marine Corps
8    officer, CH-53 Squadron Commander and pilot, having flown approximately 3,400
9    hours in CH-53 series helicopters.  I have personal knowledge of the matters stated
10   herein and, if called upon, I could and would competently testify thereto.

11   2.    As Sikorsky's CH/MH-53E Program Manager, my responsibilities
12   included negotiating contracts and leading a team whose purpose was to meet
13   military procurement contract requirements for the design, development,
14   qualification and production of the CH/MH-53E helicopter, including the contract
15   for the production and purchase of the subject CH-53E helicopter, BUNO 163077.
16   These contracts were between the U.S. Navy and Sikorsky Aircraft, which at the
17   time was a division of United Technologies Corporation, and which in 1994 became
18   a wholly owned subsidiary of United Technologies Corporation.  Sikorsky Support
19   Services, Inc. (SSSI) is a separate corporation that was not involved in the design,
20   manufacture, marketing or sale of the CH/MH-53E.  My work required me to be
21   familiar with the design and manufacturing program for the CH-53E (operated by
22   Marine Corps) and MH-53E (operated by Navy) helicopters, the related military
23   procurement contracts awarded to Sikorsky, the specifications used to implement
24   the program, the engineering reports, drawings and testing completed to achieve
25   qualification of the helicopters, and the working relationship between the Naval Air
26   Systems Command (NAVAIR) and Sikorsky in carrying out the procurement
27   programs.  My CV is attached as **Exhibit 1**.

28

3.    The facts and opinions set forth in this declaration are based on my military experience, my work at Sikorsky, and review of documents received from the U.S. Navy and U.S. Marine Corps ("USMC") and of Sikorsky business records that were made and/or received by Sikorsky in the ordinary course of its business.

4.    The CH-53A, CH-53D and RH-53D (U.S. Navy variant) were predecessor heavy lift military helicopters to the CH-53E. The CH-53A, CH-53D and RH-53D were developed in the 1960s under Navy procurement contracts in accordance with detailed specifications   reviewed and approved by the U.S. Navy. Experience with the CH-53A/D helicopters in the Viet Nam conflict led to a request by the U.S. Navy and other branches for a helicopter with greater payload lift capacity. The U.S. Defense Systems Acquisition Review Council approved the Navy's request to proceed with development of a CH-53E in November 1971. The Navy's Specific Operational Requirement in 1967 stated their need for a new shipboard compatible, heavy lift helicopter in order to increase tactical mobility and provide much greater payload capacity. The Navy CH-53E Development Plan in 1972 stated their specific purpose that the program design, develop, fabricate and demonstrate a CH-53E helicopter with increased lift capability, compatibility with Navy ships, and "retain maximum commonality" with the CH-53D. The Navy had at that point had many years of operational and maintenance experience with the earlier H-53 series aircraft and obviously desired to stick with a proven design to the extent possible. (a true and correct copy of the U.S. General Accounting Office Staff Study, CH-53E Helicopter, February 1973, see pages 7 and 12 is attached hereto as **Exhibit 2**).

5.    The design and development of the CH-53E flowed directly from NAVAIR's Development Plan which identified the specific CH-53E program objectives, including the objective to retain maximum commonality with the existing previous H-53 series aircraft. During my years as a military pilot I flew the CH-53A, CH-53D, RH-53D and CH-53E aircraft, and I am familiar with the design

1    and operation of those aircraft, and particularly the landing gear system, including
2    the landing gear control system for each of those model aircraft.  The landing gear
3    control system on all these aircraft has the same design, with the same two interlocks
4    in the cockpit (the landing gear control handle and the mechanical lock), the two
5    independent weight-on-wheels switches, one per main landing gear, with all four of
6    these interlocks being wired into the same electronic wiring system, and three
7    separate mechanical landing gear safety pins, one for each landing gear.

8         Accordingly, the final CH-53E landing gear design, including electrical and
9    mechanical control components, and electrical and mechanical interlocks, was
10   identical to the CH-53D design with minor differences due to the size of the aircraft
11   and use of Kapton wire and a hydraulic utility module in the CH-53E.  The landing
12   gear system of the CH-53E was one that had been operated and maintained by the
13   Navy and Marine Corps for many years with more than one million flight hours in
14   the CH-53A and CH/RH-53D.

