LAWRENCE P. GRASSINI — Cal. SBN 49046
LARS C. JOHNSON — Cal. SBN 205712
MARSHALL J. SHEPARDSON — Cal. SBN 263637
GRASSINI, WRINKLE & JOHNSON
20750 Ventura Boulevard, Suite 221
Woodland Hills, CA 91364-6235
Tel:   (818) 348-1717
Fax:   (818) 348-7921
Email:  mail@grassinilaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMINIC FONTALVO, a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and TANIKA LONG, a minor, by and through her Guardian Ad Litem, TASHINA AMADOR,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.; UNITED TECHNOLOGIES CORPORATION; G.E. AVIATION SYSTEMS, LLC; DUPONT AEROSPACE CO.; E.I. DUPONT DE NEMOURS AND COMPANY; PKL SERVICES, INC.; and DOES 1 through 100, Inclusive,<br><br>　　　　　　Defendants. | Case No.:  3:13-cv-00331-GPC-KSC<br><br>Judge: Hon. Gonzalo P. Curiel<br><br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO  SIKORSKY'S MOTION FOR SUMMARY JUDGMENT** |

1
2

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ................................................................................ 1

FACTUAL SUMMARY ...................................................................... 2

ARGUMENT....................................................................................... 3

I.   SIKORSKY CANNOT PROVE ITS "MILITARY CONTRACTOR
     IMMUNITY" AFFIRMATIVE DEFENSE AS A MATTER OF LAW
     BECAUSE IT DEPENDS ON DISPUTES OF MATERIAL FACT
     BEING DECIDED IN SIKORSKY'S FAVOR.............................. 3

II.  SIKORSKY CANNOT MEET THE FIRST PRONG OF *BOYLE*
     UNDER THE STANDARD ENUNCIATED BY THE NINTH
     CIRCUIT IN *SNELL V. BELL*, BECAUSE THE NAVY
     NEVER WIEGHED IN ON THE CONFIGURATION OF
     THE LANDING GEAR WIRING HARNESS AT ALL............................... 6

     A.   This Case is Precisely Analogous to *Snell*, and its
          Fifth-Circuit Predecessor *Trevino*, Because the Government
          Never Deliberated on the Defective Wiring Harness Faulted
          by Plaintiffs ........................................................................... 7

     B.   Each of Sikorsky's Cases Explicitly Involved an Allegedly
          Defective Design Which Significantly Implicated Express
          Governmental Decision-Making. ....................................... 10

     C.   Sikorsky Is Not Insulated from Liability Due to the
          CH-53E's "Commonality with the Delta" Because the Delta Was
          the Product of Sikorsky's Discretion Alone, and Because the
          Two Aircraft Are Not Common as to the Features at Issue,
          In Any Event ........................................................................ 12

          1.   Under Snell's Controlling Principles, the Delta's Landing
               Gear Control System Is Not Immune Because There
               Is No Evidence, Let Alone Undisputed Evidence, of
               Government Discretion Respecting That System.................... 14

i

2.   The Relevant Features of the Echo Were Not "Carried Over" from the Delta, But Were Newly Designed According to Sikorsky's Sole Discretion, and Not the Government's ........................................................................ 15

III.   SIKORSKY CANNOT MEET THE SECOND PRONG OF *BOYLE* AS A MATTER OF LAW BECAUSE THERE IS AN ISSUE OF FACT WHETHER THE WIRING HARNESS WAS DEFECTIVELY MANUFACTURED, THEREFORE FAILING TO MEET THE APPLICABLE SPECIFICATIONS, WHICH IS NEVER IMMUNE ........ 15

IV.   SIKORSKY CANNOT MEET THE THIRD PRONG OF *BOYLE* (TO THE EXTENT IT CAN BE INVOKED AT ALL) BECAUSE SIKORSKY NEVER WARNED THE NAVY ABOUT THE DANGER OF INADVERTENT LANDING GEAR RETRACTION DUE TO AN ELECTRICAL SHORT ................................................................ 18

V.   SIKORSKY'S GRAB-BAG OF ALTERNATIVE ARGUMENTS CONTAINS NO GROUNDS FOR DISPOSING OF THIS CASE ............ 20

A.   The Political Question Doctrine Is Not Implicated Because Kapton Is Not Relevant to Plaintiffs' Theories of Liability .............. 20

B.   The Navy's Kapton Remediation Policy Was Not a Cause, Let Alone a Superceding Cause, of the Accident ..................................... 20

C.   Sikorsky's Sophisticated User Defense Raises, at Most, a Disputed Issue of Fact on Just One of Plaintiffs' Theories, Which Could Never Justify Total Dismissal ...................................................................... 21

D.   Tanika Has Standing Because There Is (at a Minimum) a Question of Fact That She Depended on the Decedent for More Than Half of Her "Necessities of Life" ............................................. 22

1.   There Is Evidence That the Decedent Provided 60% of Tanika's Support, Well Above the Threshold for Standing under § 377.60(c). ..................................................................... 22

2.   Decedent Contributed Support for 60% of Tanika's Necessities of Life" .................................................................. 23

ii

3.  The Decedent in *Soto* Was Three Generations Removed from the Minor Claimant whereas SSgt. Fontalvo was Tanika's Direct Parental Provider. ..........................................................25

CONCLUSION  ........................................................................................25

1

# TABLE OF AUTHORITIES

2

## CASES                                                      PAGE

3

*Boyle v. United Technologies*

4
    487 U.S. 500 (1988) ..............................................................passim

5

*Chavez v. Carpenter*

6
    91 Cal.App.4th 1433 (2001)....................................................22, 24

7

*Getz v. Boeing Co.*

8
    654 F.3d 852 (9th Cir. 2011) .......................................................11

9

*Harduvel v. General Dynamics Corp.*

10
    878 F.2d 1311 (11th Cir. 1989) ...................................................19

11

*Johnson v. City of Vallejo*

12
    2015 WL 11233190 (E.D. Cal., July 7, 2015)……………………………..23

13

*McKay v. Rockwell Intern. Corp.*

14
    704 F.2d 444 (9th Cir. 1983) ......................................................16

15

*Oliver v. Oshkosh Truck Corp.*

16
    96 F.3d 992 (7th Cir. 1996) ........................................................12

17

*Perry v. Medina*

18
    192 Cal.App.3d 603 (1987) ........................................................24

19

*Smallwood v. American Trading & Transp. Co.*

20
    868 F.Supp. 280 (N.D. Cal. 1994) .............................................23

21

*Snell v. Bell Helicopter*

22
    107 F3d 744 (9th Cir. 1997) ................................................passim

23

*Soto v. BorgWarner* (2015)

24
    239 Cal App. 4th 165 ................................................22, 23, 24, 25

