LAWRENCE P. GRASSINI — Cal. SBN 49046
LARS C. JOHNSON — Cal. SBN 205712
MARSHALL J. SHEPARDSON — Cal. SBN 263637
GRASSINI, WRINKLE & JOHNSON
20750 Ventura Boulevard, Suite 221
Woodland Hills, CA 91364-6235
Tel: (818) 348-1717
Fax: (818) 348-7921
Email: mail@grassinilaw.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DOMINIC FONTALVO, a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and TANIKA LONG, a minor, by and through her Guardian Ad Litem, TASHINA AMADOR,<br><br>Plaintiff,<br><br>vs.<br><br>SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.; UNITED TECHNOLOGIES CORPORATION; G.E. AVIATION SYSTEMS, LLC; DUPONT AEROSPACE CO.; E.I. DUPONT DE NEMOURS AND COMPANY; PKL SERVICES, INC.; and DOES 1 through 100, Inclusive,<br><br>Defendants. | Case No.: 3:13-cv-00331-GPC-KSC<br><br>Judge: Hon. Gonzalo P. Curiel<br><br>**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED FACTS OF DEFENDANT SIKORSKY**<br><br>DATE: August 11, 2017<br>TIME: 1:30 P.M.<br>CTRM: 2D |

Plaintiffs DOMINIC FONTALVO, a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and TANIKA LONG, a minor, by and through her Guardian Ad Litem, TASHINA AMADOR, respond to Defendant SIKORSKY AIRCRAFT CORPORATION's Separate Statement of Undisputed Material Facts as follows:

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1. Plaintiff's decedent U.S. Marine Corps Sgt. Alexis Fontalvo died on March 17, 2011, at Miramar Marine Corps Air Station, as the result of a military helicopter accident involving a CH-53E Super Stallion heavy lift cargo helicopter that was being prepared for a training flight. [Hickey Decl., Ex. A] | Undisputed |
| 2. Sgt. Fontalvo was acting as an aerial observer responsible for pulling the chocks and safety pins before departure, and had trouble removing a safety pin from the helicopter's left landing gear, which pin is designed to slide out easily. [Hickey Decl., Ex. A, Findings of Fact 3(e) (p.4); 31 (p.7); 39 (p.8)] | Undisputed |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| 3. Sgt. Fontalvo moved from the left main landing gear to the left auxiliary fuel tank to remove that safety pin, and then returned to the landing gear and tried again to forcibly remove the stuck safety pin. As soon as Sgt. Fontalvo forced the safety pin out, the landing gear retracted and the aircraft collapsed upon him, resulting in his death. [Hickey Decl., Ex. A, Findings of Fact 35-39 (p.8)] | Undisputed |
| 4. Sgt. Fontalvo was an Airframe Collateral Duty Quality Assurance Representative (CDQAR), and considered by the Navy to be a duty expert on the landing gear system. [Hickey Decl., Ex. A, Findings of Fact 30 (p.7); Ex. B, Deposition of Wilcox at 23: 19-24:21] | Objection: vague and ambiguous insofar as "duty expert" is not defined and has no lay meaning in this context. Further objection to the extent this is a legal conclusion rather than a fact. Without waiving said objections, it is undisputed that S.Sgt. Fontalvo obtained a "CDQAR" qualification, indicating a specialty in airframe, including landing gear. |
| 5. Sgt. Fontalvo was trained never to | |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| remove a landing gear safety pin if any resistance is felt.<br>[Hickey Decl., Ex. B, Deposition of Wilcox at 17:5-18:2; 35:23-36:5; 56:11-19] | Disputed.<br>"[A] at no time are aircrewman nor airframes mechanics <u>formally</u> taught the function of the landing gear safety pin nor the danger and immediate actions if the pin is not functioning properly."<br>**Hickey Decl., Ex. A** (Command Investigation Report), p. 13, para. 10. [MIL073018]<br>"[The] crew chief stated that the knowledge was handed down to him by word of mouth at crew chief school from experienced crew chiefs. Not all crew chiefs were aware of the hazard but some were. No non-crew chief MOS aircrewman appear to ever have been made aware of the hazard in any training or operational venue."<br>**Hickey Decl., Ex. D** (NCIS Report), p. 2 [MIL092438]<br>All of Staff Sergeant Fontalvo's peers who were on active duty with him on March 17, 2011, testified that up until that date, they were never taught |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | anything, and never knew anything, about the danger and immediate actions if the landing gear safety pin is not functioning properly.<br>**Shepardson Decl., Exs. O** (Captain M. Hamilton Depo., pp. 84:11–85:17, 87:20–22); **P** (Coffin Depo., pp. 61:12–62:1); **Q** (Danley Depo., pp. 20:18–21:2); **R** (Shelton Depo., pp. 117:6–11, 146:1–5, 158:17–25); **S** (Captain J. Brown Depo., p. 99:8–17); **& T** (Sgt. J. Perkins Depo., p. 33:4–7) |
| 6. The subject CH-53E and the prior models, CH-53A, CH-53D and RH-53D, share a similar landing gear control system, consisting of five protective interlocks. Two interlocks are operated by the pilot — the up and down control handle and a separate lock to prevent inadvertent actuation. Two other interlocks are "Weight on Wheels" (WOW) switches associated with each of the two main landing gear, which prevent the landing gear from being retracted while the aircraft | Objection: compound, and vague and ambiguous as to the meaning of "similar" in this context.<br>Further objection that this statement is incoherent and unanswerable as written.<br>Without waiving these objections, it is disputed.<br>The wiring scheme for the CH-53E is conceptually and physically distinct from that of the RH-53D.<br>**Lawrence Decl., para. 6; Exs. A** (- |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| is on the ground. The fifth interlock consists of landing gear safety pins — one for each of the two main landing gear, and one for the nose landing gear. These are mechanical locks that prevent each of the gear from being retracted on the ground. The two cockpit interlocks and the two WOW switches are connected by electrical wiring terminating at the hydraulic components which move the landing gear upon pilot command. The three landing gear safety pins are independent of the cockpit and WOW switches, and "downstream" of all components which operated the landing gear. [Wakefield Decl., ¶ 5; Knox Decl., ¶¶8-12] | 53D Schematic (SIK024984)) **& B** (-53E Schematic (SIK008384))<br><br>It is further disputed that the wiring between the "two cockpit interlocks" and the "two WOW switches" terminates at any hydraulic component. A separate length of wire runs from the control panel to the hydraulic components; this entire length is downstream of the WOW switches.<br>**Shepardson Decl., Exs. F** (Bloomfield Report), paras. 10 & 15; **& U** (Technical Manual), pp. MIL100991–92. |
