| | |
|---|---|
| 1 | LAWRENCE P. GRASSINI — Cal. SBN 49046 |
| | LARS C. JOHNSON — Cal. SBN 205712 |
| 2 | MARSHALL J. SHEPARDSON — Cal. SBN 263637 |
| | GRASSINI, WRINKLE & JOHNSON |
| 3 | 20750 Ventura Boulevard, Suite 221 |
| | Woodland Hills, CA  91364-6235 |
| 4 | Tel:    (818) 348-1717 |
| | Fax:   (818) 348-7921 |
| 5 | Email:  mail@grassinilaw.com |
| 6 | Attorneys for Plaintiff |

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DOMINIC FONTALVO, a minor, by and through his Guardian Ad Litem, TASHINA AMADOR, individually and as successor in interest to Alexis Fontalvo, deceased, and TANIKA LONG, a minor, by and through her Guardian Ad Litem, TASHINA AMADOR, | Case No.:  3:13-cv-00331-GPC-KSC |
| | Judge: Hon. Gonzalo P. Curiel |
| Plaintiff, | |
| vs. | **DECLARATION OF WILLIAM LAWRENCE IN OPPOSITION TO SIKORSKY'S MOTION FOR SUMMARY JUDGMENT** |
| SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.; UNITED TECHNOLOGIES CORPORATION; G.E. AVIATION SYSTEMS, LLC; DUPONT AEROSPACE CO.; E.I. DUPONT DE NEMOURS AND COMPANY; PKL SERVICES, INC.; and DOES 1 through 100, Inclusive, | |
| Defendants. | |

26  ///

27  ///

28

DECLARATION                                             CASE NO. 3:13-CV-00331-GPC-KSC

Pursuant to 28 U.S.C. § 1746, I, William Lawrence, declare:

1. I am a retired Colonel of the United States Marine Corps, and an expert retained by the plaintiffs in this action to testify regarding aviation, aircraft design and development, and military procurement procedures.

2. I submit this Declaration in opposition to the Motion of defendants Sikorsky Aircraft Corporation, Sikorsky Support Services, Inc., and United Technologies Corporation (collectively, "Sikorsky") for summary judgment.

3. Since my retirement from the Marine Corps in 1991, I have consulted in numerous aviation matters. During my time in the service I served as a Marine Corps aviator from 1966–1991, and have accumulated over 4,000 flight hours in over 120 types, models and series of aircraft. I attended the U. S. Navy Test Pilot School from 1978–1979 and served as an engineering and experimental test pilot for over l0 years. I have flown the CH-53A, as well as the -D and –E models during my tours as an engineering test pilot from 1979–1991. The CH-53A was my first fleet helicopter after being designated as a Naval Aviator. I flew combat missions in Viet Nam in the CH-53A. At the time of my retirement, I was the senior active test pilot in the Marine Corps and in command of all rotorcraft flight testing for the Navy, Marine Corps, and Coast Guard. Since 1991, I have continued to fly both military and civilian aircraft in the furtherance of my investigations.

4. I am a graduate of the Defense Systems Management College "Program Manager's Course." This 5-month course at Fort Belvoir, Virginia, is required for all senior military and civilian personnel assigned to senior positions in the major weapons systems acquisition process. This course teaches the acquisition process by which all major weapons systems are procured. By virtue of my experience and qualifications, I am an associate fellow in the Society of Experimental Test Pilots.

5. I have conducted a thorough survey of the prodigious document productions by both Sikorsky and the U.S. Navy in connection with this case.

6. After my review of the documentary productions, I can confidently say that there is no evidence there was any back-and-forth deliberative process between the Navy and Sikorsky in which the government exercised any design decisions regarding how the landing gear control system would be configured and implemented in the CH-53E, or, for that matter, in the CH-53D. This includes a complete absence of any evidence that the government exercised any discretion regarding the placement or routing of the wiring harness, the schematics of the landing gear control system, the interconnections with the hydraulic utility module, the safety interlock system, or any particular subsystem or component of any of those systems. The major weapons system procurement system is designed such that all design decisions are exercised by the contractor without government interference.

