# EXHIBIT B

D.F. et al., v. Sikorsky Aircraft Corporation, et al.

USDC Case No.: 13:cv-00331-GPC-KSC

(Exhibits to Declaration of Marshall J. Shepardson

In Support of Opposition to Motion for Summary Judgment )

UNITED SATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DOMINIC FONTALVO, a minor, by and through his Guardian Ad Litem, NORMA FONTALVO, individually and as successor in interest to Alexis Fontalvo, deceased,

Plaintiff,

v.

SIKORSKY AIRCRAFT CORPORATION; SIKORSKY SUPPORT SERVICES, INC.; et al.,

Defendants.

Case No.: 3:13-cv-00331-GPC-KSC
Judge: Hon. Gonzalo P. Curiel

DEPOSITION OF JOHN DAVID WAKEFIELD

DATE: December 7, 2016

TIME: 9:25 a.m.

HELD AT: Homewood Suites by Hilton
6905 Main Street
Stratford, Connecticut

By: Sarah J. Miner, LSR #238

can ask him about facts, but I don't think it is even fair, and I would ask him not to respond to that question because it basically is a legal matter and he is not a legal expert. And even if he were, he is not here that role. Okay? 09:37 09:37 09:37 09:37 09:37
BY MR. SHEPARDSON: 09:38
Q. That being said, do you have awareness of any involvement of the U.S. Government in the design process for the CH-53E aircraft? 09:38 09:38 09:38
A. Yes, I do. The government's role in the design process is what you asked; is that correct? 09:38 09:38
Q. Yes. 09:38
A. Yes. 09:38
Q. Thank you. Backing up a little bit. What was your title at Sikorsky when you left the company in March of 2006? 09:38 09:38 09:38
A. I was the vice president and chief safety officer for Sikorsky Aircraft Corporation. 09:38 09:39
Q. Have you ever been deposed before? 09:39
A. One time. 09:39
Q. And approximately when did that occur? 09:39
A. Either 2005 or 2006. I don't remember exactly. 09:39 09:39
Q. And was that -- were you a party to a lawsuit on that occasion? 09:39

A. Was John Wakefield a party to that lawsuit? 09:39
Q. Correct. 09:39
A. No. 09:39
Q. Were you deposed on that occasion in your capacity as a Sikorsky representative? 09:39 09:40
MR. HUNT: You mean a 30(b)(6) witness or as -- because he was -- while he was an employee of Sikorsky, if he knows. 09:40 09:40 09:40
BY MR. SHEPARDSON: 09:40
Q. Let me rephrase. Was Sikorsky a party to that lawsuit? 09:40 09:40
A. Sikorsky Aircraft was, yes. 09:40
Q. Okay. Were they a defendant in that lawsuit? 09:40
A. I believe so, yes. 09:40
Q. Okay. And were you deposed as a witness with respect to your duties at Sikorsky Corporation? 09:40 09:40
A. I was deposed -- it is hard to say. I was not deposed as a safety officer. I was deposed because of my duty previous as a program management, program manager and in charge of H-53 programs at Sikorsky. 09:40 09:40 09:40 09:40 09:40
Q. What was your tenure as program manager for the 53 programs at Sikorsky? 09:41 09:41
A. I first entered program management at Sikorsky Aircraft in 1988, and continued program 09:41

management for -- and I would have to get my bio to give you exact dates. I can give you general dates, but I think generally for about eight years, until -- 10 years, 1998. I spent two years as a -- the director of international programs, which is more business development than it was program management. And then in 2000, I returned to program management and was there until I was promoted to my safety position or the vice president of safety in 2003. 09:41 09:41 09:41 09:41 09:41 09:41 09:41 09:41 09:42

Q. During your second stint in program management, was that also with respect to the 53 programs? 09:42 09:42 09:42

A. It was. It included the 53 program, but it also included all USN -- Navy and International Navy programs. Just a small clarification. Within that period of time, there was a division of us. So there were two jobs that I held in that three-year period or four-year period. One was vice president of the Navy programs and then program manager of the 53 programs. So again, you would have to get my bio to get exactly when those dates are, should you like to. 09:42 09:42 09:42 09:42 09:42 09:42 09:43 09:43 09:43

