1  **James W. Hunt – SBN 122582**
   james.hunt@fitzhunt.com
2  **Christopher S. Hickey – SBN 198938**
   christopher.hickey@fitzhunt.com
3  **FITZPATRICK & HUNT,**
   **PAGANO, AUBERT, LLP**
4  633 West Fifth Street, 60th Floor
5  Los Angeles, CA 90071
   Tel.: (213) 873-2100 / Fax: (213) 873-2125
6

7  Attorneys for Defendants
   **SIKORSKY AIRCRAFT CORPORATION**
8  **AND UNITED TECHNOLOGIES CORPORATION**

9              **UNITED STATES DISTRICT COURT**

10            **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 | D.F., a minor, by and through his | Case No. 13-cv-00331-GPC-KSC
13 | Guardian Ad Litem, TASHINA |
   | AMADOR, individually and as successor | Judge:  Hon. Gonzalo P. Curiel
14 | in interest to Alexis Fontalvo, deceased, | Magistrate:  Hon. Karen S. Crawford
   | and T.L., a minor, by and through her |
15 | Guardian Ad Litem, TASHINA | **MEMORANDUM OF POINTS AND**
   | AMADOR, | **AUTHORITIES IN SUPPORT OF**
16 | | **SIKORSKY'S MOTION *IN LIMINE***
17 | Plaintiffs, | **NO. 3 - MOTION TO EXCLUDE**
   | | **OPINIONS OF PLAINTIFFS'**
18 | vs. | **EXPERTS COFFMAN AND**
   | | **BLOOMFIELD, AND TESTIMONY**
19 | SIKORSKY AIRCRAFT | **OF DU PONT EXPERT REYNOLDS**
   | CORPORATION, et al., |
20 | | *[Filed Concurrently with Notice of*
21 | Defendants. | *Motion and Motion; Declaration of*
   | | *Christopher S. Hickey*
22

23                          Date:      April 6, 2018
24                          Time:      1:30 p.m.
                            Courtroom: 2D
25

26

27

28

---

MEMORANDUM OF POINTS AND AUTHORITIES, MIL NO. 3

CASE NO. 13-cv-00331-GPC-KSC

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Pursuant to Federal Rules of Evidence 401, 402, 403 and 702(b), the following opinions of Plaintiffs' wiring expert, Arthur Lee Coffman, and electrical systems expert, John Bloomfield, must be excluded[1], as well as the deposition testimony designated by Plaintiffs of Joseph Reynolds, an electrical systems expert retained by former defendant Du Pont de Nemours and Co. ("Du Pont").

### A.   Mr. Coffman's Manufacturing Compliance Opinion

Mr. Coffman opines in his Rule 26 Report that "the installation of the main landing gear hydraulic wiring [on the subject aircraft] was non-compliant with Military Specification Mil-W-5088F section 3.11.7," at the time the aircraft was manufactured by Sikorsky, and delivered to the Department of Defense in 1990. (*See* Coffman Rule 26 Report, attached as Ex. A to Hickey Decl., at p. 3; *see* ECF No. 164-13, Form DD-250.)   There is no evidentiary basis for Mr. Coffman's opinion in this regard.   On the contrary, the DD-250 form—issued by the government at the time of delivery—verifies that the aircraft met design criteria, and that it was manufactured properly.   (Leigh Dep., attached as Ex. B to Hickey Decl., at 70:6-71:25.)   No witnesses have contradicted this form by testifying that the wiring system was not installed properly, nor are there any documents or photographs evidencing the installation of the wiring at the time the military inspected and accepted the aircraft.