15        6.    NAVAIR is the U.S. Navy's airworthiness authority for Navy aviation
16   and takes care of all the Navy/USMC aviation requirements, from initial design,
17   evaluation, test and manufacture, and on to the oversight of the operation,
18   maintenance and modification of aircraft during use in service. NAVAIR is
19   headquartered in Patuxent River, Maryland, and is staffed with more than a 1,000
20   engineers covering all engineering fields, including electrical engineering, to
21   evaluate, qualify and determine the airworthiness of Navy developed aircraft and
22   systems.   NAVAIR develops the specifications and design and qualification
23   requirements based on the mission and operation requirements for the aircraft or
24   system.

25        7.    NAVAIR awarded a series of contracts to Sikorsky during the design
26   and development of the CH-53E helicopter:

27        A)    Design phase contracts were for engineering feasibility studies
28   for a modified CH-53D design, a propulsion test bed, development of engineering

1   drawings, and fabrication of prototypes for ground and flight testing.  Sikorsky
2   submitted all required engineering studies and drawings to NAVAIR.

3           B)    Development phase contracts which also required all
4   engineering data produced during this phase be provided to NAVAIR for review
5   and evaluation.   This included hundreds of detailed engineering reports and
6   drawings on all aspects of the design and operation of the prototype aircraft,
7   including reports on all aircraft subsystems.  The following detailed engineering
8   reports submitted to NAVAIR for its review are examples of this exchange of
9   information between NAVAIR and Sikorsky:

10          • SER-13013, dated May 10, 1972 (a true and correct copy of which
11             is attached hereto as **Exhibit 3**), which provides that the landing
12             gear extension systems for the CH-53D, RH-53D and CH-53E will
13             be the same ("The RH-53D main landing gear and existing nose
14             gear are used on the CH-53E prototype.");

15          • SER 13197, dated September 9, 1974 (a true and correct copy is
16             attached hereto as **Exhibit 4**), which identified changes to the
17             YCH-53E prototypes which NAVAIR required for the design of
18             two CH-53E pre-production prototype aircraft, and which made no
19             changes to the landing gear control system;

20          • an "Electrical/Electrical System Phase I Test Report" dated
21             October 30, 1974, SER-13066 (a true and correct copy is attached
22             hereto as **Exhibit 5**), which states that electrical power generation
23             components for the CH-53E are identical to CH-53D, except for
24             changes to accommodate a third, engine-driven generator, and that
25             the hydraulic system of the CH-53E is designed to use the same
26             landing gear retraction system as the CH-53D and RH-53D; and

27          • SER 13065, dated February 1975, relating to the YCH-53E
28             (prototype helicopter) hydraulic subsystem and components (a true

and correct copy is attached hereto as **Exhibit 5**).

- Sikorsky Engineering Report SER 13451 dated Nov. 10, 1980, also submitted to the Navy, similarly states that the landing gear "for the CH-53E helicopter is basically the same configuration as the RH-53D except for minor structural changes in piston, trunnion, axle, and wheels and the addition of a visual fluid lever indicator." (a true and correct copy is attached hereto as **Exhibit 6** – see SIK014087)

8.     In its development of the CH-53E, NAVAIR officials and engineers held hundreds of meetings with Sikorsky engineers and program management personnel on all aspects of the design specification, including items that would be changed from the CH/RH-53D.   These meetings included safety meetings, conferences and Preliminary and Critical Design Reviews.   NAVAIR or its designated USG personnel assigned to, and residing at, the Sikorsky facility (NAVPRO – Naval Procurement, now called DCMA), reviewed all the engineering drawings, test plans and test reports in detail. They had technical interchange meetings during the design, and reviews of design following testing so they could ensure the helicopter is compliant with the government's specifications.

9.     NAVAIR proceeded to contract further with Sikorsky Aircraft for the continued design and development of the CH-53E. Contract N00019-73-C-0228 was a Research & Development contract which included the Navy's CH-53E Detailed Specification, SD-552-3, and came in two parts:

- Phase I was a Research & Development Contract for Sikorsky Aircraft to produce the design (drawings), complete the development, and conduct trade off studies for CH-53E. (with FY-73 funding).

- Phase II was Research & Development Contract for Sikorsky Aircraft to fabrication of two prototype helicopters for Sikorsky

1       and USN to conduct ground and flight testing. (YCH-53E 159121

2       & 159122)

3       10.     Beginning in 1974, the design phase YCH-53E prototype underwent

4    extensive flight testing with both Sikorsky and Navy test pilots and engineers, which

5    consisted of multiple hundreds of flight test hours.  All aspects of the helicopters

6    were tested, including sub-system evaluations.  NAVAIR issued Naval Air Test

7    Center Deficiency Reports for any deficiency discovered during flight

8    testing.  Meetings were held between NAVAIR and Sikorsky engineers and

9    program personnel concerning the reports.  Resolution and design decisions were

10   always made by NAVAIR.