25

*Trevino v. General Dynamics Corp.*

26
    865 F.2d 1474 (5th Cir. 1989)………………………………………………10

27

*Wilkins v. City of Oakland*

28
    350 F.3d 949 (9th Cir. 2003)…………………………………………………6

iv

**STATUTES**

C.C.P. § 377.60(c)……………………………………………………22, 23, 24

**CIVIL JURY INSTRUCTIONS**

CACI 1201………………………………………………………………19

CACI 1202………………………………………………………………19

CACI 1203………………………………………………………………19

CACI 1204………………………………………………………………19

v

# INTRODUCTION
## *The Amber "Red Herring"*

Sikorsky's Motion for Summary Judgment is devoted entirely to batting at a straw argument.  The Motion amounts to: "Plaintiffs can't hold us liable for using Kapton, because the military made us use Kapton."  The problem with this argument, however, is that plaintiffs' actual theories of liability have *nothing to do with Kapton*.  As all of plaintiffs' experts' reports and depositions have made clear, they intend to prove at trial that *Kapton has been ruled out* as a contributing factor to the fatal mishap.  Instead, the mishap was caused by defective configuration and faulty installation of the landing gear wiring harness, which caused a short at a section of wire that wasn't Kapton at all, but was instead an alternative type of wire known as "Spec-55" that contains no Kapton.  Discovery has further revealed that the U.S. Military played absolutely ***no role in designing the defective features*** in the wiring harness that contributed to this accident, and Sikorsky's Motion provides no evidence suggesting any such involvement.  At most, Sikorsky's evidence on this Motion creates a triable issue of fact as to whether Kapton played a role in the mishap, and therefore under firm Supreme Court and Ninth Circuit case law, it is up to a jury to decide whether Kapton, and not the defective design of the wiring harness, was in fact a contributing factor, and whether Sikorsky is therefore immune from liability to some extent.

Kapton insulation is easily distinguishable from other wire (even to the lay, naked eye) due to its distinctive, translucent amber color, which is differentiated from its yellow-grey outer sheathing.[1]   Spec-55 wire, on the other hand, is colloquially known as "white wire," due to the uniform milky-white appearance of

---

[1] A series of microscopic photographs illustratively depicting both the amber appearance of the inner Kapton insulation and the milky appearance of Spec-55 is included in Appendix M to the Expert Report of Joseph Reynolds, filed herewith as Exhibit N to the Declaration of Marshall Shepardson.  See pages 130–132 for white Spec-55 and 133–142 for amber Kapton.

1

the insulation and the outer sheath.  Although it is true that Kapton happens to have a long and storied history of contributing to mishaps, and it is also true the government knew about that history when it ordered the aircraft in question, none of that has any bearing on this case.  In *this* case, the fateful electrical short occurred on readily identifiable Spec-55 wire, as all the available photographic, microscopic and testimonial evidence amply shows.  Sikorsky's "Kapton Defense" attempts to pin the blame on the "usual suspect," because their entire immunity defense hinges on the amber wire being the sole culprit in this tragedy.  However, Kapton in this case is just an amber herring.

Therefore, the Motion should be denied.

## FACTUAL SUMMARY

The facts are laid out in the accompanying Plaintiffs' Statement of Additional Facts ("PSOF").  There is no dispute that plaintiffs' decedent Staff Sergeant Alexis Fontalvo was killed when an electrical short caused an inadvertent retraction of the landing gear while the Sikorsky-made helicopter was on the tarmac, and SSgt. Fontalvo was under the helicopter.  Crucially, plaintiffs' reconstruction experts have rigorously determined that the fatal short occurred at Spec-55 wire, and not at Kapton wire.  (PSOF Nos. 39–48.)  The culpable Spec-55 "white wire" is plainly depicted in photographs taken in the mishap's aftermath.  (Shepardson Decl., Ex. I.)

The central fallacy of Sikorsky's alternative theory, in which Kapton is to blame, is evident in their constant repetition of the falsehood that "Military investigators found" that Kapton was the suspected cause of the mishap (for instance, in their Memo., p. 3, Sec. II.C., and their Statement of Facts Nos. 10 & 11).  This statement is outright false.  The only "source" of the (convenient) suspicion of Kapton was Sikorsky's own internal Materials Engineering investigation, conducted by Sikorsky's employee Manning Stelzer.  (PSOF No. 60.)  The military investigators, in fact, expressly declined to attribute the cause to any particular site

or type of wire.  (PSOF No 38.)  Nonetheless, and fatally for Sikorsky, the Marine avionics troubleshooters ruled out any damaged Kapton wire in the wiring harness that could have served as an entry point for the stray voltage.  (PSOF No. 40.)  Even Mr. Stelzer conceded that the Kapton part of the wire was in remarkably pristine condition, with no telltale radial cracking suggestive of "Kapton degradation" that is found in cases of genuine Kapton flashover or arc tracking.  (PSOF No. 47.)

Rather than some mythic "Kapton degradation," the experts in this case have determined that the short occurred ***due to the defective design and installation of the landing gear wiring harness—and in particular the Spec-55 wire "pigtails"*** connected to the Hydraulic Utility Module ("UM").  (PSOF Nos. 34–37.)  This means that Sikorsky's immunity defense is a non-starter, since it is entirely grounded on the specious conceit that Kapton is the culprit.  There are no facts to support any theory that Sikorsky is immune for the defective configuration of the wiring harness and UM, because the government never weighed in on that component in any discretionary way.

## ARGUMENT

**I.   SIKORSKY CANNOT PROVE ITS "MILITARY CONTRACTOR IMMUNITY" AFFIRMATIVE DEFENSE AS A MATTER OF LAW BECAUSE IT DEPENDS ON DISPUTES OF MATERIAL FACT BEING DECIDED IN SIKORSKY'S FAVOR.**

As Sikorsky concedes, summary judgment can only be granted where there is no genuine dispute as to any material fact bearing on the Sikorsky's affirmative defense, on which Sikorsky bears the burden of proof.  F.R.C.P. 56(a).  Sikorsky relies on the affirmative "military contractor defense," which originated in the Supreme Court case *Boyle v. United Technologies*, 487 U.S. 500 (1988).  Writing for the majority in *Boyle*, Justice Scalia specifically explained that "whether the facts establish the conditions for the defense is a question for the jury" and that ***it "would***

*be error" for the Court of Appeals to "assess on its own whether the defense had been established."* *Id.* at 514 (emphasis added).

Here, there is an overwhelming preponderance of evidence that would allow any reasonable jury to reject Sikorsky's affirmative defense. Stated most generally, there are two key disputes, both of which would have to be resolved in Sikorsky's favor in order for them to prevail, and each of which would turn on the resolution of numerous sub-disputes. Sikorsky would need to prove: 1.) that the fatal short occurred between two segments of Kapton-insulated wire; and 2.) that the offending wire was damaged as a result of characteristic chemical decomposition of the Kapton insulation, which is a defect inherent to that type of insulation, rather than being damaged as a result of the faulty design and installation of the wiring harness. Both of these contentions are hotly disputed by the plaintiffs, based on competent physical evidence and expert testimony. Therefore, the Motion should be denied based on that contest alone. But plaintiffs will go further to show not only the dispute, but the overwhelming volume of evidence in plaintiffs' favor, and the blatant implausibility of Sikorsky's theory.