| 7. Military investigators determined that an electrical short somewhere along the 437 inches of wire that connects the landing gear control panel in the cockpit to a hydraulic utility module activated the three | Disputed.<br>The Marine avionicsmen who performed the military's inspection identified the damaged portions of wire where shorting could have |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| landing gear to command retraction while the helicopter was on the ground.<br>[Hickey Decl., Ex. A, Opinion 5 (p.12-13)] | occurred.<br>**Shepardson Decl., Exs. H (**Wuthrich Report) **& I** (Bare Wire Photos) |
| 8. Military investigators found several portions this electrical wire had degraded lamination and exposed wire<br>[Hickey Decl., Ex. A, Opinion 6 (p.13); D, Material Factors #1 and #2 (p.1)] | Objection: vague and ambiguous as to the meaning of "several" and "degraded" in this context.<br>Without waiving said objections, it is undisputed that the Marine avionicsmen who performed the military's inspection identified damaged portions of Spec-55 wire where shorting could have occurred.<br>**Shepardson Decl., Exs. H (**Wuthrich Report) **& I** (Bare Wire Photos) |
| 9. This "interconnect" wire starts at the landing gear control panel in the cockpit as "Kapton" wire. Three hundred sixty-seven (367) inches of the Kapton wire routes toward the rear of the helicopter, and is spliced to 70 inches of "Spec 55" wire.<br>[Hickey Decl., Ex. C (p.2-3)] | Objection: compound and vague and ambiguous as to the meaning of "this 'interconnect' wire" in this context.<br>Without waiving said objections, it is undisputed for the purposes of this Motion that these measurements of the up- and down-command wiring leading from the control panel to the hydraulic utility module are |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | approximately correct. |
| 10. Military investigators found that the Kapton portion of the wire "showed significant degradation, and several indications of moisture and possible arcing," and that the non-Kapton wire "also had possible exposure sites.". ." [Hickey Decl., Ex. A, Opinion 6 (p.13)] | Disputed.<br>The Marine avionicsmen who performed the military's inspection expressly found that none of the Kapton wire was degraded or damaged. **Shepardson Decl., Ex. H (**Wuthrich Report), p. 2. |
| 11. Military investigators found that Kapton wiring degradation had previously caused a similar inadvertent landing gear retraction of a CH53-E helicopter in 2005. [Hickey Decl., Ex. A, Findings of Fact 69 (p.11)] | Disputed.<br>This finding was made by Sikorsky, not the military.<br>Hickey Decl., Ex. A (Command Investigation Report), Enclosures 41 (Sikorsky Materials Engineering Report [MIL073205–73213]) & 43 (Sikorsky Report [MIL07316–73226])<br>The only damaged wire identified by a military investigating officer ("IO") was Spec-55-type wire, not Kapton. [JAGMAN p. 2 (description of Enclosure No. 42); Enclosure 42; **Shepardson Decl., Exs. H (**Wuthrich |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Report), **I** (Bare Wire Photos); **L** (Stone Depo., pp. 78:17–84:4) |
| 12. Military investigators found that Sgt. Fontalvo, a CDQAR and duty expert with respect to the landing gear system, should have recognized the danger of a stuck safety pin because it indicated that the landing gear was under pressure to retract; and that "a significant training issue with respect to maintenance publications and the landing gear safety pins." [Hickey Decl., Ex. D, Human Factors #1 and #2 (p.1 -2)] | Objections: compound.<br>Further objection to the extent these statements are legal conclusions rather than facts.<br>Without waiving said objections, it is disputed that any "military investigator" found that SSgt. Fontalvo "should have recognized the danger"; this is a gross misrepresentation of the evidence.<br>**Hickey Decl., Ex. D**, Human Factors #1 and #2 (p.1 -2)]<br>Without waiving said objections, it is undisputed that the Investigating Officer Major Ian Stevens observed, "There exists a significant training issue with respect to maintenance publications and the landing gear safety pins."<br>**Hickey Decl., Ex. A** (Command Investigation Report), p. 13, para. 10. [MIL073018] |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | |
| 13. Plaintiffs sued Sikorsky and DuPont for defects in the landing gear and wiring systems, alleging that the "wire path leading to the landing gear was subject to an unplanned and uncommanded energization" that caused the landing gear to retract. [Plaintiffs' Second Amended Complaint, Dkt. 71, ¶ 17] | Undisputed. |
| 14. More particularly as to Sikorsky, Plaintiffs allege that the landing gear system was defectively designed due to the configuration which juxtaposed a wiring harness and wire path "downstream of any and all interlocks and failsafes capable of preventing gear retraction in the event of unplanned energization." [Plaintiffs' Second Amended Complaint, Dkt. 71, ¶ 13] | Undisputed |