7. The Detail Specification applicable to the subject helicopter contains no specifications dictating or mandating the configuration or implementation of the landing gear control system or the landing gear wiring harness.

8. The Detail Specification contains no language concerning the functional design or the physical configuration of the electrical interlocks for the prevention of inadvertent landing gear retraction. The only express government requests concerning an interlock, that I noted, pertained to the flight control system (Secs. 3.10 & 3.15.1); the rotor brake (3.12.15.4); the engine anti-ice system (Sec. 3.16.5.2) and a failsafe to prevent jettisoning of the auxiliary fuel tanks in low-fuel and on-the-ground situations (Secs. 3.12.9.4, 3.12.9.15 & 3.18.5.2). The interlock described in Sec. 3.12.9.4 is unique to the CH-53E, and was not present in the -53D. (Wakefield Decl., Ex. 4 (SER 13197), p. 41 (Sec. 3.1.17). The integration of this interlock into the weight-on-wheels switch by necessity required significant modification of the physical configuration of the wiring system, but discretion as to the implementation and ultimate configuration of this new feature was not specified by the Navy, and was left entirely up to Sikorsky.

9.     The CH-53E incorporates three engines as opposed to the -53D's two engines.  It has an aerial refueling probe not present on the -53D.  It comprises an increase in maximum gross weight of over 20,000 pounds, with corresponding structural and size modifications.  These significant differences by necessity required a significant overhaul of the physical and functional configurations of both the wiring and hydraulic systems.  No design decision related to these overhauls was made by any representative of the U.S. Government.  The entire record produced by the Navy and Sikorsky contains no evidence or suggestion of any government input regarding how any of these changes would be accommodated by the wiring or hydraulic systems.  Instead, the design and implementation of these substantial changes was specifically left entirely to the discretion of Sikorsky.

10.    One such discretionary decision made in this process, evidently, was to consolidate the hydraulic manifold components into a single, unified "module." (Wakefield Exhibit 12 (SER-13300), Sec. 3.1.74.)  The ultimate design implementation of this principle was left entirely up to Sikorsky's discretion.  The entirety of the record yields no evidence whatsoever that the government ever considered, was involved with, or offered  any design input on any description or depiction of the CH-53E Utility Module during the design and development phases.

11.    Other variances between the wiring designs of the -53D and -53E are discernible in the schematic depictions of those systems.  Exhibit A hereto is the Landing Gear System schematic pertaining to the R-/CH-53D [SIK024984]. Exhibit B hereto is the Landing Gear Control schematic pertaining to the CH-53E [SIK008384].

12.    Nowhere in the extensive record of the -53E's development is there any suggestion that the government ever directed these variances in the design of the CH-53E landing gear control system.  This was strictly a discretionary decision on the part of Sikorsky alone.

13. In any event, both schematics contain a block for a reviewed-signature from a government representative in the right-hand corner. Both government-signature blocks are empty on the schematics produced by Sikorsky in this action. Moreover, neither of these schematics was produced by the government in this action, even though upon information and belief the parties to this action issued a broad subpoena seeking all the government's documents pertaining to the design and development of the CH-53E. And finally, government signatures on these documents are specifically intended to approve the format of the drawing, not approval of the design.

14. Of course, even if government signatures had been put to these schematics, this would be insufficient to show the government ever exercised any discretion as to how the system in either aircraft was configured, since without more it would be a mere "rubber stamp." The importance of the absence of signatures in the context of Sikorsky's Motion for Summary Judgment is that *they can't even show a rubber stamp!*

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on July 2, 2017, at North Richland Hills, Texas.

COL. WILLIAM LAWRENCE

DECLARATION                                   CASE NO. 3:13-CV-00331-GPC-KSC