Q. Do you have a copy of your curriculum vitae or your bio? 09:43 09:43

A. I do not have it with me. I do have one, but I do not have it with me. 09:43

163078; is that correct? 10:02
MR. HUNT: 77. 10:02
THE WITNESS: 163077, which was delivered 10:02
September of 1990. And it was a Lot 12 aircraft, but 10:02
it was still purchased under the contract and the 10:02
detailed specification called the -9 spec. 10:03
BY MR. SHEPARDSON: 10:03
Q. So there was not then a detailed 10:03
specification with the -12 suffix? 10:03
A. There was not. Well, let's -- let me back up 10:03
and say that. There might be. I don't know if there 10:03
actually is or not. I do know through -- when I was 10:03
running the program through Lot 13 and 14, there are 10:03
-10 specifications. There probably is a -11 and a 10:03
-12, but it relates to other aircraft. 10:03
Q. So in that case, the lot number wouldn't 10:03
necessarily correspond with the suffix? 10:03
A. Well, it did up until the time that this 10:03
specification was used for a four year, multi-year 10:03
procurement. It was in place for all of those 10:03
aircraft, all 56 aircraft. It and its corresponding 10:03
specification for the MH-53E which was purchased under 10:03
the same contract. 10:04
Q. Okay. While we are looking at this, I am 10:04
just going to go through this note-by-note.

A. I can speculate. 12:21
Q. Without speculating, do you know? 12:21
A. No, I was not there at that time. I don't know. The government directed it and put it in the specification for us to do. 12:21 12:21 12:21
Q. Did you see any correspondence between the government and Sikorsky concerning that specific change? 12:21 12:21 12:21
A. I did not. 12:22
Q. Did you see any correspondence between the U.S. Government and Sikorsky concerning the development of the interlock system of the landing gear of the CH-53E? 12:22 12:22 12:22 12:23
MR. HUNT: Vague. 12:23
THE WITNESS: The specific answer is no. However, the reference -- the direction was to utilize the RH-53 or the CH-53D landing gear. 12:23 12:23 12:23
MR. SHEPARDSON: I am probably going to have something else, but I am going to pass the questioning to Ms. Savitt for now and then look over my notes and hopefully finish up soon. 12:23 12:23 12:23 12:23

CROSS-EXAMINATION 12:23

BY MS. SAVITT: 12:23
Q. I only have a few questions, I think. 12:23
A. Yes, ma'am.

specification. It would be a government change. 12:26
Q. Do you know if Sikorsky purchased Kapton -- 12:26
take that back. 12:26
We have been using the term Kapton wiring. 12:26
Do you know if, in fact, Kapton is an insulation that 12:26
is part of wiring? 12:26
A. I did not know that, although there is no 12:26
reason I should. It is identified a type of wire 12:26
coating. It is generally referred to as Kapton wire 12:26
in my vernacular of a particular kind of wire. And my 12:27
definition of wire would include coatings that are on 12:27
it. 12:27
Q. You mentioned earlier SSWG, I am sorry, the 12:27
safety -- 12:27
A. System safety working groups. 12:27
Q. And you attended a number of meetings of 12:27
systems safety working groups while you were program 12:27
manager? 12:27
A. I generally did not attend. I generally 12:27
received the results and minutes and discussions and I 12:27
had a person assigned as my system safety person to 12:27
attend those meetings. 12:27
Q. What was that person's name, or did it change 12:27
over the years? 12:27
A. It changed over the years.