Mr. Coffman's opinion is based exclusively on the testimony of Marine Corps investigator Sergeant Robert Wuthrich regarding the post-accident condition of the wiring in 2011, *21 years later*, at which time Mr. Wuthrich found that the wires "lacked proper strain relief."   (Ex. A at p. 3.)   However, there is uncontroverted evidence that the subject wiring system was altered in the interim. Of particular

---

[1] Although the Court considered some of this evidence in the context of Sikorsky's *Daubert* motion, the Court stated at the October 20, 2017 hearing that it would further consider the admissibility of these experts' testimony at the time of trial.   (*See* Transcript of Hearing, attached as Ex. F to Hickey Decl., at 29:12-19.)

1   significance is a record of maintenance completed on January 17, 2011 (two months
2   before the accident), which describes the subject wire bundle as a "twisted mess,"
3   leading to the corrective action of, "properly secured wire bundle in left e-bay lower
4   shelf as required.  Installation checks good IAW 420-000."  (MIL073170, filed
5   under seal at ECF No. 148, and lodged with the Court at ECF No. 149.)
6   Additionally, Navy witness Keith Sparks testified that the 70 inches of wire from
7   the utility module forward had been replaced as part of "Phase 1" of the Navy's
8   Kapton program.  (Sparks Dep., attached as Ex. C to Hickey Decl., at 56:4-9.)  Mr.
9   Coffman's foundational assumption that the condition of the wiring system
10  remained unchanged for 21 years is directly contradicted by this evidence.  As a
11  result, his opinions regarding Sikorsky's installation of the wiring in 1990 must be
12  excluded as unreliable under Rule 702(b).  *See Richter v. Hickman,* 578 F.3d 944,
13  987 (9th Cir. 2009) ("an expert's opinion may not be based on assumptions of fact
14  without evidentiary support, or on speculative or conjectural factors") (citation
15  omitted).  Mr. Coffman's anticipated testimony about wire installation must also be
16  excluded under Rule 403, as any probative value of this speculative testimony is far
17  outweighed by the danger that the jury will be misled into believing that installation
18  of the wires at the time of the accident was identical to Sikorsky's installation of the
19  wires 21 years earlier, which is contrary to the actual evidence.

20      **B.      Mr. Coffman's Opinion re: Condition of the Kapton Wiring**

21      Mr. Coffman further opines, without any explanation, that "[t]he damage to the
22  Kapton wire in the subject helicopter is consistent with scraping and tearing due to
23  being removed from the helicopter after the accident." (*See* Ex. A at pp. 2-3.) Once
24  again, his opinion is not supported by any facts or data.  There were 367 inches of
25  Kapton wiring controlling operation of the main landing gear. (ECF No. 164-11,
26  Wakefield Decl. at ¶ 25, Ex. 20.) Mr. Coffman does not identify the specific
27  portion(s) of the wire regarding which he opines, either with photographs or a
28  description.  He does not explain how the act of removing wire from the helicopter

would cause the observed "scraping and tearing," nor does he consider other possible causes of the observed damage, such as maintenance performed on the very wire bundle at issue, as discussed above.  Mr. Coffman admits he was not present when the wire was removed, and he has not pointed to any evidence from those present in support of his opinion.  As a result, Mr. Coffman's speculative statement regarding the cause of damage to unspecified portions of the Kapton wire is a classic *ipse dixit*, and must be excluded under Rule 702(b) as unreliable.  *See Guidroz–Brault v. Mo. Pac. R. Co.,* 254 F.3d 825, 830-31 (9th Cir. 2001) (excluding expert testimony "not sufficiently founded on the facts" of the case).

Furthermore, because Mr. Coffman did not identify the specific Kapton wire damage that he attributes to removal from the aircraft, he should not be permitted to now offer photographs and detailed explanations of specific points of damage to a jury at trial.  Fed. R. Civ. P. 37(c)(1); (ECF No. 216 ("MSJ Order") at 38: "[t]o the extent that Coffman has withheld any material opinions, Sikorsky is correct that they should be excluded," under FRCP 37(c)(1).)  Without such demonstration, Mr. Coffman's bare statement about unspecified damage is of very slight probative value, and is far outweighed by the danger that the jury will be confused or misled into believing that all damage to the 367 inches of Kapton wiring was caused by removal from the aircraft, for which there is no evidence.  As a result, Mr. Coffman's testimony must also be excluded as unfairly prejudicial under Rule 403.