11      11.     Following the design review and flight testing of the design prototypes,

12   the Detailed Specification SD-552-3 was revised and updated.  The changes were

13   documented in Sikorsky Engineering Report 13197 (**Exhibit 4**).  NAVAIR awarded

14   another contract for fabrication of two additional "pre-production" prototypes based

15   on the revised Detail Specification.  These prototypes were designated BUNO

16   159876 and 159877, and they also underwent additional hundreds of hours of flight

17   testing by Navy test pilots, which results were evaluated by NAVAIR engineers.

18      12.     As a result of Navy evaluation and testing of the pre-production

19   prototypes, NAVAIR made additional changes to the Detailed Specification which

20   would control the production helicopters which the Navy chose to order.  The

21   changes were documented in Sikorsky Engineering Report SER 13300, dated

22   September 9, 1977 (attached as **Exhibit 7** is a true and correct copy of this report).

23   One significant change made by NAVAIR was the requirement that Kapton wiring

24   be incorporated into all electrical harnesses pursuant to MIL-W-81381 (**Ex. 7** at

25   ¶3.1.46 (SIK013611)).  The U.S. Navy approved the CH-53E for service use, with

26   a specific requirement to use Kapton wiring, on April 15, 1980.

27      13.     Beginning in approximately 1978, the Navy entered into a series of

28   production contracts with Sikorsky based on the finalized production specification

1   issued by NAVAIR.  The Navy procured a total of 229 CH/MH-53E aircraft under

2   these production contracts, which were ordered in twenty-one production lots.

3   Attached as **Exhibit 8** is a true and correct copy of the production log which

4   documents each H-53E aircraft ordered, including the contract and lot number and

5   DD-250 acceptance date.   Changes to the Detail Specification were identified

6   during the proposal phase for each respective contract.  Lots 1-8 were governed by

7   separate, one-year contracts.  Lots 9-12, consisting of 26 CH-53E and 29 MH-53E

8   helicopters, were governed by a single multi-year contract.

9          14.    The subject helicopter, BUNO 163077, was ordered in Lot 12, under

10   Contract Number N0010-85-C-0066, pursuant to Detailed Specification SD-552-3-

11   9 which incorporated military specifications including MIL-W-5088F ("Wiring,

12   Aerospace Vehicles") which, in-turn, incorporated 66 additional military

13   specification and standards concerning the design and construction of electrical

14   systems.  A true and correct copy of the production contract for Lots 9-12, dated

15   April 30, 1985; Detailed Specification SD-552-3-9; and MIL-W-5088F, are each

16   attached respectively as **Exhibits 9 - 11**.  Section 3.16.5 of SD-552-3-9 required the

17   use of wire per MIL-W-81381 (Kapton/polyimide insulation).

18          15.    Per the contract, Sikorsky is prohibited from making any changes to

19   the aircraft system without government approval.  (See **Exhibit 9**, Contract Number

20   N0010-85-C-0066, section H-7 at p.7-32 (SIK06938)

21          16.    The Navy closely monitors the production of helicopters manufactured

22   by Sikorsky.  This process includes, but is not limited to, reviewing and approving

23   every drawing before it is used for production, reviewing and approving all test plan

24   and the results of those tests, reviewing and approving every flight test by Sikorsky

25   personnel, conducting quality inspections during manufacture, reviewing the build

26   file, and ensuring the helicopter is compliant with the government's specifications.

27   Full-time on-site U.S. government personnel (NAVPRO, now DCMA) assigned to

28   the Sikorsky facility conduct a final quality acceptance inspection and Navy and

1  Marine Corps pilots fly each aircraft, to make sure the aircraft is built the way

2  NAVAIR requires.

3      17.    The production build of the subject helicopter BUNO 163077 was

4  monitored and approved by Navy engineers, inspectors, manufacturing personnel

5  and pilots stationed on site at Sikorsky in Stratford, Connecticut, who confirmed

6  that the aircraft conformed to the contract and to Detailed Specification SD-552-3-

7  9.

8      18.    Following the NAVAIR's final inspection and flight testing certifying

9  compliance with all specifications, the government accepted the subject aircraft on

10  September 30, 1990.  Attached as **Exhibit 12** is a true and correct copy of the signed

11  DD-250 and related correspondence reflecting government acceptance.  Sikorsky

12  never received any notice from the government regarding any deficiency or failure

13  to meet the government's specifications.