In brief, as to (1.) above, all reliable evidence points strongly (even ineluctably) to the site of the fatal short being on Spec-55 wire, because the only wire that showed any scientifically verifiable damage was Spec-55, while the Kapton wire was expressly found (by all disinterested investigators) to be undamaged. (PSOF Nos. 38–48.) Not only is the damaged, suspect Spec-55 site evident and scientifically verified, but it is conspicuous and discernible to the lay, naked eye. (Shepardson Decl., Exs. I (USMC Bare Wire Photos) & J (inspection photos).) As to (2.) above, Sikorsky has not brought forth ***any evidence whatsoever*** in support of its motion that any Kapton wire was damaged or denuded due to any chemical deteriorative process, the risk of which is a known, inherent propensity of Kapton. In fact, the internal Sikorsky Materials Engineering Report on which Sikorsky relies

specifically remarks on the surprising, pristine integrity of the Kapton wire in the helicopter's landing gear wiring harness.  (PSOF No. 47.)  Sikorsky's only mishap-reconstruction expert moreover admits he did no analysis looking for the telltale byproducts of any such chemical degradation, and that such an analysis is beyond his expertise.  (PSOF Nos. 49 & 50.)

Therefore, even assuming that Sikorsky could be immune to some limited degree, to the extent the known danger of "Kapton degradation" played a role in the mishap, they have not produced any evidence competent to establish that limited degree of immunity.  In other words, even if the short had occurred on Kapton wire (for which there is no evidence), ***Sikorsky still cannot establish that the Kapton was damaged due to its inherent properties, as opposed to the same design and manufacturing defects that caused the fatal damage to the Spec-55 wire***.

Plaintiffs' experts, meanwhile, have provided a thorough, satisfactory account of the manner in which the wire damage occurred to the Spec-55 wire, and it has nothing to do with the chemical composition (or decomposition) of the wire. Instead, the damage occurred due to the defective configuration of the wiring harness, as well as the defective installation of the entire system by Sikorsky.  (PSOF Nos. 19–24.)  These defects led to mechanical chafing, which ***would have occurred no matter what the insulation was made of***.[2]  (PSOF Nos. 45, 48 & 61.)  The chafing damage to the Spec-55 wire demonstrably occurred because the harness was defectively designed and shoddily installed.  (PSOF Nos. 21 & 36.)  Sikorsky alone is responsible for both the design defects and the manufacturing defects that

---

[2] Sikorsky ventures in a footnote that "[t]o the extent Plaintiffs attempt to blame the Spec 55 wiring…Spec 55 was also expressly mandated by Navy specifications, and thus likewise [immune]."  (Memo. Supp. Motion, p. 12, fn. 4.)  This demonstrates Sikorsky's stubborn, willful, fundamental misunderstanding of plaintiffs' theory of defect.  Plaintiffs are not "blaming" Spec-55, or any type of wire for that matter.  Plaintiffs are *blaming the defective design and manufacture* of the wiring harness, which would have permitted this fatality *regardless of the type of wire used*.

OPPOSITION TO MOTION                                    CASE NO. 3:13-CV-00331-GPC-KSC
FOR SUMMARY JUDGMENT

contributed to the mishap.  (PSOF Nos. 3, 9–14.)  ***The government never issued any specifications for how the (defectively-designed and manufactured) landing gear wiring harness would be configured; in fact, Sikorsky doesn't have any evidence that the government ever even gave a "rubber stamp" to the design***.  (PSOF Nos. 17 & 18.)  Therefore, Sikorsky has no immunity for that defective configuration under the controlling case law, as explained in Sections II through IV, below.

The only entity that has ever blamed Kapton for this mishap was Sikorsky. (PSOF No. 60.)  The Navy investigators simply considered that finding by Sikorsky during their investigations, but did not independent analysis or verification of the claims.  In fact, the Final Report of the Engineering Investigations division of NAVAIR expressly found only that the site of the short could have been Kapton or spec-55 depending on the location, but stopped short of determining the precise location.  (PSOF No. 38.)

In the end, even putting aside the manifest implausibility of Sikorsky's "theory," the Motion should be denied in light of the mere presence of these key, material disputes.  *See, e.g.*, *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003)("Where the [defendants'] entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.")  Because of the titanic material disputes in this case, Sikorsky cannot prove any of the necessary prongs of the asserted "military contractor defense" as a matter of law, under the controlling, seminal Supreme Court and Ninth Circuit cases.

## II.   SIKORSKY CANNOT MEET THE FIRST PRONG OF *BOYLE* UNDER THE STANDARD ENUNCIATED BY THE NINTH CIRCUIT IN *SNELL V. BELL*, BECAUSE THE NAVY NEVER WIEGHED IN ON THE CONFIGURATION OF THE LANDING GEAR WIRING HARNESS AT ALL.

**A.**    **This Case is Precisely Analogous to *Snell*, and its Fifth-Circuit Predecessor *Trevino*, Because the Government Never Deliberated on the Defective Wiring Harness Faulted by Plaintiffs.**

It is outrageous, yet hardly surprising, that the Motion pretends the case *Snell v. Bell Helicopter*, 107 F3d 744 (9th Cir. 1997), does not exist.  This glaring omission is outrageous because *Snell* is the quintessential "military contractor defense" case that controls all cases within the Ninth Circuit where that defense is raised.  Yet Sikorsky fails to mention or cite that case *a single time* in its papers ostensibly supporting its Motion.  (See, Memo. in Supp. Motion, p. iii (Table of Authorities)).  This deliberate neglect on Sikorsky's part is unsurprising, however, because *Snell*'s holding obliterates Sikorsky's entire Motion.

Sikorsky inaccurately argues, "Undisputed evidence shows that Sikorsky meets *Boyle*'s first condition—that the government approved reasonably precise specifications."  (Memo. Supp. Motion, p. 11:13–14.)  This assertion, however, is not only disputed but is entirely without basis under the longstanding interpretation of that prong by the Ninth Circuit Court of Appeals.  The Ninth Circuit has long held that the military contractor defense is only available where "the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Snell*, 107 F3d at 746 (citing *Boyle*, *supra*, 487 U.S. at 511–12).  This means military contractors may not be held liable for features that the government demanded, but the manufacturer is on the hook for any design defect not attributable to a governmental demand.  Here, there is not a single scrap of evidence suggesting that any Navy officer ever considered the configuration of the landing gear wiring harness in any way, meaning Sikorsky cannot meet the first prong of *Boyle* under *Snell*, and cannot avail itself of contractor immunity—let alone as a matter of law. *See Boyle*, 487 U.S. at 514 ("[W]hether the facts establish the conditions for the defense is a question for the jury.")