| 15. As to DuPont, Plaintiffs allege that its Kapton wire in the wire path leading from the landing gear control to the landing gear assembly was | Undisputed that this allegation is contained in the Second Amended Complaint. |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| defective due to degradation which made it prone to unplanned energizing events.<br>[Plaintiffs' Second Amended Complaint, Dkt. 71, ¶ 14] | |
| 16. The subject military CH-53E was designed in response to U.S. Navy specific operational needs for a Heavy Lift Helicopter with increased lift capacity, compatibility with amphibious shipping, and maximum commonality with the existing H-53 series helicopter. The CH-53E derives from earlier models — CH-53A, CH-53D and RH-53D (U.S. Navy variant).<br>[Wakefield Decl. ¶~ 4,5, Ex. 2; Knox Decl., ¶ 7] | Disputed.<br>As to the feature at issue, the landing gear wiring harness, there is no commonality since the hydraulic utility manifold is configured differently.<br>**Lawrence Decl., paras. 10–11; Exs. A** (-53D Schematic (SIK024984)) **&** **B** (-53E Schematic (SIK008384)); **Knox. Decl.** [Doc. No. 164-9], para. 9; **Shepardson Decl., Ex. D** (Knox Depo., pp. 50:15–53:3) |
| 17. Congress began appropriating funds for the CH-53E in 1970, and the Department of Defense authorized the Navy to proceed with development in November 1971.<br>[Wakefield Decl., Ex. 2] | Undisputed for the purposes of this Motion. |
| 18. The U.S. Navy's airworthiness | |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| authority, NAVAIR, which is staffed with more than 1,000 engineers, awarded design contracts to Sikorsky for development of the CH-53E, which began with design and production of prototype helicopters. Sikorsky submitted hundreds of engineering reports and drawings to NAVAIR pursuant to contractual requirements, which the Navy reviewed for purposes of development of a Detailed Specifications for the CH-53E.<br>[Wakefield Decl., ¶¶ 6, 7; Hickey Decl., Ex. E, Leigh Deposition at 98:19-100:4] | Undisputed for the purposes of this Motion. |
| 19. The landing gear control system of the CH-53A, CH-53D, RH-53D, and CH-53E developmental and pre-production prototypes was carried forward into the CH-53E production contracts, including the accident helicopter (BuNo 163077), utilizing the same essential electrical wiring interconnect system, and five | Disputed.<br>As to the feature at issue, the landing gear wiring harness, there is no commonality since the hydraulic utility manifold is configured differently.<br>**Lawrence Decl., paras. 10–11; Exs. A** (-53D Schematic (SIK024984)) **&** |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| interlocks, which system the Navy had operated and maintained on the earlier models.<br>[Wakefield Decl., ¶¶ 7, Ex. 3-6; Knox Decl., ¶¶ 7-12] | **B** (-53E Schematic (SIK008384)); **Knox. Decl.** [Doc. No. 164-9], para. 9; **Shepardson Decl., Ex. D** (Knox Depo., pp. 50:15–53:3) |
| 20. In its development of the CH-53E, NAVAIR officials and engineers held hundreds of meetings with Sikorsky engineers and program management personnel on all aspects of the design specification, including items that would be changed from the CH/RH-53D. These meetings included safety meetings, conferences and Preliminary and Critical Design Reviews. NAVAIR or its designated USG personnel assigned to, and residing at, the Sikorsky facility (NAVPRO — Naval Procurement, now called DCMA), reviewed all the engineering drawings, test plans and test reports. They had technical interchange meetings during the design, and reviews of design following testing to ensure the helicopter was compliant | Undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| with the government's specifications. [Wakefield Decl., ¶ 8] | |
| 21. NAVAIR proceeded to contract further with Sikorsky Aircraft for the continued design and development of the CH-53E. Contract N00019-73-C-0228 was a Research & Development contract which included the Navy's CH-53E Detailed Specification, SD-552-3 , and consisted of two parts: <br>• Phase I was a Research & Development Contract for Sikorsky Aircraft to produce the design (drawings), complete the development, and conduct trade off studies for CH-53E. (with FY-73 funding). <br>• Phase II was Research & Development Contract for Sikorsky Aircraft to fabrication of two prototype helicopters for Sikorsky and USN to conduct ground and flight testing. (YCH-53E 159121 & 159122). | Undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| [Wakefield Decl., ¶ 9] | |
| 22. Beginning in 1974, the design phase prototypes underwent extensive flight testing with both Sikorsky and Navy test pilots and engineers, which consisted of multiple hundreds of flight test hours. All aspects of the helicopters were tested, including sub-system evaluations. NAVAIR issued Naval Air Test Center Deficiency Reports for any deficiency discovered during flight testing. Meetings were held between NAVAIR and Sikorsky engineers and program personnel concerning the reports. Resolution and design decisions were always made by NAVAIR.<br>[Wakefield Decl., ¶ 10] | Disputed.<br>There is no evidence that the sub-system pertinent to this case, the landing gear wiring harness and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR.<br>**Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16) |
| 23. Following the design review and flight testing of the design prototypes, the Detailed Specification SD-552-3 was revised and updated. The changes were documented in Sikorsky Engineering Report 13197. NAVAIR awarded another contract for | Undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| fabrication of two additional "pre-production" prototypes based on the revised Detail Specification. These prototypes were designated BUNO 159876 and159877, and they also underwent additional hundreds of hours of flight testing by Navy test pilots, which results were evaluated by NAVAIR engineers.<br>[Wakefield Decl., ¶ 11, Ex. 4] | |