Q. As part of your job as program manager, do you recall seeing documents of subsystem design reports for different parts of the CH-53E? 12:28 12:28 12:28

A. Subsystem design reports, yes, ma'am. 12:28

Q. And what does that mean to you? What is a subsystem design report? 12:28 12:28

A. It is, in fact, a description of the subsystem that is in each of those paragraphs and describes the system itself. 12:28 12:28 12:28

Q. And would wiring be a subsystem? Would that be considered one? 12:28 12:28

A. I don't know how to answer that. I am not sure. I would have to go look at the document. The subsystem design report is generally a -- in my mind, generally a system related item, as in this case the landing gear system, not necessarily the individual components. So I don't know how to answer that correctly. 12:28 12:28 12:29 12:29 12:29 12:29 12:29

Q. Okay. 12:29

MS. SAVITT: I have no further questions. 12:29

MR. SHEPARDSON: Take another 10-minute break, and I will look over my notes. 12:29 12:29

MR. HUNT: All right. 12:29

THE VIDEOGRAPHER: Going off the record at 12:29. 12:29

(Recess taken from 12:29 p.m. to 12:40 p.m.) 12:41
THE VIDEOGRAPHER: We are on the record at 12:41
12:40. 12:41
REDIRECT EXAMINATION 12:41
BY MR. SHEPARDSON: 12:41
Q. Mr. Wakefield, besides the documents that we 12:41
have already discussed today, and there were many, but 12:41
are there any documents that we haven't discussed 12:41
today that you are aware of that reflect or 12:41
substantiate government participation in the design of 12:41
the landing gear of the CH-53E? 12:41
MR. HUNT: I will repeat, without repeating 12:41
word for word the objection I made at the beginning of 12:41
this, that if you are basically asking this gentleman 12:41
to give you the details of our government contract of 12:42
defense motion, which we are going to bring someday, 12:42
if there is another way of asking. I object to that. 12:42
There is no way anybody sitting here could do that 12:42
task. However, I will allow him to answer the 12:42
question to the best of his ability. 12:42
THE WITNESS: Okay. Can you read that back 12:42
for me? 12:42
(Requested portion of testimony read.) 12:42
MR. HUNT: In addition, vague, overbroad. 12:42
THE WITNESS: I would have to say none that I

am aware of at the moment. 12:43
BY MR. SHEPARDSON: 12:43
Q. Besides the documents that we have already discussed today, are you aware of any documents that reflect or substantiate government participation in the design of the wiring system of the CH-53E? 12:43
MR. HUNT: Same objections. 12:43
THE WITNESS: Again, as far as I know, there are -- I don't know of any others personally of any other documents. I just -- I am sure there are. I just have no idea. You have to go way back to find those. 12:43
BY MR. SHEPARDSON: 12:43
Q. Besides what you testified was the desire of the government to have the CH-53E generally conform to the specifications of the 53D series, are you aware of any other facts supporting government participation in the design of the CH-53E? 12:44
MR. HUNT: Same objections. 12:44
THE WITNESS: In the development of the 53E, the government is very specific on what to start with, which is the 53 two-engine D, and what to change. And those documents are the ones we have discussed. 12:45
BY MR. SHEPARDSON: 12:45
Q. Are you aware of any facts reflecting

government participation in the design of the 53D landing gear? 12:45 12:45
MR. HUNT: 53 what? 12:45
BY MR. SHEPARDSON: 12:45
Q. D, Delta. 12:45
A. Way before my time, no. 12:45
Q. Are you aware of any facts supporting government participation in the wiring system of the 53 Delta? 12:45 12:45 12:45
MR. HUNT: Same objections. 12:45
THE WITNESS: I am not of that, but I am very, very familiar with how the government asked for, procures, designs, builds and provides to the contractor the specifications to build what they want. The process I am very familiar with. Individual details, I am not. 12:45 12:45 12:45 12:46 12:46 12:46
BY MR. SHEPARDSON: 12:46
Q. What is that process? 12:46
A. Okay. It is a fairly long answer with what is the process. The process of procuring from the Naval Air Systems Command, thing starts very early with the military service. It generally is the military service that has a requirement for which that requirement -- and when I say "requirement," I am talking about mission requirement, not design 12:46 12:46 12:46 12:46 12:46 12:46