### C.     Mr. Coffman's Opinion re: "Intermittent" Electrical Signal

Mr. Coffman further opines in his Rule 26 report that electrical arcing "would have created intermittent unpredictable electrical signal" to the main landing gear retraction system, "creating a situation in which the main landing gear down lock pin could be removed with no resistance, as it should be, one moment, then causing the pin to become difficult if not impossible to remove the next moment."  (Ex. A at p. 3.)  This opinion, too, is not supported by any facts or data.  Mr. Coffman does not cite any evidence of an "intermittent" pattern as he describes, nor does he

1    identify a source for information that any such pattern existed.  Indeed, no witnesses

2    to the events and no documents identify an occurrence, much less a pattern, where

3    the landing gear safety pin became stuck "one moment," and loosened the next.

4    Additionally, Mr. Coffman provides no explanation for how the electrical signal

5    could have become "intermittent" and "unpredictable," as he claims.  Mr. Coffman

6    has essentially invented a fact, which he then relies upon to form his opinions.  This

7    is entirely unreliable, and will only serve to confuse and mislead the jury on the

8    evidence, resulting in unfair prejudice to Sikorsky.  It should therefore be excluded

9    under Rules 702(b) and 403.  *See Richter v. Hickman,* 578 F.3d 944, 987 (9th Cir.

10   2009) ("an expert's opinion may not be based on assumptions of fact without

11   evidentiary support, or on speculative or conjectural factors" (citations omitted)).

12        This testimony is also irrelevant because Plaintiffs do not dispute that Sgt.

13   Fontalvo "had trouble removing the safety pin," "tried again to forcibly remove the

14   stuck safety pin," and ultimately "forced the safety pin out."  (ECF No. 173-1 at pp.

15   2-3.)  Because the pin was undisputedly stuck at the time Sgt. Fontalvo forced it

16   out, whether the signal was intermittent (for which there is no evidence) is

17   immaterial and such evidence must be excluded under Rules 401 and 402.

18        **D.    Mr. Bloomfield's Opinion re: Source of Energy to the "Up" Wire**

19        Mr. Bloomfield opines that the uncommanded landing gear retraction was

20   caused by energy inadvertently transferring from an energized Spec-55 "down

21   wire" (which commands the landing gear to lower) to the Spec-55 "up wire" (which

22   commands the landing gear to retract), due to matching spots of bare wire on those

23   specific Spec-55 down and up wires coming into contact. (Bloomfield Dep.,

24   attached as Ex. D to Hickey Decl., at 114:25-116:9.)  However, Mr. Bloomfield has

25   no evidentiary basis for this opinion.  There is no evidence that these up and down

26   wires were touching, or even capable of touching, at the time of the accident, and

27   the assumption that they were is nothing more than speculation to support Mr.

28   Bloomfield's hypothesis.  Mr. Bloomfield cannot identify a degraded spot on the

1    down wire that matches up with a degraded spot on the up wire (*id*. at 133:15-

2    134:5)—as is necessary to support his theory that voltage passed between the two—

3    and admits that no one has identified such a spot. (*Id*. at 138:16-22.) As this Court

4    stated in its MSJ Order, "[n]o one who investigated the accident was able to

5    determine the exact source of the energy" to the up wire. (ECF No. 216 at 33.)

6        Additionally, Mr. Bloomfield's theory is premised on the idea that the down

7    wire was itself energized at the time of the accident, for which there is no evidence.