14      20.    Sikorsky did not provide, and was not contractually required to

15  provide, any manuals to the Navy for the CH-53E.  The Detailed Specification states

16  that these publications "will be furnished by the Government as specified in the

17  publications requirements of the contract." (See **Exhibit 10**, SD-552-3-9, ¶¶ 3.23.3)

18      22.    Not long after the Navy began operating CH-53E helicopters, and

19  several years before manufacture and delivery of the subject helicopter BUNO

20  163077, the Navy began experiencing an increase of electrical interconnection

21  problems which NAVAIR concluded was primarily a problem with Kapton

22  wiring.  Based on this experience, Sikorsky made formal requests to the Navy that

23  it be permitted to submit an engineering change proposal to replace Kapton wiring.

24  Attached as **Exhibits 13 and 14** are copies of Sikorsky letters to the Navy in this

25  regard, which I understand were produced by the Navy during this litigation, dated

26  December 15, 1981, and November 10, 1986.  (MIL259030 and MIL247341)  The

27  Navy declined Sikorsky's requests, and stated in one internal memorandum dated

28  July 22, 1987 regarding the "status of Kapton wire in H-53 aircraft" that "C/MH-

1  53E contains Kapton but is under a multiyear procurement (FY 1986-89).  We do
2  not have a firm quote from Sikorsky Aircraft, but to modify the multiyear
3  specification at this time would be both prohibitively expensive and untimely."
4  Attached as **Exhibit 15** is a true and correct copy of this memorandum which I
5  understand was produced by the Navy during this litigation. (MIL152795)  At a
6  meeting in November 1998, Sikorsky recommended, for the third time, that all
7  wiring be replaced in the CH/MH-53E but the Navy again rejected this
8  recommendation.  Attached as **Exhibit 16** is a true and correct copy of a November
9  27, 1998 meeting minutes memorandum which I understand was produced by the
10 Navy during this litigation.

11      23.    In 1989, the Navy decided to remove Kapton wire from the CH-53E
12 specification and substitute Spec 55 wire, as Sikorsky had urged in 1981, 1986 and,
13 later, in 1998.  However, the Navy determined the change would start with LOT 13.
14 Attached as **Exhibit 17** is a true and correct copy of excerpted pages from the
15 revised specification referencing this production change.  Since BUNO 163077 was
16 manufactured as part of LOT 12, Sikorsky was still required by the government to
17 manufacture that helicopter using Kapton wiring.

18      24.    Although the Navy switched to the use of Spec-55 wire for production
19 aircraft beginning with Lot 13, the Navy decided not to replace Kapton wiring in
20 helicopters already produced or that were being produced as part of LOT 12,
21 including the subject helicopter BUNO 163077.  In a memorandum dated July 7,
22 1987, the Navy stated that although other aircraft may be retrofitted with new
23 wiring, removal from the CH-53E "would be disapproved." (Enclosure 2 to letter)
24 A true and correct copy of this July 7, 1987 memorandum which I understand was
25 produced by the Navy in this litigation is attached as **Exhibit 18**. (MIL152796-800)
26 It was not until 2004 that the Navy began retrofitting old CH-53E helicopters under
27 a Kapton Replacement Program, which I understand is currently scheduled to be
28 completed by the end of 2017.

25.    In a memorandum dated February 6, 1989, the Navy did authorized Navy and Marine Corps to use Spec-55 wiring as a substitute for Kapton, but only for "repair, modification, engineering changes and replacements..."  A true and correct copy of this Feb. 6, 1989 memorandum which I understand was produced by the Navy in this litigation is attached as **Exhibit 19**. (MIL000006)  The build records for the subject aircraft reflect that a portion of the subject landing gear control wiring (total length 437 inches) was composed of 70 inches of Spec 55 wiring from splice group SAQ-34 to P494-A at the utility hydraulic module.  This section of the subject wire is part of the main rotor pylon wire harness (part number 65562-09303).    The Navy expressly approved this variance in wiring per the engineering change order listed in the build records.  Attached as **Exhibit 20** is a true and correct copy of the build record file which indicates the specific change order.  The reason for this change is not stated but during this timeframe there was a shortage of Kapton wiring and that is the reason for the substitution of Kapton for Spec-55. The rest of the subject wire (367 inches) was required to be Kapton per the government's SD-552-3-9 specification, section 3.16.5.   Thus, the Kapton portion of the subject wire (367 inches) is almost certainly the original, 20 year old wire, while the Spec-55 portion (70 inches) could also be the original wire or per the Navy's February 6, 1989, could also be a more recent replacement per a USMC maintenance task that occurred sometime between delivery in 1990 and the accident in March 2011.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of June, 2017, at Jupiter, Florida.

_____
John D. Wakefield