In *Snell*, the plaintiffs brought wrongful death claims after a helicopter crash due to failure of the aircraft's faulty main drive shaft. Plaintiffs' theory was that the vibration-isolating mounts did not support the drive shaft in proper alignment, which permitted friction to burn off the lubricant and overheat the system. *Snell*, 107 F.3d at 747. The District Court for the Southern District of California granted summary judgment to defendant Bell on the military contractor defense. The Ninth Circuit reversed the district court, holding that the "evidence does not establish as a matter of law that the government exercised its discretion with respect to the drive shaft and its components" because "there were no discussions with the government about the design of the critical isolation mounts." *Id*. at 748. Therefore, military contractor immunity was unavailable to the extent that "the government did not exercise judgment *with respect to the design feature in question*…." *Id*. (Emphasis added.)

The *Snell* defendant, Bell, just like Sikorsky here, had the burden of establishing the affirmative defense it was advancing, as a matter of law. *Id*. at 746. Also, like Sikorsky here, Bell mustered a record establishing "that the government was significantly involved in and approved specifications for the design of the entire helicopter," with the District Judge remarking even that the "government was significantly involved in and approved *very* precise specifications for the UH–1N helicopter." *Id*. at 747. Nonetheless, the Court of Appeals held that insufficient because the record lacked an undisputed showing that the government specifically considered the isolation mounts that the plaintiffs blamed for the mishap. *Id*.[3]

Here, neither Sikorsky nor the government has produced any documents in any way seeming to suggest that the "design feature in question," the landing gear wiring harness, was ever considered by any government officer. In fact, Sikorsky's

---

[3] The Ninth Circuit expressly distinguished *Snell* from *Butler v. Ingalls Shipbuilding, Inc.*, which is cited by Sikorsky here, because in *Butler* the Navy specifically furnished specifications as to not just the accommodation ladders overall, but for the allegedly defective "padeye and link in particular." 89 F.3d 582, 585 (9th Cir. 1996).

own expert admitted there is no such evidence.  (PSOF Nos. 7–14, 17 & 18.) Plaintiff's criticisms of Sikorsky are that the wiring harness was improperly configured so that the up-command control wire was plugged into the utility hydraulic module immediately below the plug for the down-command control wire, all downstream of any effective safety interlock, and without proper support, strain relief, slack or anti-chafing, which permitted the wires to rub and chafe together until they shorted.  (PSOF Nos. 21, 23, 24, 35 & 36.)  There is no evidence that any of these conditions was ever demanded, specified, deliberated on or considered in any way by the Navy.  (PSOF Nos. 17 & 18; Lawrence Decl. paras. 9 & 12.)

In fact, in *Snell* the Detail Specification for the UH-1N was far more substantive regarding the at-issue assembly (the drive shaft) than is the CH-53E specification regarding the landing gear control system.  The UH-1N specification provided: "The transmission shall be mounted on a suitable vibration isolator.  A lift link shall be attached to the structure to carry rotor thrust loads.  …A transmission input drive installation shall be provided. This installation shall consist of a shaft assembly to carry rotor thrust loads."  *Snell*, 107 F.3d at 748.  Nonetheless, the Ninth Circuit held that "the Detail Specification for the helicopter left the design and placement of the drive shaft and its components to Bell [and therefore] would not support application of the defense as a matter of law."  *Id.*

Here, the government essentially specified nothing at all regarding the landing gear controls, leaving all discretion as to its implementation up to Sikorsky.  The only mentions of landing gear control in the Detail Specification are as follows:

**3.8.2.5 RETRACTING, EXTENDING AND LOCKING - Applicable.**

**3.8.2.5.1 RETRACTION - Applicable.**

**3.8.2.5.2 EXTENSION - Applicable. The alighting gear shall be extended in not more than 15 seconds up to 140 knots in normal operation.**

(Wakefield Decl., Ex. 10 (Detail Specification SD-552-3-9), pp. 50–51.)  This amounts to only the most basic and generic performance requirement, with

absolutely no mandates regarding the features that gave rise to the accident: the vertical, immediate juxtaposition of plugs "P494" and "P495," and the lack of a safety interlock to prevent a short between those two wire paths.  The government was never provided any description or depiction of the landing gear wiring harness, the hydraulic utility module, or the landing gear interlock system.  (Lawrence Decl., paras. 6, 9 & 13.)  Therefore, under *Snell*, Sikorsky cannot approach demonstrating the governmental discretion required for its immunity defense.

The *Snell* court was really itself only repeating and applying the well-established rule that determines the availability of immunity to a military contractor, citing to an earlier 5th Circuit case *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989), *cert. denied*, 493 U.S. 935 (1989)).  In *Trevino*, which formulated the "rubber stamp" rule applied by *Snell*, the court rejected a defendant's government contractor defense even though the Navy had demonstrably approved the design specifications for the installation of a diving hangar on a submarine, because the design and installation of the features at issue had been left up to the contractor's discretion.  865 F.2d at 1480.

Here, the government's lack of involvement in the CH-53E's landing gear wiring harness is precisely analogous to *Snell*'s isolation mounts and *Trevino*'s diving hangar.  *The government had nothing to do with any of them.*  Sikorsky cannot avail itself of the defense because it has not *produced a hint of substantiation* that the military participated in the design *of the wiring harness at issue in particular*. (Lawrence Decl., para. 6.)

### B.     Each of Sikorsky's Cases Explicitly Involved an Allegedly Defective Design Which Significantly Implicated Express Governmental Decision-Making.

Given the complete absence of evidence of military involvement in the design of the CH-53E's landing gear wiring harness, this case is materially distinct from all

the cases where the "military contractor immunity" defense has been established. The most illustrative example of this distinction is the Ninth Circuit case Sikorsky does bother to cite, *Getz v. Boeing Co.*, 654 F.3d 852 (9th Cir. 2011).  In that case, which involved a Chinook helicopter mishap, the plaintiffs criticized the Honeywell-made ignition system for its lack of "a continuous relight function, which would have allowed the engine to restart automatically in the event of a water-induced flameout." *Id*. at 861.

In finding the contractor defense applied, the court made the following critical findings that cannot be made here: that Honeywell had submitted to the U.S. Army a "detailed description of the allegedly defective ignition system. Most importantly, at least for purposes of resolving this appeal, Honeywell's specifications explicitly state: 'Continuous duty ignition capability is not provided.'" *Id*.  Only because of this precise parameter, expressly included in the Chinook's specification, did the court conclude, "Hence, the specifications explicitly identify the 'design of the particular feature at issue' and expressly observe that feature's absence." *Id*. (quoting *Snell*, 107 F.3d at 747).

Here, the specifications for the CH-53E never "explicitly identify" the configuration of the landing gear wiring harness, the UM, or the safety interlock system applicable to those components.  They certainly never "observe the absence" of an interlock capable of preventing a short-induced retraction.  In order for *Getz* to apply in Sikorsky's favor, Sikorsky would need to show some specification in which the government commanded the functional equivalent of, "Thou shalt not have a safety interlock downstream of the control panel," or "Thou shalt put the up-command valve directly underneath the down-command valve on the hydraulic utility module."  However, these key, fatal features were never disclosed to, and therefore never considered by, the government.  Therefore, at no time did the

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT

"specifications describe, in reasonable detail, the design feature alleged to be defective." *Id*.  Therefore, *Snell* bars the application of Sikorsky's defense.