| 24. As a result of Navy evaluation and testing of the pre-production prototypes, NAVAIR made additional changes to the Detailed Specification which would control the production helicopter. The changes were documented in Sikorsky Engineering Report SER 13300, dated September 9, 1977. One significant change made by NAVAIR was the requirement that Kapton wiring be incorporated into all electrical harnesses pursuant to MIL-W-81381. The U.S. Navy approved the CH-53E for service use, with a specific requirement to | Disputed.<br>This statement is a gross misrepresentation of the record.<br>The document cited (SER-13300 [SIK013500 et seq. (**Wakefield Decl., Ex. 7**)]) on its face reflects that this document contains *proposed* features and specifications—proposed *by Sikorsky*, not NAVAIR.<br>There is no evidence that this "change" was made by NAVAIR.<br>**Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16– |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| use Kapton wiring, on April 15, 1980. [Wakefield Decl., ¶ 12, Ex. 7, at ¶3.1.46 (SIKK01361 1)] | 144:16) |
| 25. Approximately 90 installation drawings showing "clamping, routing and mounting" of wiring were required to be submitted for NAVAIR review and approval. The Navy also reviewed and approved certain changes in routing and location of wiring paths. [Wakefield Decl., ¶ 7, 8 and 12 (SER 13300 at 3.1.46 (SIK013611); Hickey Decl., Ex. E, Leigh Deposition at 98:19-100:4] | Disputed. There is no evidence of this, and the referenced evidence do not support any submission of "90 installation drawings" of wiring or anything else.<br>There is no evidence that the sub-system pertinent to this case, the landing gear wiring harness and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR.<br>**Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16);<br>**Lawrence Decl. para. 6.** |
| 26. Design development reports reflect that the hydraulic system's weight would be reduced by manifolding and relocating components to shorten line routing. | Disputed to the extent Sikorsky is attempting to use this as evidence that the CH-53E hydraulic manifold |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| [Wakefield Decl., ¶8-9, 12 (SER 13300 at 3.1.74 (SIK013664)] | configuration had been "designed" as of the date of the issuance of SER-13300. On its face, this document reflects that Sikorsky was merely proposing further study. **Wakefield Decl., Ex. 7** (SER 13300 at 3.1.74 (SIK013664)] |
| 27. The engineering reports confirm that they contain those changes "agreed to by NAVAIR" for incorporation into the production helicopter. The development and qualification process could not proceed unless and until NAVAIR engineers approved all aspects of the design. [Wakefield Decl., ¶ 7-12 (SER 13300 at 1.0 (SIK013513); SER 13197 at SIK 012485); Knox Decl., ¶ 9] | Disputed. This statement is a gross misrepresentation of the record. The document cited (SER-13300 [SIK013500 et seq.]) on its face reflects that many design features were still in the investigation/development phase, meaning NAVAIR could not have "approved all aspects of the design." (SER 13300 at 3.1.74 (SIK013664)]. There is no evidence that the sub-system pertinent to this case, the landing gear wiring harness and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | **Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16); **Lawrence Decl. para. 6**. |
| 28. Beginning in approximately 1978, the Navy entered into a series of production contracts with Sikorsky based on the finalized production specification issued by NAVAIR. The Navy procured a total of 229 CH/MH-53E aircraft under these production contracts, which were ordered in twenty-one production lots. Changes to the Detail Specification were identified during the proposal phase for each respective contract. Lots 1-8 were governed by separate, one-year contracts. Lots 9-12, consisting of 26 CH-53E and 29 MH-53E helicopters, were governed by a single multiyear contract. [Wakefield Decl., ¶ 13, Ex. 8] | Disputed. The CH-53E features at issue in this action, the landing gear wiring harness and its connection to the hydraulic manifold, were not identified for change during the proposal phase for any contract under which CH-53Es were built. Mr. Wakefield confirmed at his deposition that no changes were made to any part of the detail specification for the landing gear system from the first preliminary specification (SD-552-3) was proposed by Sikorsky to the delivery of the Subject Aircraft under the revised Detail Specification SD-552-3-9. **Shepardson Decl., Ex. B** (Wakefield Depo., pp. 156:5–160:6, 162:5–7; **C** (Preliminary Spec SD- |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| | 552-3 Secs. 3.8.2 (pp. 50 (SIK015015) to 52 (SIK015017)); 3.8.4 (p. 52 (SIK015015));<br>**Wakefield Decl., Ex. 10** (Detail Spec SD-552-3-9), Secs. 3.8.2 (pp. 49 (SIK007081) to 51 (SIK007083)); and 3.8.4 (pp. 51–52 (SIK007083–84) |
| 29. The subject helicopter, BUNO 163077, was ordered in Lot 12, under Contract Number N00 10-85-C-0066, pursuant to Detailed Specification SD-552-3-9 which incorporated military specifications including MIL-W-5088F ("Wiring, Aerospace Vehicles") which, in turn, incorporated 66 additional military specification and standards concerning the design and construction of electrical systems. [Wakefield Decl., ¶14, Ex. 9-11] | Undisputed. |
| 30. Kapton wiring was new to the CH-53E, and required by the specification. [Wakefield Decl., ¶12] | Undisputed for the purposes of this Motion. |
| 31. Pursuant to the requirement that the CH-53 E maintain maximum | Disputed. |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| commonality with the H-53D, the landing gear control system, including interlocks, were the same as the CH-53D and RH-53D. [Wakefield Decl., ¶5; Knox Decl., ¶ 8, 10-12] | The wiring scheme for the CH-53E is conceptually and physically distinct from that of the RH-53D; in the RH-53D, the up- and down-command valves on the hydraulic module were controlled by wires contained in a single plug ("P499") [SIK024984]; whereas in the CH-53E, the up- and down-command wires were housed in separate cannon plugs, "P494" and "P495." [SIK008384.] This is the key defective design feature that caused the wire damage and short in this case. **Bloomfield Decl., paras. 3–6**. |