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DOMINIC FONTALVO, a minor, )Case No.
by and through his Guardian )3:13-cv-00331-GPC-KSC
Ad Litem,TASHINA AMADOR, )
individually and as a )
successor in interest to )
Alexis Fontalvo, deceased, )
and TANIKA LONG, a minor, )
by and through her Guardian )
Ad Litem, TASHINA AMADOR, )
)
Plaintiff, )
)
v. )
)
SIKORSKY AIRCRAFT )
CORPORATION; SIKORSKY )
SUPPORT SERVICES, INC.; )
UNITED TECHNOLOGIES )
CORPORATION, et al., )
)
Defendants. )VOLUME 2
______________________________)Pages 102 - 284

DEPOSITION OF:

JOHN WAKEFIELD

TUESDAY, MAY 9, 2017

10:19 A.M.

REPORTED BY: c. jane harman

CSR No. 5266

A. Okay.
Q. It's your file.
A. (Correcting document.)
Q. Okay. So we were discussing item 2 in your executive summary which corresponds to Appendix B and also corresponds to tab 2 in your indexed reference binders here.
So I see that item G -- or reference G, I should say, is SD24J, as in Juliet.
What is SD24J?
A. As it says there, it is titled "The General Design Specification for Design and Construction of Aircraft Weapon Systems, Volume 2, Rotary Wing Aircraft," dated June of 1963.
Q. Uh-huh.
And I see the copy in your binder is not Bates-stamped. Where did you obtain this document?
A. I obtained the document from the naval archives.
Q. And did you have just general clearance to have access to the naval archives?
A. Anyone can call the naval archives and request information. It's in the public domain, naval archives.
The reason I went to the naval archives,

this volume has been updated. This particular specification, government specification, has been updated several times. The 1963 version was not -- which is referenced in the contract was not readily available.

Q. Uh-huh.
And is that what you did, you called the naval archives?
A. I did.
Q. Whom did you call at the naval archives?
A. I ... I could get her name, I don't remember it now.
Q. Do you have a reference to the telephone number that you called somewhere in these materials?
A. Not in these materials, no. And I don't remember where it is.
Q. And how did they transmit this document to you?
A. Electronically.
Q. So putting aside the annotated opinions list that we just marked as Exhibit 7, do you refer to specification 24J anywhere in Appendix B of your report?
A. I do.
Q. And what page would that be on?

A. On page eleven at the bottom.
Q. Okay. So that's a sentence that reads:
"As an example, as referenced in the 53 Echo detailed specification, NAVAIR directed compliance with its own general specification for design and construction of aircraft weapon system SD24J."
A. Correct.
Q. Okay. So to find out what that's an example of we move up ... what is that an example of?
A. It is an example from my opinion, which is opinion two, that the Navy personnel, NAVAIR personnel:
" ... had full knowledge and compliance and understanding of the design, operation, maintenance and characteristics of the CH-53 helicopter."
Q. Is there anything in the specification SD24J dictating how a landing gear wiring harness is configured?
A. I am not sure I could answer that without reading each line again specific to that question.

There are general guidance not only in SD24J and other detailed -- other reference specifications for the Navy. So it may not be there, it could be in another Navy specification.

Q. Okay. So still in Appendix B of your report on page twelve, you've got a list of items under the heading "Additional Consideration Relating to the Contract and Specification Are Listed Below."

Do you see that?

A. I do.

Q. Okay. So item A there is:

"U.S. Navy had its own engineers and routinely reviews and approves even the smallest detail of the design, test and manufacturing process."

Is there any evidence in either of these binders that the U.S. Navy engineers reviewed or approved any detail of the landing gear wiring harness of the CH-53E?

A. There is nothing in those manuals that I -- that information that I've provided you.

Q. Now, you used the term "manual." I was -- I was going to ask you --

A. I misspoke on manuals. Those are

specifications and reports.