8    When asked why he believes it was energized, he answered "because that's the only

9    place that the 494 up wire could have gotten 28 volts." (Bloomfield Dep. at 141:15-

10   21.) However, he then admitted that he does not know what other wires were

11   bundled with the up wire, and therefore cannot reliably narrow the source of energy

12   to any one wire. (*Id*. at 152:6-15.) Moreover, Mr. Bloomfield was forced to

13   acknowledge that a component called the cam limit switch shuts off energy to the

14   down wire when the aircraft is on the ground, as it was here. (*Id*. at 147:3-13.) Mr.

15   Bloomfield's theory is therefore only viable if the cam limit switch did not function

16   as designed, and yet he cannot point to any evidence of a malfunction, nor was any

17   such malfunction mentioned in his Rule 26 report. (*Id*. at 147:14-17, 149:5-8.)

18   Instead, Mr. Bloomfield merely speculates that, "we could have a limit switch – a

19   cam limit switch that wasn't perfectly adjusted," for no other reason than the simple

20   fact that his entire theory of causation depends upon it. (*See id*. at 147:22-23.)

21       Because Mr. Bloomfield's speculative opinion about how the "up" wire

22   became energized is not supported by sufficient facts or evidence, it is unreliable

23   and inadmissible under Rule 702(b). *See Guidroz–Brault v. Mo. Pac. R. Co.,* 254

24   F.3d 825, 830-31 (9th Cir. 2001) (excluding expert testimony that "was not

25   sufficiently founded on the facts" of the case). The parties do not disagree that

26   errant electricity, from an unknown source, energized the "up" wire and caused the

27   landing gear to retract, and Sikorsky is not attempting to prevent Mr. Bloomfield

28   from so testifying. However, he should not be permitted to tell the jury that a

specific section of a specific wire (Spec-55 "down" wire) was the source of that energy, when there is no evidence to support his theory.  Nor should Plaintiffs be able to rely upon this speculative "expert" testimony to meet their burden of proof on causation.  Admission of Mr. Bloomfield's testimony will only serve to confuse and mislead the jury regarding the actual evidence of what caused the landing gear to retract, and it must therefore also be excluded under Rule 403.

### E.     Mr. Bloomfield's Alternative Design Opinions

Mr. Bloomfield also proposes several alternative "theories" or "philosophies"—his own words—regarding the design of the Electric Wiring Interconnect System (EWIS) and other components. (Bloomfield Rule 26 Report, attached as Ex. E to Hickey Decl., at ¶¶ 22-25.)  However, his proposals are so theoretical in nature that Sikorsky is not able to test or evaluate them for feasibility, rendering them unreliable and inadmissible under Rule 702. *See Eisenbise v. Crown Equipment Corp.*, 260 F.Supp.3d 1250, 1259 (S.D. Cal. 2017) ("[T]he reliability of an expert's theory turns on whether it 'can be tested'" (internal citations omitted.)) Because Mr. Bloomfield has refused to provide sufficient information regarding his ideas for them to be understood, tested or analyzed for feasibility, his testimony must be excluded under Rule 403 as unfairly prejudicial.[2]  *See Eisenbise*, 260 F.Supp.3d at 1259-60 (allowing alternative design opinion of the plaintiff's expert, where the theory was *capable* of being tested but the defendant chose not to test it).

### 1.     Redundant Wiring

Mr. Bloomfield's first proposal is to install parallel redundant wires for each function of the landing gear system, and require both wires to agree before a particular system is activated.  (Ex. E at ¶ 22.)  He admitted at his deposition that "I'm not redesigning anything…. The design is the design.  I'm making this thing

---

[2] Mr. Bloomfield submitted a declaration in opposition to Sikorsky's *Daubert* Motion, in which he describes his alternative proposals in general terms. (ECF No. 168-13.) This declaration is not a supplemental Rule 26 report, and therefore has no evidentiary value in this case.

1  safer.  I'm not designing an alternative design." (Bloomfield Dep. at 176:14-19.)

2  Referring to his idea as an "alternative philosophy," he admitted that he "wasn't

3  designing a system," and had not fully thought through all of the components that

4  the system would need to function properly with redundant wires.  (*Id*. at 176:2-8.)