Another thoroughly illustrative case, expressly distinguished by *Snell*, is *Oliver v. Oshkosh Truck Corp.*, where the Court of Appeal explained:

> The record is clear…that the various stages of Marine Corps approval exceeded mere rubber stamping of Oshkosh's work. …The Marine Corps considered—and rejected—a number of design modifications….  This is not a case where the government simply accepted, without substantive review or evaluation, the contractor's exercise of discretion in meeting a given performance standard. …The record in this case supports the district court's conclusion that, given the Marine Corps' involvement in the design process and its substantive input, ***the configuration of the fuel and exhaust systems amounts to the type of deliberate trade-off*** between military mission requirements and safety concerns that is ***at the heart of the government contractor defense***.

96 F.3d 992, 999 (7th Cir. 1996)(emphasis added).  Here, there was never any "back-and-forth" concerning how the landing gear wiring harness would be configured.  There is no evidence that the Navy was ever even provided a drawing of the utility hydraulic module before production CH-53Es were delivered, and there is certainly no evidence of the Navy ever giving substantive input on the configuration of the wiring harness thereafter.  (Lawrence Decl., paras. 10, 12 & 13.)  Even if Sikorsky were to argue, for instance, that "manifolding" the hydraulic functions helped them achieve the performance envelope desired by the Navy, this would not change the fact that the final configuration of the manifold was entirely the product of Sikorsky's discretion—the government never even got a peek!  (PSOF Nos. 62 & 63.)[4]

**C.    Sikorsky Is Not Insulated from Liability Due to the CH-53E's "Commonality with the Delta" Because the Delta Was the Product of Sikorsky's Discretion Alone, and Because the Two Aircraft Are Not Common as to the Features at Issue, in Any Event.**

---

[4] Even assuming hypothetically that Sikorsky had some evidence otherwise, this would at most create a triable issue of fact.

12

Sikorsky vaguely hints at an argument that the landing gear system overall was "virtually" dictated by the government, due to the government's expectation that the -53E (the "Echo" model) would be functionally similar to the -53D (the "Delta" model).  This novel "derivative immunity" theory is not supported by any precedent, and is not even advanced outright by Sikorsky, but only implied by Sikorsky's occasional asides, such as suggesting, "Pursuant to the requirement that the CH-53E maintain maximum commonality with the H-53D, the landing gear system, including interlocks, were the same as the [Delta]."[5]  (Memo. Supp. Motion, p. 5:22–24.)

To the extent Sikorsky does in fact rely on such a theory, in order for it to be advanced logically, Sikorsky would have to show: 1.) that the government played a discretionary role in the design and configuration of the components at issue during the development of the Delta; and 2.) that the design and configuration of the components at issue were exactly the same in the Echo as in the Delta.  Sikorsky cannot show either premise to be true.  As to the first necessary premise, Sikorsky's experts have conceded that there is no evidence showing any government discretion as to the design or configuration of the relevant components in the Delta; therefore, the Delta's landing gear wiring design would never have been shielded by any immunity that it could have conferred onto that of the Echo.  As to the second necessary premise, as far as the relevant components are concerned, the Echo is materially, demonstrably different from the Delta, in any event, meaning even if the Delta's landing gear wiring harness had been immune, the Echo's would not be.

---

[5] Sikorsky's hints at this argument are made all the more cryptic if one attempts to refer to their ostensible support for their suppositions: the citation for the quoted assertion, Sikorsky's Statement of Facts No. 30, has no discernible connection to the claim being made whatsoever, concerning as it does only the use of Kapton in the Echo, which is undisputedly a feature unique to the Echo and not carried over from any past model.

OPPOSITION TO MOTION                                  CASE NO. 3:13-CV-00331-GPC-KSC
FOR SUMMARY JUDGMENT

1.   **Under *Snell*'s Controlling Principles, the Delta's Landing Gear Control System Is Not Immune Because There Is No Evidence, Let Alone Undisputed Evidence, of Government Discretion Respecting That System.**

If Sikorsky were to rely on the theory that the Echo derived immunity from the Delta, then this would require simply shifting the *Snell* analysis of the facts further back in time, to the development of the Delta.  Sikorsky would need to show "the design feature in question [in this case, the CH-53Delta's landing gear wiring harness] was considered by a Government officer, and not merely by the contractor itself." *Snell*, 107 F3d at 746; *see also Boyle*, 487 U.S. at 512 (explaining immunity only attaches in cases where the government's "discretionary function" would otherwise be frustrated).

Sikorsky's self-described "spokesman" and retained expert John Wakefield admitted that he has no knowledge that the government played any role in determining the ultimate design of the Delta's landing gear wiring harness, insofar as any feature relevant to this case is concerned, despite having voluminous knowledge of the overall process of development and procurement.

> Q.   Are you aware of any facts reflecting government participation in the design of the 53D landing gear?
>
> * * *
> A.   Way before my time, no.
>
> Q.   Are you aware of any facts supporting government participation in the wiring system of the 53 Delta?
>
> THE WITNESS:· I am not of that, but I am very, very familiar with how the government asked for, procures, designs, builds and provides to the contractor the specifications to build what they want.
> The process I am very familiar with.  Individual details, I am not.

(Shepardson Decl., Ex. B (Wakefield Depo.), pp. 87:25–88:16.)  As plaintiffs' expert Col. Bill Lawrence further explains, the government never did play such a role in determining the ultimate state of the landing gear wiring harness, either in the Delta

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT

CASE NO. 3:13-CV-00331-GPC-KSC

or in the Echo.  (Lawrence Decl., para. 6.)  Given this wholesale lack of supporting evidence, Sikorsky cannot possibly satisfy the first prong of the *Boyle*/*Snell* test on any theory, let alone on its novel "derivative immunity" theory.

> ## 2. The Relevant Features of the Echo Were Not "Carried Over" from the Delta, But Were Newly Designed According to Sikorsky's Sole Discretion, and Not the Government's.

The key component of the CH-53E as far as this lawsuit is concerned is the landing gear wiring harness; the most important feature of which is its connection to the utility module ("UM"), which is where the Marine avionics investigators discovered suspect denuded sections of wire.  This key feature was configured completely differently in the -53D, and that changed configuration is exactly what led to this mishap.  In their declarations, Joh Bloomfield and Col. Lawrence point out the unmistakable variance between the Landing Gear Control schematics for the Delta and the Echo, precisely at the interface with the UM.  (Lawrence Decl., paras. 10 & 11; Bloomfield Decl., paras. 4–6.)  In short, the up- and down-command wires in the Delta were connected via a single plug ("P499"), whereas in the Echo they were separated into two plugs ("P494" for up and "P495" for down), with one plug right on top of the other.  (Lawrence Exhibits A & B; Shepardson Exhibit E (UM photo).)  This permitted strands leading to P495 to rub and chafe directly against P494.  (Shepardson Decl., Ex. H (Wuthrich Report), p. 1 [MIL073203].)  This particular manner of mechanical chafing, therefore, was a direct function of the unique design of the Echo's UM, and could therefore never be shielded by immunity "derived" from immunity that might hypothetically apply to the Delta.