| 32. Configuration of the hydraulic utility module was also different from the CH-53D, in that it combined the hydraulic functions into a single unit (Knox Decl., ¶ 9). This change was reviewed and approved by NAVAIR. [Knox Decl., ¶9; Wakefield Decl., ¶8-9, 12 (SER 13300 at 3.1.74 (SIK013664)] | Disputed. This statement is a gross misrepresentation of the record. The document cited (SER-13300 [SIK013500 et seq.]) on its face reflects that many design features were still in the investigation/development phase, meaning NAVAIR could not have "approved all aspects of the design." |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | (SER 13300 at 3.1.74 (SIK013664)]. There is no evidence that the sub-system pertinent to this case, the landing gear wiring harness and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR. **Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16); **Lawrence Decl. para. 6**. |
| 33. Per the contract, Sikorsky is prohibited from making any changes to the aircraft system without government approval. [Wakefield Decl., ¶ 15. Ex. 9, at section H-7, p.7-32 (SIK06938)] | Objection: this is a legal conclusion rather than a fact. Further objection: vague and ambiguous as to the meaning of "prohibited," "changes," "aircraft system," and "government approval" in this context; incoherent and unanswerable as written. Without waiving said objections, this statement is disputed. Sikorsky had at all times full discretion over the design of the sub- |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | system pertinent to this case, because there is no evidence that the landing gear wiring harness, and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR.<br>**Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16);<br>**Lawrence Decl. para. 6**. |
| 34. The Navy closely monitors the production of helicopters manufactured by Sikorsky. The NAVAIR' s participation is extensive and NAVAIR approvals are documented every step of the way on the production line. This process includes, but is not limited to, reviewing and approving every drawing before it is used for production, reviewing and approving all test plan and the results of those tests, reviewing and approving every flight test by Sikorsky personnel, | Objection: compound; vague, ambiguous, and constitutes a subjective characterization rather than a fact.<br>Without waiving said objections, this statement is disputed.<br>There is no evidence that the sub-system pertinent to this case, the landing gear wiring harness and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR.<br>**Shepardson Decl., Ex. B** (Wakefield |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| conducting quality inspections during manufacture, reviewing the build file, and ensuring the helicopter is compliant with the government's specifications. Full-time on-site U.S. government personnel (NAVPRO, now DCMA) assigned to the Sikorsky facility conduct a final quality acceptance inspection and Navy and Marine Corps pilots fly each aircraft, to make sure the aircraft is built the way NAVAIR requires. [Wakefield Decl., ¶ 16] | Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16); **Lawrence Decl. para. 6.** |
| 35. The production build of the subject helicopter BUNO 163077 was monitored and approved by Navy engineers, inspectors, manufacturing personnel and pilots stationed on site at Sikorsky in Stratford, Connecticut, who confirmed that the aircraft conformed to the contract and to Detailed Specification SD-552-3-9. [Wakefield Decl., ¶17.] | Disputed. The Subject Helicopter did not conform to MIL-W-5088F, which is incorporated by reference into Detailed Specification SD-552-3-9, due to excessive slack in the P494 wire., improper strain relief in the P495 wire, and general improper routing, bundling, support and anti-chafe protection. **Shepardson Decl., Exs. A** (SIR), pp. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | 44–45 [MIL073522–23 (paras. 45 & 50)]; **G** (Coffman Report), p. 3; **H** (Wuthrich Report), p. 1; **& X** (Bloomfield Depo.), pp. 192:25–193:10) |
| 36. Following the NAVAIR's final inspection and flight testing certifying compliance with all specifications, the government accepted the subject aircraft on September 30, 1990. Sikorsky never received any notice from the government regarding any deficiency or failure to meet the government's specifications. [Wakefield Decl., ¶18, Ex. 12] | Undisputed for the purposes of this Motion. |
| 37. The DD-250 is the government's acceptance of the specific aircraft. [Wakefield Decl., ¶18 | Objection: vague, ambiguous, incoherent and unanswerable as written.<br>Without waiving said objections, it is undisputed that for "DD-250" memorializes the transfer of ownership from Sikorsky to the military. |
| 38. Sikorsky did not, and was not | |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| contractually required to provide any manuals to the Navy for the CH-53E. The Detail Specification states that these publications "will be furnished by the Government as specified in the publications requirements of the contract."<br>[Wakefield Decl., ¶20, Ex. 10, at ¶ 3.23.3] | Disputed.<br>Sikorsky did, and was under Contract No. N100140-91-D-DA28 to, prepare and provide manuals for the CH-53E. Up until February 1990, Sikorsky Customer Service had personnel dedicated to "publications and training"; after February 1990 those personnel were integrated with Sikorsky's logistics support personnel to form the Technical Support Services department.<br>**Shepardson Decl., Ex. AA** (Publications Proposal for ECP2162), Cover Letter [SIK021989]; Attachment A to Enclosure (3) [SIK022034] |