Q. Okay. What is a manual?

A. In my experience --

Q. Yeah.

A. -- a manual is something that's produced relative to aviation manuals are produced by the government and delivered to the user at one level or the other.

Q. Okay. And in your capacity working as a program manager within military aviation, did you ever participate in the drafting of a manual?

A. No, I never did.

Q. Okay. And did you ever participate in the contracting for the drafting of a manual?

A. No.

And let me explain. Manuals are not drafted by Sikorsky Aircraft. Sikorsky Aircraft provides to the Navy engineering data for which the Navy produces a manual.

Q. Do you -- is there any documentary evidence in either of these binders that Sikorsky ever provided engineering data to the Navy with respect to the risk of an inadvertent landing gear retraction in the event of a short circuit?

A. Very specific question. Can I have that

read back?
MR. SHEPARDSON: Please.
(The record was read as follows:
QUESTION: Is there any documentary evidence in either of these binders that Sikorsky ever provided engineering data to the Navy with respect to the risk of an inadvertent landing gear retraction in the event of a short circuit?)
THE WITNESS: There is nothing in those manuals that I have utilized to prepare my opinions.
BY MR. SHEPARDSON:
Q. And again, did you misspeak when you said "manuals," you meant --
A. I apologize. It's a -- I did misspeak, so my apologies. It is information provided.
Q. Okay. So going back to the list in Appendix B here, sub letter B is:
"U.S. Navy has its own flight worthiness approval authority and determines whether the helicopter is safe for flight and safe for use."
MR. HUNT: Where are you reading from,

Marshall?

MR. SHEPARDSON: It's sub B on page twelve of his report.

MR. HUNT: Okay.

BY MR. SHEPARDSON:

Q. Is there any documentary evidence in either of these binders that this flightworthiness approval authority was ever given engineering data on the landing gear wiring harness of the CH-53 Echo?

A. Not in the data that you have in front of you.

However, general practice from my experience is that the information that the Navy utilizes is reflected in the manual that they come from. And that may come from engineering reports, which are in those, but I do not remember anything specific about a wiring harness in that.

Q. Okay. So going on to item C:

"U.S. Navy has its own test pilots and aerospace engineers and conducts its own flight tests and qualification of both development and production helicopters."

Is there any documentary evidence in either of these binders that the U.S. Navy's test pilots or

aerospace engineers ever contributed to the development of the landing gear wiring harness of the CH-53 Echo?

A. There is not specific to that. There is a general statement made by a Navy deponent for which they have that responsibility for flight tests and development and engineering.

Q. When you say "a Navy deponent," do you mean a witness who was deposed with respect to this lawsuit?

A. I do.

Q. Okay. Do you remember who that was?

A. I do.

It was Ms. Leigh, L E I G H.

Q. And --

A. And also I would add, Mr. Jordan.

Q. Okay. And did either Ms. Leigh or Mr. Jordan testify as to any participation by a test pilot or aerospace engineer in the development of the landing gear wiring harness for the CH-53E?

A. Not that I'm aware of.

However, the -- my experience would say -- and I have provided at least one piece of paper from the Navy development flight test center where they have looked at flight testing the entire aircraft

and provided deficiencies if they found one.
None were provided on the landing gear or its wiring harness that I'm aware of.
Q. So moving on to item D, in italics.
"U.S. Navy has its own personnel
assigned to and housed at the
Sikorsky Corporation facility.
And this command is now called the
Defense Contract Management Agency.
and at the time of the design and
manufacture of the CH-53E helicopter
was called NavPro."
Was NavPro sort of a portmanteau of naval procurement?
A. Yes, it was.
And they changed their name several times. That means as in "Nav," naval, and "pro" as procurement, yes.
Q. Okay. Sometimes Mr. Hunt takes issue with my --
A. Yeah, I'm not sure I even understand it.
MR. HUNT: I was going to object to the use of French words in this deposition, but I'll let it go.
/// ///