5  Mr. Bloomfield refused to draw a schematic of his proposed "philosophy" during

6  his deposition.  (*Id*. at 168:16-169:5.)  Although he espouses that this design is used

7  in "dozen[s] of aircraft systems from all aircraft manufacturers," he was unable to

8  identify any aircraft manufacturer who uses redundant wires to actuate the landing

9  gear system, stating "I didn't research that."  (*Id*. at 167:10-12, 167:24-168:4.)

10    Furthermore, Mr. Bloomfield has not explained how redundant wires would fit

11  into the existing system of electrical safety interlocks.   Without a clear

12  understanding of how Mr. Bloomfield proposes to redesign the existing system, his

13  theory is incapable of being tested.  As a result, his philosophical and speculative

14  alternative design opinion must be excluded as unreliable under Rule 702, and as

15  irrelevant and unfairly prejudicial under Rules 402 and 403.

16         **2.    Hydraulic Utility Module**

17    Mr. Bloomfield also proposes to redesign the hydraulic utility module with the

18  "up" and "down" control valves on opposite sides of the module, and with the "up"

19  and "down" wires physically separated into different wire bundles.  (Ex. E at ¶ 23.)

20  Again, Mr. Bloomfield referred to this idea as a "theory" and a "philosophy more

21  than a detail."   (Bloomfield Dep. at 191:9-15.)   He could not explain at his

22  deposition how the utility module is currently designed, nor could he give a precise

23  description of how he would redesign it:

24         Q: So you're assuming that the connectors are currently on the same side of the
             mechanism … correct?
25         A: Correct
26         Q: Okay.  So you believe from other pictures that they're on the same side of
             the mechanism, correct?
27         A: I think so.  And if they are, they shouldn't be … is what I'm saying.
28         …

1    (*Id*. at 189:9-190:18.)  Mr. Bloomfield's inability to provide any concrete

2    specifications regarding his proposal makes it impossible for Sikorsky to determine

3    whether it is feasible.  As a result, his testimony in this regard is unreliable, and

4    should be excluded under Rule 702.  Mr. Bloomfield's speculative and unreliable

5    "theory" regarding a redesign of the hydraulic utility module must also be excluded

6    as irrelevant, confusing and unfairly prejudicial under Rules 401, 402 and 403.

7                    **3.    Radio (or Radar) Altimeter**

8         Mr. Bloomfield next proposes use of the radio altimeter as yet another safety

9    interlock to prevent uncommand retraction of the main landing gear, by measuring

10   the distance of the aircraft from the ground.  (Ex. E at ¶ 24.)  Again, Mr. Bloomfield

11   has provided no specifics regarding the actual change he proposes, and testified

12   only in vague terms about the design—which he again referred to as a

13   "philosophy."  (Bloomfield Dep. at 198:19-206:3.)  He explained the theory of how

14   a Radio Altimeter might break an electrical circuit based on distance from the

15   ground, but when asked what additional components would be required to

16   implement this, he responded that "a piece of wire, a comparator and relay" are the

17   basic building blocks, but "there may be another little piece here, another little piece

18   there … this is an alternative philosophy that will work because they're already

19   using it.  Maybe I need a transistor here.  I don't know yet."  (*Id*. at 203:17-204:20.)

20   This testimony clearly shows that Mr. Bloomfield has only a flimsy grasp of his

21   own untested concept.   Furthermore, he again did not provide a diagram or

22   schematic of a proposed altered radio altimeter in his report, and he refused to

23   sketch out the design theory at his deposition.  (*Id*. at 208:22-209:15.)  As with his

24   other ideas, Sikorsky is not able to test this design or evaluate its feasibility without

25   more information than Mr. Bloomfield is willing or able to provide.  As a result, his

26   testimony in this regard should be excluded as unreliable under Rule 702, and as

27   irrelevant and unfairly prejudicial under Rules 402 and 403.