## III. SIKORSKY CANNOT MEET THE SECOND PRONG OF *BOYLE* AS A MATTER OF LAW BECAUSE THERE IS AN ISSUE OF FACT WHETHER THE WIRING HARNESS WAS DEFECTIVELY MANUFACTURED, THEREFORE FAILING TO MEET THE APPLICABLE SPECIFICATIONS, WHICH IS NEVER IMMUNE.

In the *Boyle/Snell* analysis of this case, the second prong need never be reached because the Navy never made any specifications as to the design feature in question, and never brought to bear any discretionary function on the landing gear control system.  However, even if the second prong *were* addressed, Sikorsky cannot show that it conformed to all applicable specifications.  Instead, **the landing gear wiring harness was demonstrably defectively *manufactured*, independently of its defective design, and manufacturing defects are *never* immune**.  *McKay v. Rockwell Intern. Corp.*, 704 F.2d 444, 451 (9th Cir. 1983)(Military contractor immunity "does not relieve suppliers of military equipment of liability for defects in the manufacture of that equipment. To hold otherwise would remove the incentive from manufacturers to use all cost-justified means to conform to government specifications in the manufacture of military equipment.")

As Sikorsky admits in its filings, "The Detail Specification incorporated additional required military specification, such as…MIL-W-5088F…."  (Memo. Supp. Motion, p. 5:16–18 (citing Sikorsky Statement of Facts, No. 29.)  Yet the evidence shows—or at least creates a question of fact—that the MIL-W-5088F standard was not met in the subject aircraft, giving rise to a manufacturing defect.

The Air Mishap Board specifically found that the wires immediately leading into the UM's landing gear control valves, both Kapton and Spec-55, were native to manufacture, and were installed in violation of the build standards established by MIL-W-5088F.  The pertinent passage of the Safety Investigation Report ("SIR") reads:

> 44 - THE NON-KAPTON SECTION OF WIRE RAN FROM THE SPLICE POINT TO THE UP SOLENOID ON THE L[anding] G[ear] C[ontrol] V[alve] LOCATED ON THE UTILITY HYDRAULIC MODULE
>
> 45 **THE KAPTON AND NON KAPTON SEGMENTS WERE** SPLICED TOGETHER AND **INSTALLED BY SIKORSKY AIRCRAFT CORPORATION DURING AIRCRAFT MANUFACTURE**

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT

CASE NO. 3:13-CV-00331-GPC-KSC

* * *

50 EXCESSIVE SLACK EXISTED IN THE WIRE THAT ALLOWED THE POINTS OF EXPOSED WIRE TO COME IN CONTACT WITH THE UTILITY HYDRAULIC MODULE MOUNT FRAME

* * *

52 THREE POINTS OF EXPOSED WIRE ALL WITHIN 1 INCH OF EACH OTHER EXISTED ON PIN B P495 OFTHE LGCV DOWN SOLENOID 8 INCHES FROM THE PIN B P495 CONNECTOR

(Shepardson Decl., Ex. A, p. 45 (emphasis added).)   Independently, the Marine avionics investigators discovered that "the tension of the wires on the Down Control were tight and without proper strain relief and pin A of 495 had two wear through spots w[h]ere the wires came in contact with the Up Landing gear Control Valve Cannon Plug."  (Shepardcon Decl., Ex. H (Wuthrich Report), p. 1.)  In other words, the "Down" wires were too tight and the "Up" wires were too loose, allowing them to chafe directly against each other, and the metal UM assembly.  (Shepardson Decl., Ex. G (Coffman Report), pp. 2–4.)  The worn sections of wire—on both the Up and Down paths—are depicted in the avionics team's photographs, and they are all on Spec-55 "white wire".  (Shepardson Decl., Exs. G (Coffman Report), pp. 2–3; I (Bare Wire Photos); & L (Stone Depo.), pp. 78:17–84:4.)

The general military specification for the proper wiring practices for military aircraft, applicable to the helicopter in this case, is designated MIL-W-5088F. (Wakefield Decl., para. 14, Ex. 11.)   Section 3.10.6 of the 5088F specification requires that wire be routed to assure reliability and offer protection from (among other things) chafing.  (Wakefield Decl., Ex. 11, p. 18.)  Section 3.10.7 specifically provides that "[e]xcess slack shall not be provided in wires."  (Wakefield Decl., Ex. 11, p. 18.) Section 3.11 ("Protection and support") demands that wires and harnesses be adequately supported to prevent chafing and excessive movement in high-vibration areas.  (Wakefield Decl., Ex. 11, p. 20.)   Section 3.11.4 ("<u>Anti-chafing provisions</u>") requires, "Chafing shall be prevented by routing and clamping bundles

to prevent contact with edges of equipment and structure." (Wakefield Decl., Ex. 11, p. 22.) Section 3.11.10 requires "Special protection" to wires in the form of extra insulation, standoff mounting and *separation* where appropriate. (Wakefield Decl., Ex. 11, p. 24.) Section 3.11.7 requires the radius of wire bends to be sufficient to relieve strain on the wires and connectors. ((Wakefield Decl., Ex. 11, p. 23.) As both plaintiffs' experts Lee Coffman and John Bloomfield have explained, the subject aircraft was manufactured in noncompliance with those requirements, and this fatal mishap is the result. (Shepardson Decl., Exs. F (Bloomfield Report), para. 23; G (Coffman Report), p. 3; & X (Bloomfield Depo.), pp. 191:22–193:10.)

The findings of the Air Mishap Board in the Safety Investigation Report (Shepardson Decl., Ex. A), along with the pictures of the woefully chafed Spec-55 wires taken by the avionics investigators (Shepardson Decl., Ex. I), without anything else, create a more-than-sufficient triable issue of fact to defeat the *Boyle* defense as a matter of law. This evidence is only buttressed by the testimony of plaintiffs' experts, and *Sikorsky has not even submitted any evidence, in any form, tending to establish that the subject aircraft met the military's specifications set out in MIL-W-5088F*. On the other hand, Plaintiff has evidence of *departures* from that specification, and such a defect in manufacture can never be insulated from liability under military contractor immunity. Therefore, if *any party* is entitled to summary judgment on the affirmative military contractor defense, it certainly isn't Sikorsky.

## IV. SIKORSKY CANNOT MEET THE THIRD PRONG OF BOYLE (TO THE EXTENT IT CAN BE INVOKED AT ALL) BECAUSE SIKORSKY NEVER WARNED THE NAVY ABOUT THE DANGER OF INADVERTENT LANDING GEAR RETRACTION DUE TO AN ELECTRICAL SHORT.