| 39. Although the Navy specification for the CH- 53E required the use of Kapton wiring, the Navy recognized well before the subject CH-53E was manufactured, that there that there were "many problems inherent in our Navy aircraft wiring systems" and that | Undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| the "maintainability and durability aspects in many of our current aircraft wiring systems have been compromised by the use of [Kapton wire] which is the predominant type wire installed in Naval aircraft." After conducting several studies, the Navy concluded in 1985 that Kapton "exhibits properties that are not acceptable for continued installation in Naval aircraft." [Wakefield Decl., ¶ 22, Ex. 13-16] | |
| 40. Sikorsky made formal requests to the Navy that it be permitted to submit an engineering change proposal to replace Kapton wiring. The Navy declined Sikorsky's requests, and stated in one internal memorandum dated July 22, 1987 regarding the "status of Kapton wire in H-53 aircraft" that "C/MH-53E contains Kapton but is under a multiyear procurement (FY 1986-89). We do not have a firm quote from Sikorsky Aircraft, but to modify the | Undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| multiyear specification at this time would be both prohibitively expensive and untimely." Sikorsky recommend for the third time at a meeting in November 1998, that all wiring be replaced in the CH/MH-53E. The Navy again rejected this recommendation. [Wakefield Decl., ¶22, Ex. 13-16] | |
| 41. In 1989, the Navy decided to remove Kapton wire from the CH-53E specification and replace it with Spec 55 wire. However, the Navy determined the change would start with LOT 13. Since the subject helicopter, BUNO 163077, was manufactured as part of LOT 12, Sikorsky was required by the government to manufacture the subject helicopter using Kapton wiring. [Wakefield Decl., ¶23, Ex. 17] | Undisputed for the purposes of this Motion. |
| 42. Although the Navy switched to the use of Spec-55 wire for production aircraft beginning with Lot 13, the Navy decided not to replace Kapton | Undisputed. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| wiring in helicopters already produced or that were being produced as part of LOT 12, including the subject helicopter BUNO 163077. In a memorandum dated July 7, 1987, the Navy stated that although other aircraft may be retrofitted with new wiring, removal from the CH-53E "would be disapproved." It was not until 2004 that the Navy began retrofitting old CH-53E helicopters under a Kapton Replacement Program, which is currently scheduled to be completed by the end of 2017. [Wakefield Decl., ¶24, Ex. 18] | |
| 43. In a memorandum dated February 6, 1989, the Navy authorized Navy and Marine Corps to use Spec-55 wiring as a substitute for Kapton, but only for "repair, modification, engineering changes and replacements ... " The rest of the subject wire (367 inches) was required to be Kapton per the government's SD-552-3-9 specification, section 3.16.5. Thus, the | Disputed.<br>Both the Kapton and Spec-55 lengths of the Subject Aircraft's landing gear wiring harness were original to the manufacture of the Subject Aircraft. **Shepardson Decl., Exs. A** (SIR), p. 45 [MIL073523], para. 45; **& K** (Stelzer Depo.), pp. 118:14–119:16. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Kapton portion of the subject wire (367 inches) is almost certainly the original, 20-year-old wire, while the Spec-55 portion (70 inches) could also be the original wire or per the Navy's February 6, 1989, could also be a more recent replacement per a USMC maintenance task that occurred sometime between delivery in 1990 and the accident in March 2011. [Wakefield Decl., ¶ 25, Ex. 19, 20] | |
| 44. The build records for the subject aircraft reflect that a portion of the subject landing gear control wiring was composed of Spec 55 wire rather than Kapton. The Navy expressly approved this variance m wiring per an engineering change order. The reason for this change is not stated but during this timeframe there was a shortage of Kapton wiring and that is the reason for the change. [Wakefield Decl., ¶ 25, Ex. 20] | Disputed.<br>The Spec-55 is not present due to a variance, and the reason for its presence is known: when the hydraulic module was fabricated and partially assembled by Eaton Corporation, it was affixed with Spec-55 "pigtails" to be spliced into the Kapton main wiring bundle.<br>**Shepardson Decl., Ex. K** (Stelzer Depo.), pp. 118:14–119:16 |
| 45. The Navy conducted safety | |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| assessment risk analyses of Kapton wiring in 2002 and 2009, before the accident. The Navy's 2009 study recognized that "catastrophic severity damage due to Kapton wiring failure" caused an inadvertent landing gear retraction in 2005. (MIL230432) Seven Navy officials reviewed and signed the 2009 assessment, including the Rear Admiral who signed under "Risk Accepted," which specifically included "an inadvertent landing gear retraction while the aircraft is on the ground."<br>[Hickey Decl., Ex. F, G (96:10-97:12)] | Objections: compound, commentary rather than fact.<br>Without waiving those objections, this statement is undisputed for the purposes of this Motion. |
| 46. The Navy's replacement of Kapton wiring was delayed by funding shortages. The Navy initially planned in 1995 to replace all Kapton wiring in connection with a Service Life Extension Program for the CH-53E, with Kapton listed as "priority #2" under the program. By June 1, 2000, the program was essentially | Objections: compound, commentary rather than fact.<br>Without waiving those objections, this statement is undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| cancelled due to insufficient Congressional funding then re-started in 2002-03, and then dropped without comment in 2004, after which the Navy then instituted a phased wiring replacement program which prioritized replacement of more than one hundred Kapton wire harnesses into three phases. Inadequate funding also delayed this program, which was initially planned to be completed in 2011 and is currently scheduled to be completed by the end of 2017. [Hickey Decl., Ex. G at 64:23-65:9; 75:10-77:5; 78:7-21; 82:3-83:14; 102:8-16] | |