BY MR. SHEPARDSON:
Q. So -- and you say that:
"NavPro comprises highly-trained engineers, inspectors, business managers, contract specialists and program managers."
Were you ever technically part of NavPro?
A. I was not.
Q. Okay. Is there any documentary evidence in either of these binders that NavPro ever participated in the development of the landing gear wiring harness for the CH-53 Echo?
A. Not in those documents.
Q. Item E is:
"U.S. Navy is the only authority that can make changes to specification or changes to the aircraft, including approval of all ECPs."
What does "ECP" stand for?
A. Engineering change proposals.
Q. What is an engineering change proposal, in general?
A. In general, it is a change to the detailed specification that changes some aspect of the aircraft.

comparison of the two detailed specs in order to ascertain what exactly was being asked for; correct?
A. No, I said to see what had changed.
Q. To see what had changed, exactly.
Okay. So I've taken the liberty here of opening up the preliminary detailed specification to section 3.8.2, which concerns the main landing gear.
And here is from tab 29 in your binders, which is dash nine, which you testified earlier is the detailed specification that applied to the mishap helicopter.
And -- so can you look at the language of -- I'll do it just one-by-one.
Starting with 3.8.2.1, can you tell me whether any changes were made in between the preliminary spec and the dash nine revision?
A. (Comparing documents.)
3.8.2.1 --
Q. Right.
A. -- appear to be the same in the dash three specification and the dash nine specification.
Q. All right. And when you say "dash three specification," that's the preliminary specification?
A. The dash three was -- I have a copy of the

preliminary, but it was a signed-out specification.
I don't know if I have one signed, but there is one
signed.

Q. Okay. Putting aside the issue of the signature, when you say "dash three," that's actually the preliminary. And then dash 3-9 would be the -- how one would read the revision that applied to our helicopter?

A. Correct.

Dash three was a preliminary -- I misspoke, I'm sorry. The dash three specification was preliminary. I don't know if it was signed or not.

But the 3-1, which was also in use at the same time, was in fact signed out.

The changes between the 552-3 and the 552-3-9, the wording in 3.8.2.1 is -- appears to be identical.

Q. Okay. So moving on to 3.8.2.5. Can you compare the language of those -- in those two specifications?

A. "Retracting, extending and locking," it says "applicable."

"Retracting, extending and locking" it says "applicable."

They appear to be the same.

Q. Just that one word, "applicable"; correct?
A. "Applicable, applicable."
Q. And then the next provision, 3.8.2.5.1.
A. Yes.
Q. Are those the same language?
A. They are.
Q. And is it just the single word "applicable" in both versions?
A. Correct.
Q. Okay. And then on the -- the next sub provision is 3.8.2.5.2.
Are you able to compare the language between the preliminary detailed specification and the dash nine revision specification?
A. (Comparing documents.)
3.8.2.5.2, just that one?
Q. Uh-huh.
A. And in that one the words appear to be identical.
Q. Okay. And then the next one down ending in point three, are -- is that the same between both versions in front of you?
A. It is.
Q. And just the single word "applicable"?
A. Correct.

Q. And then the next line ending in point four titled "alighting gear switches," do both versions contain just the single word "applicable"?
A. Yes.
Q. Meaning there were no changes --
A. There were no changes.
Q. -- to that?
And then going down to 3.8.4 with the title "Auxiliary Landing Gear Nose Wheel."
A. Uh-huh.
Q. Then the point one subsection contains a description. Can you compare those two descriptions and tell me whether there were any changes.
A. (Comparing documents.)
3.8.4.1 are the same in both of the two specifications.
Q. Okay. And then going down to the -- to 3.8.4.5, can you compare the language between those two?
A. And 3.8.4.5 appear to be identical.
Q. Okay. So "retracting and sending and locking system" is followed by just the single word "applicable" in both versions; correct?
A. Correct.
Q. Okay. So in other words, no changes were

made to the language of the detailed specification with respect to any of those features from -- in between the preparation of the preliminary detailed specification and the active detailed specification that applied to the mishap aircraft; correct?