28

### 4. Tool to Extract Landing Gear Pin

The last idea proposed by Mr. Bloomfield is not a change to the design of the wiring system or the aircraft, but rather a separate tool or device that he claims can be used to extract a resistant landing gear safety pin without standing under the aircraft. (Ex. E at ¶ 25.) However, the safety pin provides an important mechanical interlock, whose main purpose is to prevent uncommanded retraction of the landing gear. If it is stuck, it should not be pulled out—by hand or with a tool—but instead the aircraft should be sent to maintenance to determine the problem. Mr. Bloomfield's proposal that Sikorsky should have provided a tool to bypass its own safety device borders on the absurd.

Furthermore, once again, Mr. Bloomfield's proposed "tool" for removing a landing gear safety pin is nothing more than a figment of his imagination, which lacks any indicia of reliability and should be excluded under Rule 702. Mr. Bloomfield has not produced a diagram or a prototype to demonstrate that his invention would actually be able to pull out a landing gear safety pin, whether stuck or unstuck, nor can his theory be tested without concrete information about the proposed design. Furthermore, while Mr. Bloomfield touts his "experience" with safety pins as a basis for his design, he is entirely unfamiliar with the CH-53E landing gear safety pin mechanism. He testified that he has never pulled a safety pin from a CH-53E landing gear, and has only witnessed such a pin being pulled one time, during an inspection for this litigation. (Bloomfield Dep. at 219:24-220:7 and 221:10-14.)

In sum, Mr. Bloomfield's design change opinions are nothing more than vague notions that should not be presented to the jury. Mr. Bloomfield is unable, or unwilling, to provided sufficient information for his ideas to be tested or evaluated by Sikorsky for feasibility. Consequently, his fanciful "theories" or "philosophies" must be excluded as unreliable under Rule 702, and as irrelevant and unfairly prejudicial under Rules 402 and 403.

1

### F. Joseph Reynolds

2 Before being dismissed from the case, defendant Du Pont designated Joseph

3 Reynolds as an electrical systems expert. Mr. Reynolds was not designated as an

4 expert by Plaintiffs, who instead designated John Bloomfield as their electrical

5 systems expert. However, Plaintiffs now seek to present the majority of Mr.

6 Reynold's deposition testimony (approximately 214 pages of his 278-page

7 transcript) to the jury at trial, in addition to presenting the live testimony of Mr.

8 Bloomfield. By doing so, they propose to present two electrical engineering

9 experts, who practice in the same specialty, reviewed the same evidence, and will

10 offer opinions on the same substantive issues. Regardless of whether their opinions

11 are consistent, this overlapping expert testimony is needlessly cumulative, and will

12 only result in a waste of time and unfair prejudice to Sikorsky. Under Rule 403,

13 Plaintiffs should only be permitted to present the testimony of one electrical

14 systems expert, not two. Sikorsky therefore requests an order *in limine* precluding

15 the presentation of Mr. Reynolds' deposition testimony at trial.[3]

16

### G. Conclusion

17 For the foregoing reasons, Sikorsky respectfully requests that this Court grant

18 its Motion *in Limine* No. 3 to exclude the speculative and unreliable opinions of

19 Plaintiffs' experts under Rules 402, 403 and 702, and to exclude the testimony of

20 Mr. Reynolds as needlessly cumulative, a waste of time, and unfairly prejudicial

21 under Rule 403.

22 Dated: March 23, 2018

**FITZPATRICK & HUNT,**
**PAGANO, AUBERT, LLP**

23

24 By: /s Christopher S. Hickey

25 James W. Hunt

26 Christopher S. Hickey
Attorneys for Defendants

27

28

[3] Sikorsky reserved the right to object to specific testimony from this witness on evidentiary grounds prior to its presentation to the jury, should the Court deny this motion.