Sikorsky argues that the third prong of *Boyle* (that the contractor warned of any danger that it knew about but the government didn't) is satisfied by the government's long-standing knowledge of the "risks relating to electrical wire degradation." It is unclear why Sikorsky brings up this factor at all, since plaintiff's

claims are not premised in any way on Sikorsky's knowledge of the risks posed by the CH-53E's design.[6]  All plaintiffs need to prove at trial is that Sikorsky is strictly liable for the manufacturing defect in the landing gear wiring harness (under CACI 1201 & 1202) and strictly liable for the design defects under the consumer-expectation and risk-benefit-tests, neither of which require knowledge on the manufacturer's part (under CACI 1203 & 1204).  It would therefore again seem that Sikorsky raises this factor only due to its mistaken belief that plaintiff intends to criticize Sikorsky at trial for using Kapton, despite the government's knowledge of its dangerous propensities.  Because plaintiff does not fault Sikorsky for using Kapton—or Kapton itself for that matter—the third prong of *Boyle* does not come into play.[7]

However, if it is true that Sikorsky knew about the tendency of the landing gear on the CH-53E to retract randomly, there is certainly no evidence they ever

---

[6] In fact, it stands to reason that Sikorsky did not appreciate the danger posed by this particular risk until it revealed itself in the 2005 New River mishap. Sikorsky's own retained expert James Knox even takes the position that the inadvertent landing gear retraction was not foreseeable.  (Shepardson Decl., Ex. N (Knox Report), p. 70, Opinion No. 9.)

[7] Sikorsky makes an allusion to the 2005 New River mishap, seeming to imply that the Navy "ratified" the design defects in the CH-53E in 2009, by acknowledging the risk revealed by the 2005 inadvertent-retraction mishap.  This would be a radical expansion of the already-broad immunity conferred by *Boyle*, and would be unsupported by any authority.  Sikorsky cites only *Harduvel v. General Dynamics Corp.,* where the court observed in 1989 that the Air Force was still purchasing the F-16 as a primary combat fighter, despite acquiring full knowledge by 1979 that the aircraft suffered from a generalized "chafing problem."  878 F.2d 1311, 1318 (11th Cir. 1989).  However, *Harduvel*'s reasoning is inapposite here because the Navy had already ceased purchasing CH-53Es in 1999, long before the landing gear wiring defect reared its lethal head in 2005.  (Wakefield Decl., Ex. 8.) Therefore, Sikorsky's position is essentially that they were absolved of all responsibility for the CH-53E's defects the moment they took their first victim, if the Navy did not scrap the entire fleet immediately.  Such a "rule" is not only unjustified under *Boyle* and *Snell*, but is facially absurd.

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT

warned the government of that.  In fact, Mr. Wakefield explained that the Navy relies on Sikorsky to furnish the "engineering data" that the Navy turns into the operations and maintenance manuals employed by the Navy.  (Shepardson Decl., Ex. B (Wakefield Depo.), p. 137:2–19.)  Yet Wakefield outright denied having any evidence that Sikorsky ever provided "engineering data" to the Navy disclosing a risk that an electrical short might cause the landing gear to retract uncommanded. (Shepardson Decl., Ex. B (Wakefield Depo.), pp. 137:20–138:17.)  Therefore, if the third prong of the *Boyle* test were applicable, Sikorsky would be unable to satisfy it.

## V.   SIKORSKY'S GRAB-BAG OF ALTERNATIVE ARGUMENTS CONTAINS NO GROUNDS FOR DISPOSING OF THIS CASE.

### A.   The Political Question Doctrine Is Not Implicated Because Kapton Is Not Relevant to Plaintiffs' Theories of Liability.

Sikorsky tacks on an argument that "plaintiffs' claims are not justiciable per the Political Question Doctrine" because this case might "require the Court to examine military judgments and decisions, including Navy decisions as to proceeding with production…using Kapton…the various measures considered and initiated by the Navy to replace Kapton…the adequacy of warnings and training of servicemen who were exposed to the hazards of Kapton wiring [and] decisions on how best to allocate limited funding to address the problem." (Memo. Supp. Motion, p. 18:15–22.)  This entire argument is a house made of straw, of course, because *plaintiff's claims have nothing to do with Kapton*, and therefore might never implicate these supposedly political questions.

### B.   The Navy's Kapton Remediation Policy Was Not a Cause, Let Alone a Superceding Cause, of the Accident.

As with Sikorsky's asserted "Political Question" argument, the "Superceding Cause" Argument is aimed squarely at their favorite straw target, Kapton.  As plaintiffs' evidence shows in abundance, there is at least a triable issue of fact as to

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT

***whether Kapton had anything at all to do with this mishap***, so the "Navy's failure to resolve the known Kapton wiring problem" cannot dispose of the case as a matter of law.

### C.      Sikorsky's Sophisticated User Defense Raises, at Most, a Disputed Issue of Fact on Just One of Plaintiffs' Theories, Which Could Never Justify Total Dismissal.

Sikorsky attacks plaintiffs' failure-to-warn theory based on the testimony of just one Marine, Gunnery Sergeant Wilcox, who testified that he "instructed" the decedent not to "force" a "stuck pin." (Sikorsky SOF No. 5.)   This testimony is contradicted, however, by an enormous amount of evidence that before the accident, no Marine was ever formally trained on that issue (PSOF No. 54), that no non-crew chiefs were ever trained on that issue[8] (PSOF No. 57), and that none of the decedent's peers who were on active duty with him on the day of the accident were ever taught or made aware of any such issue. (PSOF No. 58.) This wealth of evidence seemingly disproving any "sophisticated user" defense, of course, is only corroboration of the irresistible inference from the very occurrence of the fatal mishap—that SSgt. Fontalvo never heard and did not know that a "stuck pin" meant that the landing gear was trying to retract on its own, and therefore posed a mortal threat. This "knowledge gap," acknowledged by all the investigating officers, is exactly why Sikorsky should have included conveyed some express warning to the government that such a danger existed. However, they did not.

Prior to the mishap giving rise to this action, the official design purpose of the landing gear safety pin was only "for securing each landing gear in the down position, to prevent collapse during ground maintenance." (PSOF No. 52.) This gives no suggestion that anyone in the military ever contemplated that a retraction might occur due to an electrical short alone. Even Sikorsky's own expert Jim Knox opines that this mishap was not foreseeable before it happened. (PSOF No. 59.) If

---

[8] The decedent was not a crew chief. (Pl's SOF No. 53.)

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT                          CASE NO. 3:13-CV-00331-GPC-KSC

it is true that Sikorsky did possess some knowledge of this potentiality, then it had a corresponding duty to pass on that knowledge in the form of "engineering data" that the Navy relied on to prepare its training and maintenance manuals.  (PSOF No. 66.)  However, Sikorsky's expert John Wakefield admitted that there is no evidence that such a warning was ever conveyed.[9]   (PSOF No. 67.)   In light of all this countervailing evidence, Sikorsky cannot prove its limited "Sophisticated User Defense" as a matter of law.