| 47. The wiring in question in this accident was part of Phase III, which was "still in development" at the time of Sgt. Fontalvo's accident. [Order Granting Defendant PKL Services Inc. 's Motion for Summary Judgment, ECF No. 144, at pp. 3:22-25, 4:1-2] | Objection: this characterization misquotes the Order of the Court cited and attributes to the Court language not found in that Order. Without waiving those objections, this statement is undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 48. NAVAIR engineers also attempted to address wire degradation issues by modifying the CH-53E electrical wiring interconnect system by (1) installing an arc-fault circuit breakers ("AFCB"), and (2) experimenting with two-types of diagnostic clamps to determine the level of wire damage. [Supp. Hickey Decl., Ex. P, Deposition of Montes de Oca at 61:19-63: 14; 40: 15-44: 11] | Undisputed. |
| 49. The AFCBs were installed on some CH-53E but ultimately all were removed because the false- detection rate was too high. The diagnostic clamps were also removed due to poor performance, inability to survive the USMC helicopter operating environment, and because they increased the weight of the aircraft. [Supp. Hickey Decl., Ex. P, Deposition of Montes de Oca at 40:15-44:11; 74:11-75:25] | Undisputed. |
| 50. While these measures were due primarily to Kapton degradation | Undisputed. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| issues, NAVAIR also testified that they were experiencing problem with all wiring due to improper Navy and USMC maintenance actions. NAVAIR responded to this problem by developing wiring awareness and inspection technique training.<br><br>[Supp. Hickey Decl., Ex. P, Deposition of Montes de Oca at 59:9-13; 44:12-25; 50:7-51:14; 55:9-23; 57:7-10; 57:25-60:18] | |
| 51. The Marine Corps chartered a CH-53E Super Stallion Independent Readiness Review **("SSIRR")** in 2015 to identify the root cause of aircraft, aircrew and maintenance readiness. The report concluded the USMC CH-53E fleet has been in a state of decline since 2001 due to "the effects of very heavy and hard usage in eleven years of war overseas and an ineffectual reset effort upon their return home." The **SSIRR** resulted in a NAVAIR decision to completely replace all | Objections: compound, commentary rather than fact.<br>Without waiving those objections, this statement is undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| wiring (Kapton and Spec-55) in its CH-53E fleet.<br>[Hickey Decl., Ex. M] | |
| 52. The Navy conducted a risk assessment of helicopters from Production Lots 1-12 that contained Kapton, observing that "[t]he properties of Kapton wiring insulation are such that it lends itself to causing, rather than preventing electrical problems."<br>[Hickey Decl., Ex. F at SIK230432] | Objections: compound, commentary rather than fact.<br>Without waiving those objections, this statement is undisputed for the purposes of this Motion. |
| 53. A Navy survey revealed 54 incidents relating to Kapton, and causing at least 17 separate subsystems to malfunction.<br>[Hickey Decl., Ex. F at SIK230430, 434] | Objections: compound, commentary rather than fact.<br>Without waiving those objections, this statement is undisputed for the purposes of this Motion. |
| 54. A follow-up safety risk assessment in 2009 at referenced "catastrophic severity damage due to Kapton wiring failure" that caused an inadvertent landing gear retraction in 2005. Seven Navy officials reviewed and signed the assessment, including the Rear | Objections: compound, commentary rather than fact.<br>Without waiving those objections, this statement is undisputed for the purposes of this Motion. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Admiral who signed under "Risk Accepted," which specifically included "an inadvertent landing gear retraction while the aircraft is on the ground." By 2009, the Navy noted that the number of known Kapton-related incidents had risen from 38 to 54.<br><br>[Hickey Decl., Ex. F at SIK230434] | |
| 55. A NAVAIR Program Manager testified in this case about the Kapton wiring replacement efforts:<br>"Well, even every year I was there, it was always -- we never were able to receive funding that was was necessary to replace all the Kapton on all the aircraft that needed it, which led us down this multiple phase thing. So it was difficult to get full funding of the entire scope of what we had to do, which was, you know, almost a hundred aircraft that had to have replacement wiring in the order of over a million dollars per | Objections: vague and ambiguous. Without waiving these objections, it is undisputed that this accurately quotes Mr. Mellen's testimony. |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| aircraft to replace it. We couldn't get that kind of money." [Hickey Decl., Ex. G, Mellen Deposition at 78:7-21] | |
| 56. Plaintiff's decedent, Alexis Fontalvo, died on March 17, 2011. [Undisputed] | Undisputed. |
| 57. Alexis Fontalvo was not married on March 17, 2011. [Undisputed] | Undisputed. |
| 58. Plaintiff T.L. was born on February 3, 2000, to his biological mother, Plaintiff Tashina Amador and biological father, Delvin Long. [Hickey Decl., Ex. H, Amador Deposition at 43:19-20]. | Disputed. Plaintiff Tanika Long is a she, and she was born November 10, 2000. **Shepardson Decl., Ex. Y** (Amador Depo.), p. 43:19–20. |