A. In the paragraphs we read, that is correct.

Q. Okay. Now, I'm going to turn your attention to that same series of provisions in the dash ten specification.

And can you just look at 3.8.2.1 and tell me whether any changes were made.

MR. HUNT: Excuse me. What are you asking? Dash ten to what?

MR. SHEPARDSON: Well, we've already established that the preliminary and the dash nine revision are the same. So now I'm asking him to compare --

MR. HUNT: Dash ten?

MR. SHEPARDSON: -- that language to the dash ten.

THE WITNESS: 3.8.1, okay.

BY MR. SHEPARDSON:

Q. I think 3.8 point ... yeah, yup.

A. Point one?

Q. Right.

preliminary detailed specification with the dash nine revision. Can you compare 3.8.1 and ascertain whether they are the same or different?
A. (Comparing documents.)
3.8.1 in the SD552-3 specification and 3.8.1 in the SD552-3-9 specification appear to be identical.
Q. Okay. So now comparing that language to the language in 3.8.1 of the dash ten revision --
A. Uh-huh.
Q. -- glancing at that, can you tell whether it's the same or different?
A. (Comparing documents.)
Okay. The identical paragraph does appear to be different, but they also appear to be different in the subject material.
Q. I'm sorry, I didn't --
A. The Alighting Gear, 3.8.1 --
Q. Right.
A. -- says in the dash three specification --
Q. Uh-huh.
A. -- "shall" -- says -- talks about retractable dual landing gears.
Q. Right.
A. Paragraphs -- which there is no particular

Case 3:13-cv-00331-GPC-KSC Document 173-6 Filed 07/06/17 PageID.9525 Page 30 of 32



Q. I'm not asking you to speculate, I'm just saying whether you know based on your experience.

A. Then the person that wrote it would know, not me.

Q. Okay.

So now working our way back to Appendix B of your report, page twelve, you say that:

"The U.S. Navy makes its own decision on who will design, develop, test and install anything on the helicopter. Any change done by anyone other than the U.S. Navy must have a contract to do so."

Okay. You say that the U.S. Navy makes its own decision on who will design anything on the helicopter. Do you know whom the U.S. Navy choose to design the landing gear wiring harness of the CH-53 Echo helicopter?

A. The CH-53E main landing gear was directed by the Navy to be identical to the CH-53E -- RH-53D main landing gear, which I have documented in multiple -- under item -- under 14.

And so they gave us the RH-53D landing gear consistent with the utilization of a common item and achieved their goal of commonality by use of every

system including the main landing gear.
Q. Okay. And when you say "us," you mean Sikorsky?
A. Sikorsky. I apologize, yes.
Q. So -- now, you just made reference to your references under section 14 --
A. Correct.
Q. -- correct?
And you say that those concern the RH-53 Delta?
A. Correct.
And the CH-53 Echo.
Q. Okay. So do you know whom the Navy chose to design the landing gear wiring harness of the RH-53 Delta?
A. I have no recollection. I was not even in the program at that time.
However, they did have it and they told us to use it.
Q. Okay.
Okay. So turning to Exhibit C --
Actually, I'm sorry, turning back to your executive summary.
A. Uh-huh.
Q. Number three in that executive summary

Q. Does one come to mind other than the landing gear?

A. The utility hydraulic system controls exactly what it says. It controls the ramp. It controls the landing gear. It controls the ... I used to have them all down here ... it powers half of one of the other systems. It powers ...

Yeah, I can't remember the -- I think there's five systems it takes care of. I would have to look them up to be sure.

Q. Does it exert any powering function over any of the engine?

A. Engine start.

Q. Engine start?

A. Uh-huh.

Q. Okay. Do you know whether the 53 Echo has the same number or different number of engines than the 53 Delta?

A. The 53 Echo has three engines; Delta has two engines.

Q. Okay. So would the utility hydraulic module necessarily have to have changed its configuration in order to provide an engine start function to that third additional engine?

A. It's -- I don't know that for sure, but if