> **D.    Tanika Has Standing Because There Is (at a Minimum) a Question of Fact That She Depended on the Decedent for More Than Half of Her "Necessities of Life."**

Finally, Sikorsky attempts to dismiss the Wrongful Death claim of Tanika Fontalvo lacks standing under C.C.P. § 377.60(c) as a matter of law, ***even though her mother testified that the decedent contributed about 60% of Tanika's support to the household***.    For this argument, Sikorsky ostensibly relies on *Soto v. BorgWarner Morse TEC Inc.*, 239 Cal.App.4th 165 (2015).  However, the central principle of *Soto* is that standing under 377.60(c) must be determined on a "case-by-case" basis, and the decision there turned on an extraordinarily unusual set of facts, none of which applies here.

> **1.    There Is Evidence That the Decedent Provided 60% of Tanika's Support, Well Above the Threshold for Standing under § 377.60(c).**

Financial dependence generally presents a question of fact, which "should be determined on a case-by-case basis."  *Chavez v. Carpenter*, 91 Cal.App.4th 1433, 1445 (2001).  Here, there is ample evidence, in the form of testimony and financial documents, that SSgt. Fontalvo provided more than half of Tanika's financial support.  The plaintiffs' mother has testified that the decedent provided 60% of Tanika's support: he paid half the rent for the household, paid outright for appliances

---

[9] See Section IV. above, regarding Sikorsky's failure to meet the overlapping third prong of the *Boyle* test.

OPPOSITION TO MOTION                                   CASE NO. 3:13-CV-00331-GPC-KSC
FOR SUMMARY JUDGMENT

like the clothes washer and dryer, paid for her braces, and shared in the costs of her clothes and food.  (Shepardson Decl., Ex. Y (Amador Depo.) pp. 158:14 –159:23, 160:17–163:12.)  Tashina testified specifically that the decedent paid approximately 60% of these expenses for Tanika for the entire time they cohabited (more than three years).  (Shepardson Decl., Ex. Y (Amador Depo.) pp. 81:17–82:2.)  This is in keeping with the fact the decedent made slightly more money than Tashina did, and they both did their best to contribute their soldiers' salaries to the household.  At a bare minimum, this evidence creates a triable issue with respect to that fact, making summary judgment unavailable to Sikorsky.

### 2. Decedent Contributed Support for 60% of Tanika's "Necessities of Life."

Sikorsky acknowledges this evidence, yet nonetheless argues Tanika should be thrown out of court based on the holding of *Soto, supra*.[10]  *Soto* involved a minor, both of whose parents were alive and well, as well as gainfully employed, but who nonetheless brought a Wrongful Death suit under C.C.P. § 377.60(c) after the death of his great-grandfather.  The court explained that the young family had decided to take up residence with the doting great-grandfather before his death, and that the decedent had proceeded generously to "spoil" the minor boy and his parents, forgiving their rent and loans, and occasionally buying gifts for the minor.  239 Cal.App.4th at 178–79.  The trial court granted a nonsuit after full development of

---

[10] In making its ruling in *Soto*, the California Court of Appeal acknowledged that there was no controlling case law analyzing § 377.60(c) at that time.  Likewise, no appellate case law has been published since.  The Eastern District of California recently applied the clause, but in that case no material dispute was presented as to whether the claimant cohabitated with or was supported by the decedent.  *Johnson v. City of Vallejo* (E.D. Cal., July 7, 2015, No. 213CV01072JAMKJN) 2015 WL 11233190, at *1; similarly, in *Smallwood v. American Trading & Transp. Co.* (N.D. Cal. 1994), the claimants "conceded that [decedent] did not provide one-half or more of the children's financial support." 868 F.Supp. 280, 283, *decision supplemented* (N.D. Cal., Dec. 30, 1994, No. C-92-0869 MHP) 1994 WL 735929.

23

the evidence at trial, finding that because the great-grandfather's *largesse* on the boy was superfluous, he could not make a claim under the Wrongful Death Statute.  The Court of Appeal affirmed, and in doing so stressed the "case-by-case" nature of such an analysis, and that the evidence viewed in the light most favorable to the claimant. *Id*. at 189 (citing *Chavez*, *supra*, 91 Cal.App.4th at 1447–48).

That case could not be more dissimilar to this one.  The *Soto* court expressly based its decision on its finding that no reasonable jury could conclude that the great-grandson relied on the decedent for "one half or more of the financial support for his necessaries of life." *Id*. at 190.  It defined "necessaries of life" as "things, such as shelter, clothing, food and medical treatment, which one cannot and should not do without."  *Id*. at 189 (quoting *Perry v. Medina*, 192 Cal.App.3d 603, 610 (1987). These, of course, are the very things that SSGt. Fontalvo provided for Tanika here.

SSgt. Fontalvo was not just a "moneybags" remote relative giving sporadic gifts to Tanika.  He was the only "father" Tanika had for the last three years of his life.  Rather than spoiling Tanika with "niceties," as did the great-grandfather in *Soto*, the decedent here provided 60% of Tanika's "necessities of life": shelter, essential appliances, her braces, and her clothes and food.  (Shepardson Decl., Ex. Y (Amador Depo.), pp. 158:14 –159:23, 160:17–163:12.)

This humble, selfless sharing of resources is what made this four-person family work and function, and what gave Tanika the comfort and security of having two parents.  This is more than adequate to permit a trier of fact reasonably to conclude that the decedent provided something over half of Tanika's support.  Sikorsky's motion is premised on the notion that they have evidence to refute this testimony.  That does no entitle them to summary judgment.  It entitles both parties to a trial to resolve the disputed evidence.  To preclude Tanika a trial would thwart the policy that led the legislature to enact § 377.60(c), which is to provide a claim to a child whose primary breadwinner was not her biological parent.

OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT

CASE NO. 3:13-CV-00331-GPC-KSC

### 3. The Decedent in *Soto* Was Three Generations Removed from the Minor Claimant whereas SSgt. Fontalvo was Tanika's Direct Parental Provider.

The plaintiffs' circumstances here are crucially distinct from the *Soto* scenario, where the minor in question had two living parents capable of supporting him, but brought a claim based on the death of his great-grandfather, an ancestor three generations removed.  Here, Tanika lost her direct father figure.  By arguing that Tanika's material comforts were "good enough" before SSgt. Fontalvo ever entered her life, Sikorsky is asking the Court to extend *Soto* to all situations where there exists any surviving parent (or other benefactor) capable of providing one-half of the would-be claimant's minimum means of sustenance.  This extension is unjustified by *Soto*'s reasoning, and would be tantamount to a rule of law that all children are just as well off with a single parent than with two.[11]  Such a reprehensible, callous and inhuman philosophy should not govern the policy behind California law.

### CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.


/s/ Marshall J. Shepardson, Esq.
_____
Attorney for Plaintiffs
E:Mail: mshepardson@grassinilaw.com

---

[11] Sikorsky makes no effort to sugar-coat this.  They outright rely on the brutal pronouncement that "Ms. Amador could have continued to be the sole financial provider of T.L. as she was prior to December 2007."  (Memo. Supp. Motion, p. 24:8–9.)

OPPOSITION TO MOTION                              CASE NO. 3:13-CV-00331-GPC-KSC
FOR SUMMARY JUDGMENT