| 59. Delvin Long never provided any financial support to Plaintiffs Tashina Amador or T.L. [Hickey Decl., Ex. H, Amador Deposition at 45:23-46:8] | Disputed. Mr. Long provided some support to Tanika until August 2006 when he was divorced from Tanika's mother. **Shepardson Decl., Ex. Y** (Amador Depo.), p.45:23–25. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 60. From February 3, 2000 to December 2007, Tashina Amador provided 100% of T.L.'s support.<br>[Hickey Decl., Ex. H, Amador Deposition at 45:23-46:8] | Disputed.<br>Mr. Long provided some support to Tanika until August 2006 when he was divorced from Tanika's mother.<br>**Shepardson Decl., Ex. Y** (Amador Depo.), p. 45:23–25. |
| 61. Tashina Amador's filing status on her 2010 federal tax return was "Head of Household" with T.L. as her qualified dependent.<br>[Hickey Decl., Ex. H, Amador Deposition at 134:5-16; 138:19-139:7] | Undisputed. |
| 62. Alexis Fontalvo was never married to Tashina Amador, T.L.'s mother and guardian ad litem.<br>[Undisputed] | Undisputed. |
| 63. T.L. was not dependent upon Alexis Fontalvo for 50% or more of her support in the 180 days prior to the death of Alexis Fontalvo.<br>[Hickey Decl., Ex. H, Amador Deposition at 45:23-46:8; Ex. K, Fractor Deposition at 65:23-66:9] | Disputed.<br>**Shepardson Decl., Ex. BB** (Amador Decl.), paras. 7–8;<br>**Shepardson Decl., Ex. Y** (Amador Depo.), p. 79:25–80:14, 81:17–82.10, 160:13–25] |
| 64. Plaintiffs' economists testified at deposition that the sole basis for his | Disputed.<br>This is a gross misrepresentation of |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| opinion that the decedent was providing 50% of T.L.'s support was Ms. Amador' s testimony and not any analysis of the financial records produced.<br>[Hickey Decl., Ex. K, Fractor Deposition at 63:12-25] | the record.<br>Dr. Fractor's Report clearly indicates that he relied on the financial records produced by plaintiffs.<br>**Shepardson Decl., Ex. CC** (Fractor Report), p. 2, para. 3.<br>Dr. Fractor in no way testified that he disregarded the financial records; he said he didn't have any sworn testimony other than the deposition.<br>**Shepardson Decl., Ex. DD** (Fractor Depo.), pp. 63:19–64:3. |
| 65. Plaintiffs' economist testified at deposition that his opinion regarding the support of T.L. by decedent was at the "time of his death" only.<br>[Hickey Decl., Ex. K, Fractor Deposition at 69:9-70:3] | Disputed.<br>SSgt. Fontalvo contributed more than half of Tanika's support from December 2007 to his death in March 2011.<br>**Shepardson Decl., Exs. BB** (Amador Decl.), paras. 7–8; **& Y** (Amador Depo.), pp. 79:25–80:14, 81:17–82.10, 160:13–25 |
| 66. The filing status "Head of | |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Household" requires that the filer have paid more than half the cost of the support for the qualifying dependent.<br>[Hickey Decl., Ex. J] | Objection: this is a legal conclusion rather than a fact.<br>Without waiving this objection, this statement is disputed.<br>This is a misrepresentation of the contents of the cited document. |
| 67. Tashina Amador's Marine Corps gross income was approximately the same in 2010 as the decedent, Alex Fontalvo.<br>[Hickey Decl., Ex. H, Amador Deposition; Ex. K, Fractor Deposition] | Disputed.<br>SSgt. Fontalvo made $30,046.30 in 2010, more than the $28,766 earned by Tashina Peshlakai (now Amador) Shepardson Decl., Exs. EE & FF. |
| 68. In October 2010, Alex Fontalvo stated in a notarized military form that the total personal monthly expenses for D.F. in October 2010 were $1,300, that he contributed $1,500 to D.F.'s monthly support and that no other person contributes to the support of D.F.<br>[Hickey Decl., Ex. I] | Objection: the cited exhibit is Hearsay not within an exception.<br>Further objection: lack of foundation<br>Without waiving said objection, this statement is disputed. This is a misrepresentation of the contents of the document, and the imputed "statements" are not contained therein. |
| 69. Tashina Amador's (the guardian of T.L. and her biological mother) testified that the decedent provided | Undisputed. |

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| "about 60 percent" of T.L' s support. [Hickey Decl., Ex. H, Amador Deposition at 81:17-82 :2] | |
| 70. Sikorsky Support Services, Inc. had no involvement in design or manufacturer of the subject helicopter. [Wakefield Decl., ¶ 2] | Undisputed. |
| 71. NAVAIR opened a H-53 Safety Action Record ("SAR 42-005") in 1986. [Supp. Hickey Decl., Ex. O] | Objection: vague, ambiguous and incoherent as written. Further objection to the extent this is a legal conclusion rather than a fact. Without waiving said objections, this statement is undisputed for the purposes of this Motion. |
| 72. NAVAIR discussed, worked, made decisions and took action regarding the wire deterioration problem through several of its working groups including the H-53 System Safety Working Group, the Integrated Logistics Support Management Team, and Fleet Support Team. [Hickey Decl., Ex. N] | Objection: vague and ambiguous as to the meaning of "the wire deterioration problem." Without waiving said objections, it is disputed that NAVAIR ever had knowledge or information regarding the danger posed by the defective configuration of the landing gear wiring harness in the CH-53E; there is |

| **MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE** |
|---|---|
| | no evidence that the sub-system pertinent to this case, the landing gear wiring harness and its connections to the hydraulic utility module, were evaluated in any way by NAVAIR. **Shepardson Decl., Ex. B** (Wakefield Depo., pp. 82:10–15, 136:17–142:13; **& V** (Leigh Depo., pp. 142:16–144:16); **Lawrence Decl. para. 6.** |

DATED: July 5, 2017 GRASSINI, WRINKLE & JOHNSON

By: /s/ Marshall J. Shepardson
MARSHALL J. SHEPARDSON

Attorneys for Plaintiff
E:Mail: mshepardson@grassinilaw.com